**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**BRIDGEPORT DIVISION**

-------------------------------------------------------x
                :

In re:                :       Chapter 11

                :

HO WAN KWOK, *et al.*,[1]    :       Case No. 22-50073 (JAM)

                :

      Debtor.      :       (Jointly Administered)

-------------------------------------------------------x
                :

LUC A. DESPINS, Chapter 11 Trustee,  :      Adv. Proceeding  24-_____

                :

      Plaintiff,    :       February 15, 2024

                :

v.                :

                :

HING CHI NGOK, MEI GUO, QIANG  :
GUO, WILLIAM JE, YVETTE WANG,  :
XUEBING WANG, MAX KRASNER,  :
CHUNGUANG HAN, YONGBING  :
ZHANG, AARON MITCHELL, RULE OF  :
LAW FOUNDATION III, INC., GTV  :
MEDIA GROUP, INC., SARACA MEDIA  :
GROUP, INC., HUDSON DIAMOND NY  :
LLC, G-CLUB US OPERATIONS LLC,  :
BRAVO LUCK LIMITED, GREENWICH  :
LAND LLC, CRANE ADVISORY GROUP  :
L.L.C., G-CLUB OPERATIONS LLC, GS  :
SECURITY SOLUTIONS INC., GYPSY  :
MEI FOOD SERVICES LLC, HCHK  :
TECHNOLOGIES INC., LEXINGTON  :
PROPERTY AND STAFFING,  :
HAMILTON OPPORTUNITY FUND SPC,  :
HUDSON DIAMOND NY LLC, TAURUS  :

---

[1]    The Debtors in these chapter 11 cases are Ho Wan Kwok (also known as Guo Wengui, Miles Guo, and Miles Kwok, as well as numerous other aliases) (last four digits of tax identification number: 9595), Genever Holdings LLC (last four digits of tax identification number: 8202), and Genever Holdings Corporation. The mailing address for the Trustee and the Genever Debtor is Paul Hastings LLP, 200 Park Avenue, New York, NY 10166 c/o Luc A. Despins, as Trustee for the Estate of Ho Wan Kwok (solely for purposes of notices and communications).

FUND LLC, TAURUS MANAGEMENT    :
LLC, LEADING SHINE NY LTD., ACA    :
CAPITAL GROUP LIMITED, RULE OF    :
LAW FOUNDATION III, INC., RULE OF    :
LAW SOCIETY IV, INC., HAMILTON PE    :
FUND SP, HAMILTON DIGITAL    :
ASSETS FUND SP, HIMALAYA    :
CURRENCY CLEARING PTY. LTD,    :
HIMALAYA INTERNATIONAL    :
FINANCIAL GROUP LIMITED, HOLY    :
CITY HONG KONG VENTURES, LTD.,    :
VICTOR CERDA, ANA C. IZQUIERDO-    :
HENN, HAITHAM KHALED, JESSICA    :
MASTROGIOVANNI, ALEX    :
HADJICHARALAMBOUS, BEILE LI,    :
ANTHONY DIBATTISTA, GLADYS    :
CHOW, SCOTT BARNETT, HAORAN    :
HE, HSIN SHIH YU, LIMARIE REYES    :
MOLINARIS, NICHOLAS SAVIO,    :
QIDONG XIA, YAN CHUN LIU,    :
XUEBING WANG, ACA CAPITAL    :
GROUP LIMITED, GETTR USA, INC., G    :
CLUB INTERNATIONAL LIMITED,    :
GNEWS MEDIA GROUP INC.    :
HIMALAYA INTERNATIONAL    :
CLEARING LTD., HUDSON DIAMOND    :
HOLDINGS LLC, LAWALL &    :
MITCHELL, LLC, O.S.C. ORBIT    :
SERVICE COMPANY LLC, and SAVIO    :
LAW LLC    :
    :
                    Defendants.    :
---------------------------------------------------------x

**COMPLAINT OF CHAPTER 11 TRUSTEE FOR DAMAGES FOR
VIOLATIONS OF THE RACKETEERING INFLUENCED CORRUPT
ORGANIZATIONS ACT AND CONSPIRACY TO VIOLATE
THE RACKETEERING INFLUENCED CORRUPT ORGANIZATIONS ACT**

Luc A. Despins, in his capacity as the chapter 11 trustee (the "Trustee") appointed in the chapter 11 case (the "Chapter 11 Case") of Ho Wan Kwok (the "Debtor" or "Kwok"), files this adversary complaint (the "Complaint") against the defendants identified below as parties to this action (collectively, the "Defendants") and states as follows:

## NATURE OF ACTION

1.  The Trustee brings this Complaint to recover damages suffered by the Debtor's creditors as a result of an extensive, years' long racketeering conspiracy involving multiple fraudulent schemes facilitated by the Defendants in violation of the Racketeer Influenced and Corrupt Organization Act of 1970 ("RICO").

2.  As the Court well knows, the Debtor is a self-proclaimed Chinese dissident, who, prior to his bankruptcy filing on February 15, 2022 (the "Petition Date"), long claimed on social media and elsewhere to be a billionaire with access to nearly unlimited resources. This action relates to how the Debtor and his co-conspirators were able to amass vast amounts of money and then, through widespread criminal conduct, use it to enrich themselves while hiding it from the Debtor's creditors.

3.  As alleged herein, since at least 2015, the Debtor and the Defendants have operated a racketeering enterprise (the "Kwok Enterprise") through an extensive worldwide network of shell companies with the goal of enriching the Debtor, his family members, and his close associates, while concealing the true nature and extent of the Debtor's wealth from his creditors and preventing them from being repaid. As a result, the Debtor and those close to him have enjoyed all the trappings and luxury of a billionaire's lifestyle—from private jets, to luxury super yachts, to $10,000 suits, to multiple palatial residences, and much, much more—while the Debtor's

creditors, who over the years have amassed hundreds of millions of dollars in claims against him, have been left with nothing.

4.      Chief among the Debtor's creditors is Pacific Alliance Asia Opportunity Fund, L.P. ("PAX"), which, as of 2015, held a claim of approximately $50 million against the Debtor under a personal guarantee (the "2011 Personal Guarantee") of a loan to one of the Debtor's companies.  In or around April 2017, PAX filed suit against the Debtor in New York state court to recover on the 2011 Personal Guarantee and, in September 2020, obtained summary judgment on the debt, which by then had increased to approximately $115 million, due to the accrual of interest. Meanwhile, other creditors have asserted serious and material claims against the Debtor related to, among other things, defamation and sexual assault.  In or around September 2017, one such creditor, Rui Ma, filed suit against the Debtor in New York seeking approximately $20 million in damages on various tort claims.  Other creditors based in China also commenced litigation against the Debtor in the United States as early as 2017, alleging that the Debtor had left them holding the proverbial "bag" in China.

5.      In addition to the Debtor's huge debts owed to creditors, another key part of the backdrop for the Kwok Enterprise (but not part of the enterprise itself) is a series of fraudulent money-raising schemes beginning in approximately 2020, which the Debtor and others used to further enrich the Debtor and fund his extravagant lifestyle.  To support these schemes, the Debtor and his supporters first developed and distributed, primarily through social media, a compelling (and false) narrative in which the Debtor both flaunted his enviable lifestyle and pledged to lead a sociopolitical movement to "take down" the Chinese Communist Party (the "CCP").  The Debtor and others then used this narrative to attract investments or donations from their victims, who often

consisted of members of the Chinese diaspora aligned with the Debtor's purported anti-CCP cause and/or persons who were impressed (and fooled) by the Debtor's boasts of immeasurable wealth.

6.      These money-raising schemes, which collectively defrauded victims of hundreds of millions of dollars, included soliciting sham investments in a purported cash-for-stock loan program (the Farm Loan Program),[2] encouraging the purchase of "memberships" in a lifestyle club based on the false promise of member benefits (G-Club), and creating a fake cryptocurrency and related exchange platform (the Himalaya Exchange). While the victims were promised returns on their investments—whether in the form of interest payments, membership benefits, support for political causes, or otherwise—the Debtor and the other participants in the schemes fraudulently diverted the proceeds for their own personal gain.

7.      Against the backdrop of both his creditors' claims and the Debtor's fraudulent money-raising initiatives, the Debtor and his co-conspirator Defendants established the Kwok Enterprise for the purpose of concealing and shielding the Debtor's vast wealth—including both the proceeds of the investment schemes and assets the Debtor acquired independent of those schemes—from his creditors. The Debtor and his co-conspirator Defendants have accomplished this goal by creating a complex, worldwide network of interconnected shell companies and bank accounts that they use to both launder money (to conceal its fraudulent origin) and hold title to assets—such as the Debtor's luxury yacht, the "Lady May" (pictured below), his private Bombardier jet, and his many homes, including his nearly 50,000 square foot mansion in Mahwah, New Jersey (pictured below, the "Mahwah Mansion")—under the veil of corporate separateness. In reality, these shell companies, which are typically nominally owned by one of the Debtor's

---

[2]    Capitalized terms not defined in this Preliminary Statement have the meanings ascribed to such terms in the remainder of the Complaint.

family members or close associates, are shams that exist solely to hide valuable assets and perpetuate the fraud.





8.     The Kwok Enterprise's efforts to conceal the Debtor's assets were successful for a number of years.  In 2021, however, the Kwok Enterprise's fraud started to unravel, at least in part, when PAX sought to collect on its judgment in the New York litigation by attempting to seize the

"Lady May" yacht on the basis that it belonged to the Debtor and not to the shell company nominally owned by his daughter (a Defendant in this action) that held title to it. After a trial in early February 2022, the New York court agreed with PAX that the Lady May belonged to the Debtor and found that the Debtor and those close to him had engaged in a "shell game" to hide the yacht and other assets from creditors. Because the Debtor had, despite ample opportunity to do so, failed to return the Lady May to Connecticut, the New York court imposed a daily contempt fine on the Debtor, which, by the time of trial, had ballooned to $134 million.

9.      Unable to pay the New York judgment or the contempt fine without revealing the true location and extent of the Debtor's assets, the Debtor and his Defendant co-conspirators had no choice but to deploy the next phase of their fraudulent scheme: filing a bankruptcy case in this Court on February 15, 2022, in which the Debtor falsely claimed to have only approximately $3,800 in assets to his name. The goal of the bankruptcy filing was for the Debtor to obtain the protection of the Bankruptcy Code's automatic stay to prevent PAX from continuing its judgment-enforcement efforts in New York litigation, while giving the Debtor an opportunity to consensually restructure his debts under a chapter 11 plan that could keep hidden the true nature and extent of his vast wealth and its fraudulent origins. This strategy eventually backfired, however, when the Trustee was appointed in July 2022 to conduct a comprehensive investigation into the Debtor's affairs and pursue litigation to bring assets into the estate.

10.      In response to the Trustee's appointment, the Defendant-members of the Kwok Enterprise have undertaken (and continue to undertake) numerous actions to obstruct the administration of the chapter 11 case and impede the Trustee's investigation and litigation efforts. These actions include, without limitation, lying under oath, refusing to produce documents and information to the Trustee in response to validly issued subpoenas and Court orders, filing

frivolous lawsuits in other courts, and organizing an unprecedented worldwide harassment and intimidation campaign specifically designed to interfere with the Trustee's investigation and force him to resign. The objective of the Debtor and his co-conspirator Defendants who have engaged in these activities remains the same as it was at the outset of their fraudulent schemes: to conceal their fraud and prevent the Debtor's creditors from reaching his assets.

11. Although the Debtor is and has been the mastermind behind the Kwok Enterprise, the co-conspirator Defendants have knowingly played a key role, collectively and cohesively, in directing, facilitating, and directly participating in the enterprise's various schemes for the Debtor's and their benefit. The Defendants and other non-party participants, who conspired and acted in furtherance of the Kwok Enterprise, broadly consist of (i) the Debtor, (ii) sham entities secretly owned and controlled by the Debtor, including entities funding the fraudulent scheme and entities holding assets or operating as front entities, (iii) individuals, including Kwok's family members, acting as nominees for these sham entities and engaging in additional misconduct, (iv) professionals facilitating the design and operation of the scheme, including lawyers and financial advisors, and (v) individuals otherwise participating in the scheme in various capacities, including employees of the sham entities and Kwok's followers, among others.

12. As described in detail below, the Defendants have committed a host of predicate criminal acts in carrying out the Kwok Enterprise's fraudulent schemes. These criminal acts include, among others, bank fraud, wire fraud, and violations of anti-money laundering laws. They also include bankruptcy fraud and obstruction of justice, including in particular numerous instances of obstruction of justice designed to interfere with the chapter 11 process.

13. These and other actions of the Defendants in furtherance of the Kwok Enterprise have substantially harmed the Debtor's creditors by depriving them of access to substantial assets

of the Debtor that should be available to satisfy their claims. The Debtor's creditors have further been harmed as a result of the substantial legal fees and other costs the Trustee has been forced to incur as a result of the Kwok Enterprise's fraudulent concealment of the Debtor's assets and their obstruction of the chapter 11 case. The Trustee is entitled to treble damages from the Defendants based on this harm caused to the creditors of the estate.

## JURISDICTION AND VENUE

14.     The Trustee brings this Complaint under 11 U.S.C. §§ 105, 544, 550 and other applicable law.

15.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1334(b) because this adversary proceeding arises under title 11 of the United States Code and arises in and is related to these chapter 11 cases, and under 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c) because this adversary proceeding arises under the laws of the United States, including 18 U.S.C. § 1962, and seeks recovery for injuries by reason of a violation of 18 U.S.C. § 1962.

16.     This adversary proceeding has been referred to this Court pursuant to 28 U.S.C. §157(a).

17.     To the extent that this Court does not have authority to enter final judgment on the claims asserted in this adversary proceeding, the Trustee consents to the issuance and entry of a final judgment or order by this Court.

18.     Venue of this adversary proceeding is proper in this district under 28 U.S.C. § 1409.

## PARTIES AND OTHER RELEVANT ENTITIES AND INDIVIDUALS

19.     The Trustee is the duly appointed chapter 11 trustee of the Debtor's estate pursuant to the Court's order entered on July 8, 2022 [Main Case Docket No. 523].

20.    Ho Wan Kwok, the Debtor (also known as Guo Wengui, Miles Guo, and Miles Kwok, as well as numerous other aliases), is an individual debtor who alleges to live at 373 Taconic Road, Greenwich, CT 06831.  The Debtor is currently incarcerated in Brooklyn, New York while awaiting trial on criminal racketeering and fraud charges the United States filed against him and his co-conspirators Defendants Yvette Wang and William Je.

21.    Defendant Hing Chi Ngok (a/k/a Hing Chi Ng, a/k/a Yue Qingzhi) is the Debtor's purported spouse who resides in Greenwich, Connecticut.  Ngok has nominally owned and held titles in a variety of entities that were part of the Kwok Enterprise and instrumentalities of the fraud described herein.

22.    Defendant Mei Guo (a/k/a Mei Gui) is the Debtor's daughter and lives in New York City. Mei Guo has nominally owned and held titles in a variety of entities that were part of the Kwok Enterprise and instrumentalities of the fraud described herein.

23.    Defendant Qiang Guo (a/k/a/ Mileson Kwok) is the Debtor's son and lives in London, England.  Qiang Guo has nominally owned and held titles in a variety of entities that were part of the Kwok Enterprise and instrumentalities of the fraud described herein.  Upon information and belief, Defendant Qiang Guo traveled to the United States during times relevant to the allegations in this action.  He also purposefully directed his actions toward the United States in a manner that caused harm to the Debtor's creditors in the United States.

24.    Defendant Yanping Wang (a/k/a Yvette Wang, a/k/a Y. Wang) ("Yvette Wang") is an individual who, at all relevant times, was a citizen of China principally residing in New York City.  Yvette Wang has worked for the Debtor and his family for several years, since at least in or about 2018, and has essentially operated as the "chief of staff" for the Debtor and the Kwok Enterprise.  Defendant Yvette Wang is currently incarcerated in Brooklyn while awaiting trial

regarding criminal racketeering and fraud charges the United States filed against her and her co-conspirators the Debtor and Defendant William Je.

25.    Defendant Kin Ming Je (a/k/a William Je, a/k/a Yu Jianming a/k/a W. Je) ("William Je") is an individual who, at all relevant times, was a dual citizen of Hong Kong and the United Kingdom who principally resided in the United Kingdom, while often traveling to the United States and elsewhere.  Defendant William Je has been charged by the United States with criminal racketeering and fraud alongside the Debtor and Defendant Yvette Wang.  Defendant Je remains at large and is believed to be currently located in the United Arab Emirates.  Defendant Je purposefully directed his actions toward the United States in a manner that caused harm to the Debtor's creditors in the United States.

26.    Defendant Aaron Mitchell is an individual who is alleged herein to be a Professional Participant and is the Debtor's personal attorney and has represented (individually and through his law firm, Lawall & Mitchell LLC) numerous of the Debtor's shell companies, essentially acting as the in-house general counsel for the Kwok Enterprise.  Mr. Mitchell has served the Debtor as a member of the board of directors of GTV Media Group, Inc., prior to his resignation in April 2023.  Mr. Mitchell has been intimately involved in numerous of the Debtor's major activities and transactions, including the GTV Private Placement (as defined herein), the collection of funds from the Debtor's followers through the sale of G Club memberships, ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮  Mr. Mitchell has also, upon information and belief, assisted the Debtor in coordinating the opening of foreign bank accounts for the Debtor's shell companies.  In addition, Mr. Mitchell has used the address of the Debtor and numerous of his shell companies at 162 E. 64th Street in New York as his law firm address.  He resides in New Jersey.

27.     Defendant Alex Hadjicharalambous is an individual who is alleged herein to be an Additional Participant and served the Debtor as, among other things, Financial Controller of G Club Operations, as well as holding positions at certain of the HCHK Entities and Golden Spring. Mr. Hadjicharalambous was also, among other things, a bank account signatory for G Fashion LLC, G Music LLC, and G Club Operations LLC.  Mr. Hadjicharalambous resides in New York.

28.     Defendant Beile Li has been found by the Court to be an associate of the Debtor and certain of the Defendants.  The Court also found that Beile Li actively participated in the harassment campaign against the Trustee both outside of the Trustee's residence and at entrance of Paul Hastings office at Grand Central Terminal in New York, which were enjoined by this Court pursuant to the Court's PAX PI Order.  Li is also among the plaintiffs in the frivolous, now-dismissed lawsuits filed in November 2022 against the Trustee by a group of the Debtor's supporters, which falsely accused the Trustee as being an agent of the Chinese government.

29.     Defendant Ana C. Izquierdo-Henn ("Defendant Izquierdo") is an individual who is alleged herein to be a Professional Participant and served as general counsel to G-Club Operations LLC throughout the course of the G-Club Scheme.  She resides in Puerto Rico.

30.     Defendant Anthony DiBattista is an individual who is alleged herein to be a Nominee Participant and has served in a variety of roles at different Debtor-controlled entities. Mr. DiBattista has served the Debtor as an employee of Golden Spring, minority owner and corporate officer of the HCHK Entities, and corporate officer, authorized signatory, and high level employee of GTV, among other shell entities.  Mr. DiBattista resides in New York.

31.     Defendant Chunguang Han (a/k/a "Hank" Chunguang) is an individual who is alleged herein to be a Nominee Participant and is the Debtor's household employee and chef, as confirmed by recent testimony of the Debtor's wife.  The Debtor has placed Han Chunguang in

numerous positions within the Debtor's network of shell companies, including as the former nominal owner of Eastern Profit Corporation, Anton Development, and Rosy Acme Ventures Limited.[3] Among other roles, Han Chunguang has also served the Debtor as corporate officer and account signatory of Saraca and numerous BVI-registered entities that are the subjects of the Bombardier Adversary Proceeding. He resides in New York.

32.    Defendant David Fallon is an individual who is alleged herein to be an Additional Participant.

33.    Defendant Gladys Chow is an individual who is alleged herein to be an Additional Participant and served as a purported project manager at Defendant HCHK Technologies, an entity functionally owned by the Debtor.  She resides in New York.

34.    Defendant Scott Barnett is an individual who is alleged herein to be a Professional Participant and has served as the Debtor's bodyguard and chauffer.  Upon information and belief, he resides in New York or New Jersey.

35.    Defendant Haoran He is an individual who is alleged herein to be a Nominee Participant and is believed to be a purported real estate developer residing in the United Kingdom who serves the Debtor as nominal (indirect) owner of the G-Club Entities, as discussed herein. Upon information and belief, Haoran He is a strawman of the Debtor who was selected by the Debtor to be the nominal owner of these entities precisely so as to avoid the regulatory and other scrutiny that would arise if the entities were placed in the name of the Debtor or one of his family members.  He resides in the United Kingdom.

---

[3]    Rosy Acme Ventures Limited is one of the BVI entities that is the subject of the Bombardier Adversary Proceeding.

36.    Defendant Haitham Khaled is an individual and is alleged herein to be an Additional Participant and served as a financial advisor to the Debtor and the Kwok Enterprise, directing the establishment of banking relationships within the United States and abroad. Defendant Khaled also was the owner of Crane Advisory Group LLC, a one-time licensed New York money-transmitter entity.  He resides in New York.

37.    Defendant Hsin Shih Yu is an individual who is alleged herein to be an Additional Participant. Hsin Shih Yu is has played a prominent role in Protests (as defined below) and litigation against the Trustee.  He resides in Taiwan.

38.    Defendant Jessica Mastrogiovanni is an individual who is alleged herein to be an Additional Participant and served the Debtor in multiple roles including as general counsel of GTV and as corporate officer and authorized signatory of GTV and Saraca.  She also served in an in-house legal role at G Club Operations and G Club International.

39.    Defendant Limarie Reyes Molinaris ("Defendant Reyes") is an individual who is alleged herein to be an Additional Participant and served as the putative CEO of G-Club Operations LLC.  She resides in Puerto Rico.

40.    Defendant Max Krasner is an individual who is alleged herein to be a Nominee Participant and was employed by the Debtor in roles at Golden Spring and the HCHK Entities, as well as numerous other positions.  Defendant Krasner served as an officer and authorized signatory of Hudson Diamond Holding LLC, Hudson Diamond NY LLC, Infinity Treasury Management Inc. (parent company of Lamp Capital LLC), and Rule of Law Foundation.  Mr. Krasner has assisted the Debtor, at the Debtor's behalf and at the Debtor's direction, with, among other things, the purchase of real property in Greenwich, Connecticut titled to Greenwich Land LLC, arrangements for the movement and maintenance of the yacht the Lady May, █████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████████ He
resides in New York.

41.    Defendant Nicholas Savio is an individual who is alleged herein to be a Professional Participant and served as a legal advisor to various Debtor-owned shell entities.  He resides in New Jersey.

42.    Defendant Qidong Xia is an individual who is alleged herein to be an Additional Participant.  Qidong Xia played a prominent role in harassment and intimidation campaign against the Trustee.  He resides in New York.

43.    Defendant Victor Cerda is an individual who is alleged herein to be a Professional Participant and served as a legal advisor to various Debtor-owned shell entities. He resides in New York.

44.    Defendant Yongbing Zhang is an individual who is alleged herein to be a Professional Participant and was employed by the Debtor as his personal counsel and also served the Debtor, as, among other things, a Director of Rule of Law Foundation ████████████

███████████████████████████ Among other things, Mr. Zhang took a leading role in the harassment and intimidation campaign against the Trustee that resulted in the Court issuing a preliminary injunction against the Debtor, including by personally participating in the campaign in front of the Trustee's home.  Mr. Zhang also was involved in filing complaints against the Trustee, PAX, and PAX's counsel in the United States District Court for the Southern District of New York.  Those complaints falsely accused the Trustee, PAX, and PAX's counsel of being agents of the Chinese Communist Party (the "FARA Litigation"), in connection with which Mr. Zhang was sanctioned under Rule 11 multiple times.  The Court has become particularly

familiar with Mr. Zhang based on his role in the HCHK Adversary Proceeding, in which context the Court found, among other things, that Mr. Zhang was the leader of the purported HCHK Creditors' Committee and that Mr. Zhang is involved in filing frivolous lawsuits to hinder the Trustee's work in this case for the perceived benefit of the Individual Debtor.  In addition, upon information and belief, the Debtor arranged for Mr. Zhang to "win" a Lamborghini vehicle as part of a sweepstakes event designed to promote the G-Club Scheme.  He resides in Illinois.

45. Defendant Yan Chun Liu is an individual who is alleged herein to be an Additional Participant.  Yan Chun Liu played a prominent role in the harassment and intimation campaign against the Trustee.  She resides in Canada.

46. Defendant Xuebing Wang is an individual who is alleged herein to be an Additional Participant and has been at various times among the most prominent lieutenants of the Debtor in his New Federal State of China and Himalaya Global Alliance organizations.  Defendant Xuebing Wang has also played a prominent role in the harassment and intimidation campaign against the Trustee.  He resides in New Zealand.

47. Defendant ACA Capital Group Limited ("ACA Capital") is a Hong Kong company that is alleged herein to be a Funding Entity.  The Debtor used ACA Capital to, among other things, transfer funds to his other shell entities, including Greenwich Land, Lamp Capital, Golden Spring, Saraca, Hudson Diamond NY, and Leading Shine NY, among others, as well as to fund legal and other expenses, including $9 million provided to Golden Spring in connection with the DIP financing proposed by the Debtor in March 2022 in his individual chapter 11 case.

48. Defendant Bravo Luck Limited ("Bravo Luck") is a British Virgin Islands company that is alleged herein to be a Funding Entity.  The Debtor used Bravo Luck to, among other things, transfer funds for the Debtor to purchase his yacht, the Lady May, and his apartment at the Sherry

Netherland Hotel, and through which the Debtor provided the funds used to establish his alter ego Golden Spring (New York) Ltd.  The nominal owner of Bravo Luck is the Debtor's son, Defendant Qiang Guo.

49.     Defendant Crane Advisory Group LLC ("Crane") is a New York limited liability company and was a licensed money transmitter in New York.

50.     Defendant Greenwich Land LLC ("Greenwich Land") is a Delaware limited liability company that is alleged herein to be an Asset-Holding Entity (as defined herein). Although nominally-owned by the Debtor's wife, Defendant Hing Chi Ngok, Greenwich Land is functionally owned by the Debtor.

51.     Defendant GS Security Solutions Inc. ("GS Security") is a New York corporation that is alleged herein to be a Business-Front Entity (as defined herein).  Defendant Scott Barnett is the nominal owner of GS Security.

52.     Defendant GETTR USA, Inc. is a Delaware corporation that is alleged herein to be a Business-Front Entity and is the entity that operates the alternative social media platform, GETTR.

53.     Defendant G Club International Limited ("G-Club BVI" or "G-Club International") is a British Virgin Islands company that is alleged herein to be a Business-Front Entity (as defined herein) and is the parent company G Club Operations LLC.

54.     Defendant G Club Operations LLC ("G-Club PR" or "G-Club") is a Puerto Rico limited liability company that is alleged herein to be a Business-Front Entity and was the principal operating entity that purported to offer membership services to the victims of the G-Club Scheme but in reality fraudulently accepted the member-victims' funds and transferred those funds on to other Debtor-controlled entities to further the purposes of the Kwok Enterprise.

55.     Defendant GNews Media Group Inc. ("GNews") is a Delaware corporation that is alleged herein to be a Business-Front Entity.

56.     Defendant GTV Media Group, Inc. ("GTV") is a Delaware corporation that is alleged herein to be a Business-Front Entity and was the wholly-owned subsidiary of Saraca (as defined below), a purported media company.

57.     Defendant Gypsy Mei Food Services LLC ("Gypsy Mei Food") is a Delaware limited liability company that is alleged herein to be an Asset-Holding Entity, nominally owned by the Debtor's daughter, Defendant Mei Guo.

58.     Defendant Hamilton Opportunity Fund SPC (including its segregated portfolios) is a Cayman Islands segregated portfolio company that is alleged herein to be an Asset-Holding Entity that the Debtor used to, among other things, fund the purchase of the Mahwah Mansion.

59.     Defendant HCHK Property Management, Inc. ("HCHK Property") is a Delaware corporation that is alleged herein to be an Asset-Holding Entity that the Kwok Enterprise used to conceal and disguise the fraudulently obtained proceeds of the Farm Loan Program from the Debtor's creditors and member-victims.

60.     Defendant HCHK Technologies, Inc. ("HCHK Technologies") is a Delaware corporation that is alleged herein to be an Asset-Holding Entity that the Kwok Enterprise used to conceal and disguise the fraudulently obtained proceeds of the Farm Loan Program from the Debtor's creditors and member-victims, among other unlawful conduct.

61.     Defendant Himalaya International Clearing Ltd (BVI) (d/b/a Himalaya Exchange) (the "Himalaya Exchange") is a British Virgin Islands company that is alleged herein to be a

Business-Front Entity that the Debtor used to operate his purported cryptocurrency business, the "Himalaya Exchange," which the Debtor used to, among other things, fund the $37 million placed into escrow in connection with the return of the Lady May to the United States.

62. Defendant Himalaya Currency Clearing Pty. Ltd is an Australian entity.

63. Defendant Himalaya International Financial Group Limited is a BVI entity.

64. Defendant Holy City Hong Kong Ventures, Ltd. ("Holy City") is a British Virgin Islands corporation that is nominally owned by Defendant Yvette Wang.

65. Defendant Hudson Diamond Holdings LLC is a Delaware limited liability company that is alleged herein to be a Funding Entity that members of the Kwok Enterprise used to conceal the Debtor's assets from his creditors.

66. Defendant Hudson Diamond NY LLC is a New York limited liability company that is alleged herein to be a Funding Entity and is a nominal subsidiary of Hudson Diamond Holdings LLC.

67. Defendant Lawall & Mitchell, LLC is a New Jersey limited liability company that is alleged herein to be a Professional Participant and is the law firm of Defendant Aaron Mitchell.

68. Defendant Leading Shine NY Limited ("Leading Shine NY") is a Delaware corporation that is alleged herein to be a Funding Entity and is nominally owned by the Debtor's daughter, Defendant Mei Guo.

69. Defendant Lexington Property and Staffing Inc. ("Lexington Property") is a Delaware corporation that is alleged herein to be an Asset-Holding Entity that the Kwok Enterprise used to conceal and disguise the fraudulently obtained proceeds of the Farm Loan Program from the Debtor's creditors and member-victims, among other unlawful conduct.

70.    Defendant O.S.C. Orbit Service Company LLC ("Orbit Service") is a Connecticut limited liability company that is alleged herein to be a Business-Front Entity.

71.    Defendant Rule of Law Foundation III, Inc. ("Rule of Law Foundation") is a Delaware nonprofit corporation that is alleged herein to be a Business-Front Entity.  Rule of Law Foundation is nominally owned (indirectly) by Defendant Yvette Wang, the Debtor's chief of staff, and criminal fraud and racketeering co-defendant, through a holding company she nominally owns, Seven Mission Group LLC.

72.    Defendant Rule of Law Society IV, Inc. ("Rule of Law Society" and, together with Rule of Law Foundation, the "Rule of Law Entities") is a Delaware nonprofit corporation that is alleged herein to be a Business-Front Entity.  Rule of Law Society is also nominally owned (indirectly) by Defendant Yvette Wang, through Seven Mission Group LLC.  The Rule of Law Entities were used by the Kwok Enterprise to fraudulently obtain purported charitable and/or political funding for anti-CCP causes from the Debtor's followers, only to use such ill-gotten funds to further the Kwok Enterprise's purposes, including enriching the Debtor, his family, and associates, and, among other things, bankrolling harassment and intimidation activities against the Trustee on behalf of the Debtor.

73.    Defendant Saraca Media Group, Inc. ("Saraca") is a Delaware corporation that is alleged herein to be a Business-Front Entity and purported media company that is the parent of GTV.

74.    Defendant Taurus Fund, LLC is a Nevada limited liability company that is alleged herein to be an Asset-Holding Entity and is purportedly managed by Defendant Scott Barnett, and was used by the Kwok Enterprise to hold title to the Mahwah Mansion.

75.     Defendant Savio Law LLC is a New Jersey limited liability company that is alleged herein to be a Professional Participant and the law firm of Defendant Nicholas Savio.

76.     Defendant Taurus Management LLC is a New Mexico limited liability company and a manager of Taurus Fund LLC, the nominal title-holder of the Mahwah Mansion, along with Defendant Scott Barnett.

## BACKGROUND

### I.     Investment Schemes Forming Backdrop for Kwok Enterprise

77.     The Debtor is an "exiled Chinese businessman who fled to the United States in or about 2015."[4] Prior to his arrival in the United States, the Debtor had accumulated or obtained access to considerable wealth by a variety of known and unknown means. Upon information and belief, the Debtor had acquired hundreds of millions of dollars in assets that he beneficially owned or controlled. At the same time, he had incurred hundreds of millions of dollars in liabilities to creditors, including without limitation a debt of approximately $50 million (at the time) owed to PAX under a loan guaranteed by the Debtor, which was not repaid by the underlying obligor.

78.     In or around late 2014, the Debtor fled China after, upon information and belief, having been warned by well-connected associates in the CCP that security authorities in China and Hong Kong would soon seek his arrest. Shortly thereafter, in or around early 2015, the Government of the People's Republic of China (the "PRC") reportedly charged the Debtor with multiple crimes, including corruption, and seized or attempted to seize his PRC assets (the "PRC Seizures"), including real property, securities, and funds in bank accounts. In or around 2015, the Debtor arrived in the United States.

---

[4]     *See* Superseding Criminal Indictment of Ho Wan Kwok and Kin Ming Je, *United States v. Kwok et al.*, 23 Cr. 118, filed Mar. 6, 2023 [ECF No. 215] (the "Superseding Indictment"), ¶ 9(a).

79.     Upon information and belief, by the time of his arrival in the United States, the Debtor had lost access to some, but not all, of his assets as a result of, among other things, the PRC Seizures.  Accordingly, beginning in or around 2018, to obtain new capital to continue funding his and his family members' and associates' lavish lifestyles, and to protect against the possibility his existing assets might be discovered by creditors, the Debtor and others devised a series of fraudulent schemes to raise money from unwitting investors.

80.     Specifically, the Debtor and certain of his close family members, advisors, and business associates defrauded thousands of victims of more than approximately $1 billion, including victims in the United States, the United Kingdom, Japan, Australia, Germany, the PRC, and other nations throughout the world.  These schemes, which form part of the Superseding Indictment against the Debtor, are discussed herein because they provide relevant background for the formation of the Kwok Enterprise, but they do not themselves form part of the Kwok Enterprise as alleged herein, and the Trustee does not allege that the schemes themselves were predicate acts.

81.     According to the Superseding Indictment, the Debtor's and his co-conspirators' investment schemes involved several interrelated parts, including fundraising activities involving the GTV Private Placement (as defined below), the Farm Loan Program (as defined below), the G Club membership program, and the Himalaya Exchange (as defined below).

A.      GTV Private Placement

82.     GTV, a Delaware corporation, was a purported news-focused social media platform based in New York City. GTV was functionally owned and controlled by the Debtor despite the fact the Debtor held no formal position or title at GTV.

83.     Between in or about April 2020 and in or about July 2020, the Debtor, with the assistance of various co-conspirators, fraudulently obtained more than $485 million in victim funds

through an illegal private stock offering related to GTV (the "GTV Private Placement") and a related offering of a purported digital asset security that was referred to as either G-Coins or G-Dollars (the "GTV Coin Offering").

84.     As a result of the GTV Private Placement and GTV Coin Offering, whose proceeds were commingled, the Debtor and others are alleged to have defrauded more than 5,000 investors, including individuals in the United States, through approximately July 2020.[5]

B.     Farm Loan Program

85.      As alleged in the Superseding Indictment, beginning in or about June 2020—the Debtor and his co-conspirators fraudulently obtained more than approximately $150 million in victim funds through the "Himalaya Farm Alliance."[6]

86.     The Himalaya Farm Alliance, which the Debtor, among others, organized and promoted, was a collective of informal groups (each known as a "Farm") located in various cities throughout the world.  The Debtor and others working on his behalf and at his direction obtained these funds by making further misrepresentations to the investor-victims in the GTV Private Placement and fraudulently soliciting further investments, this time in the form of purported "loans" to a Farm, and promising that such loans would be convertible into GTV common stock at a conversion rate of one share per dollar loaned (the "Farm Loan Program").[7]

87.     As a result of the Debtor's alleged promotion of the Farm Loan Program through misrepresentations, thousands of victims "loaned" money to the Farms by sending money to bank

---

[5]     *See In the Matter of GTV Media Group, Inc., Saraca Media Group, Inc., and Voice of Guo Media, Inc.,* Administrative Proceeding No. 3-20537 (U.S. Securities and Exchange Commission) (Order Instituting Cease and Desist Proceedings).

[6]     *See* Superseding Indictment ¶ 17.

[7]     *Id.*

accounts controlled by the Farms (and not GTV).[8] According to the "Loan Agreements," which the Farms rarely countersigned, these funds were to be used for a Farm's "general working capital purposes." In reality, the Debtor and his co-conspirators allegedly misappropriated funds that were raised through the Farm Loan Program for their own benefit.

C.      G Club Operations, LLC

88.     G-Club was a purported membership organization based in Puerto Rico and in New York City that claimed to provide its "members" with luxury experiences, access to the Debtor, and ancillary benefits regarding the Debtor's other business opportunities.  G-Club was launched in or about October 2020.  As alleged in the Superseding Indictment, in truth and in reality, G-Club was a world-wide fraudulent scheme designed to enrich the Debtor that provided no discernable benefits to its "members."  Rather, "members" paid various membership fees to G-Club to obtain certain "tiers" or status's within the purported organization, with each alleged "tier" providing greater benefits (there were none) to the member, but costing more money as well.  The "members'" contributions were ultimately transferred from G-Club to G-Club BVI or other locations where they could be used to enrich the Debtor, his family, and his associates.

89.     G-Club was functionally and beneficially owned and controlled by the Debtor, although the Debtor held no formal executive position at G-Club.  The Debtor "officially" provided consulting services for G-Club and held titles as spokesperson, key host and promotional contact.

90.     The Debtor and his co-conspirators allegedly obtained more than approximately $250 million[9] through the G-Club membership scheme from would-be members. Contrary to the representations being made to such members, G-Club provided nothing remotely resembling "a

---

[8]    *See* Superseding Indictment ¶ 17(e).

[9]    *See id.* ¶ 18.

full spectrum of services" and "experiences" to its unwitting member-victims.[10]  Nor did members receive additional benefits they were promised.  Instead, as alleged in the Superseding Indictment, the G-Club membership scheme was used to enrich the Debtor and his associates.

        D.        Himalaya Exchange

91.      The "Himalaya Exchange" is another vehicle the Debtor and his co-conspirators allegedly used to defraud investor-victims. As alleged in the Superseding Indictment, the Himalaya Exchange was a purported cryptocurrency "ecosystem" (and not itself a legal entity) that William Je founded and operated through various entities located abroad which he nominally owned, but which the Debtor controlled and beneficially owned.[11] Additional entities beneficially owned and controlled by the Debtor had purported business relationships with the Himalaya Exchange.[12]  The Superseding Indictment alleges that, from at least in or about April 2021 through at least in or about March 2023, the Debtor and William Je fraudulently obtained more than approximately $262 million in investor-victim funds through the Himalaya Exchange, which they used for their own benefit.[13]

## II.      General Scope and Purpose of Kwok Enterprise

92.      At the same time the Debtor amassed his considerable wealth, through the above-described schemes and otherwise, he had also incurred hundreds of millions of dollars in liabilities to creditors, including without limitation a debt of approximately $50 million (as of 2015) owed

---

[10]    *See* Superseding Indictment ¶ 18(e).

[11]    *See id.* ¶ 15.

[12]    *Id.*

[13]    *Id.* ¶ 19.

to PAX under a loan guaranteed by the Debtor.  As time went on, the Debtor's creditors became increasingly aggressive in seeking payment on their claims, including by pursuing litigation.

93.     For example, on or about April 18, 2017, PAX filed a complaint in the Supreme Court of the State of New York, County of New York (the "New York Court"), for breach of contract against the Debtor regarding the 2011 Personal Guarantee and amounts owing thereunder (the "PAX Litigation").  On September 15, 2020, the New York Court granted partial summary judgment in PAX's favor on its claim, and PAX thereafter undertook efforts to enforce that judgment by, among other things, seeking discovery of the Debtor's assets and financial affairs.

94.     Similarly, on or about September 11, 2017, creditor Rui Ma filed a verified complaint in the Supreme Court of the State of New York, County of New York, seeking damages of not less than $20 million for battery, assault, and intentional infliction of emotional distress, among other claims against the Debtor and Golden Spring (New York) Ltd., the Debtor's "family office" and slush fund, arising from allegations that the Debtor mentally abused and sexually assaulted Rui Ma on multiple occasions during her employment with the Debtor, including in the state of New York (the "Ma Litigation").  *See generally* Claim 2-1, [Main Case No. 22-50073].

95.     PAX and Rui Ma were just two of many of the Debtor's creditors who had either commenced litigation against him or were otherwise taking action to enforce their claims.  With the walls closing in around him, the Debtor and those close to him had to ensure that he kept his assets hidden from his creditors at all costs.

96.     The mechanism used to hide the Debtor's assets from his creditors was the Kwok Enterprise.  The Debtor and his Defendant co-conspirators had previously formed the Kwok Enterprise as early as 2015, when, as described below, certain of the Defendants, including shell

companies and the Debtor's family members, began concealing the Debtor's assets to avoid paying his debts, which by that time were already in excess of $50 million, at a minimum.

97. The Kwok Enterprise's activities evolved over time, but its purpose remained the same. In addition to hiding assets from creditors, such as PAX, Rui Ma, and others, the Debtor and his Defendant co-conspirators utilized the Kwok Enterprise's shell companies and other participants to fraudulently conceal the origins of the above-described fraudulent investment schemes, through money laundering and otherwise. Further, once this bankruptcy case began, the Kwok Enterprise added obstruction of justice and bankruptcy fraud to its repertoire, with the goal of interfering with this chapter 11 case and impeding the Trustee's investigation.

98. The Kwok Enterprise's participants have consisted of the following general categories of entities and individuals, among others:

   a. "Funding Entities" that were used by the Kwok Enterprise, including the Debtor, other Defendants, and co-conspirators, as cash management or "slush fund" entities, and which transferred substantial sums to various entities and individuals to enrich the Debtor and his family, including by funding the Debtor's luxurious, billionaire-lifestyle, paying expenses and funding opulent purchases, providing money to maintain the Debtor's appearance as a successful entrepreneur who victims should invest with, and otherwise hiding and concealing the Debtor's assets from his creditors. The Funding Entities included, among others:

      i. Defendant Bravo Luck,

      ii. Golden Spring,

      iii. Defendant Leading Shine,

      iv. Defendants Hudson Diamond Holding LLC and Hudson Diamond NY LLC (together, the "Hudson Entities"), and

      v. Infinity Treasury Management Inc. and Lamp Capital.

   b. "Asset-Holding Entities" that were used by the Kwok Enterprise, including the Debtor, other Defendants, and co-conspirators, to hold specific assets for the benefit of the Debtor and his family, such that not only would the Debtor's assets be concealed and possibly beyond the reach of his creditors, but such assets would also

be available to the Debtor to demonstrate his purported wealth and business acumen, and maintain the Debtor's billionaire-image, allowing the Kwok Enterprise to promote the Debtor's purported investments and business lines to investor-victims; such entities included, among others:

    i. Defendants Hamilton Opportunity Fund SPC, a Cayman Islands segregated portfolio company; and its thirteen segregated portfolios, including Hamilton SA Fund SP; Fortress Digital Assets Fund SP; Taurus Fund SP; Hamilton Delphi Fund SP; Hamilton Mars Fund SP; Hamilton M&A Fund SP Class A; Hamilton M&A Fund SP Class B; Hamilton PE Fund SP; Hamilton FX Fund SP; Hamilton Diversified Trading Fund SP; Hamilton Digital Assets Fund SP; Hamilton Digital Assets Fund SP Class A; Hamilton Digital Assets Fund SP Class B (together, the "Hamilton Entities");

    ii. HK International Funds Investments (USA) Limited, LLC;

    iii. Defendants HCHK Technologies, HCHK Property, Lexington Property (collectively, the "HCHK Entities"), and Holy City;

    iv. Defendant Greenwich Land; and

    v. Defendant Gypsy Mei Food.

c. "Business-Front Entities" that were used by the Kwok Enterprise, including the Debtor, other Defendants, and co-conspirators, to conceal the Debtor's assets from creditors and pass-through fraudulently obtained funds for the benefit of the Debtor, his family, and associates, while nominally being operating media, real estate, technology, and social media enterprises, but functionally being owned and controlled by the Debtor to further the Kwok Enterprise, including, among others:

    i. Defendant GETTR USA, Inc., G Fashion International Limited, GFNY Inc., GF Italy LLC, and Defendant GNews Media Group, Inc.;

    ii. Defendant GS Security Solutions Inc.;

    iii. Defendant O.S.C. Orbit Service Company LLC;

    iv. Defendants GTV Media Group, Inc., and Saraca Media Group, Inc.;

    v. Defendants G Club Operations LLC and G Club International Limited (BVI) (together, the "G-Club Entities"); Defendant Crane Advisory Group LLC.; G Club HoldCo I LLC; Jovial Century International Limited; G Fashion Hold Co. B Limited; Stichting Duurzame (Netherlands);

vi. Defendants Himalaya International Clearing Ltd (BVI) (d/b/a Himalaya Exchange); Defendant Himalaya International Financial Group Ltd. (BVI); Himalaya International Payments Ltd (BVI); Himalaya International Reserves Limited (BVI); Defendant Himalaya Currency Clearing Pty Ltd (Australia); Major Lead International Limited (BVI); Perfect Company Ltd. (BVI); Stichting Gewelf (Netherlands);

vii. Defendants the Rule of Law Entities; and

viii. The Himalaya Farm Alliance and the Himalaya Farm Loan Program

d. "Nominee Participants" consisting of individual members of the Debtor's family and inner circle, including his children and closest business associates, who acted as purported nominal owners, executives, directors, employees and/or appointees of entities the Debtor functionally and beneficially controlled and which knowingly participated in the Kwok Enterprise, including:

i. Defendants Hing Chi Ngok, the Debtor's wife; Mei Guo, the Debtor's daughter, and Qiang Guo, the Debtor's son; and

ii. Defendants William Je, Yvette Wang, Haoran He, Max Krasner, Scott Barnett, Anthony DiBattista, Chunguang Han, and Defeng Cao.

e. "Professional Participants" consisting of legal advisors that did more than provide ordinary legal services to the Debtor, Defendants, and co-conspirators. Rather, such legal professionals and other Defendants and co-conspirators, as alleged herein, had knowledge of and directly participated in the conduct at the heart of the Kwok Enterprise's various fraudulent schemes and unlawful activities. Such individuals include Defendants Aaron Mitchell, Lawall & Mitchell LLC, Victor Cerda, Savio Law LLC, Nicholas Savio, and Yongbing Zhang.

f. "Additional Participants" consisting of financial advisors, agents, employees, and other individuals acting on behalf of the Debtor, the Debtor's family, other Defendants, or on behalf of other co-conspirators, such that those individuals did more than provide ordinary business services to the Debtor, Defendants, and co-conspirators. Rather, oftentimes in the course of their employment by Defendants and/or the Debtor or co-conspirators, such individuals, as alleged herein, had knowledge of and directly participated in the conduct at the heart of the Kwok Enterprise's various fraudulent schemes and unlawful activities. Such individuals include Defendants Alex Hadjicharalambous, Limarie Reyes Molinaris, Ana C. Izquierdo-Henn, David Fallon, Ehsan Masud, Gladys Chow, Hsin Shih Yu, Xuebing Wang, Yan Chun Liu, Jessica Mastrogiovanni, and Qidong Xia.

99.     The specific activities and transactions these individuals and entities engaged in for the purpose of defrauding the Debtor's creditors and enriching the Debtor and his family are described in detail throughout this Complaint.

### III.    Diverting, Transferring and Concealing Assets and Fraud Proceeds

100.    The Debtor and his Defendant co-conspirators used the Kwok Enterprise and its web of shell companies to both (i) disguise the origins of certain of the Debtor's assets, including in particular the proceeds of the fraudulent investment schemes described above, and (ii) conceal all of the Debtor's material assets and keep them beyond the reach of the Debtor's creditors.

####     A.      Concealment and Diversion of G-Club Fraud Proceeds

101.    The Debtor and many of the Defendants went to great lengths to conceal the G-Club fraud and to divert its proceeds to individuals and entities within the Kwok Enterprise.

#### *G-Club and Rest of Kwok Enterprise Face Banking Problems*

102.    From the outset, G-Club's fraudulent nature gave rise to significant difficulties maintaining banking relationships with FDIC-insured domestic financial institutions.  This led to uncomfortable questions and caused the Kwok Enterprise, including many of the Defendants, to go to great lengths to conceal the fraudulent source of the G-Club funds.













*G-Clubs Member-Victims' Funds Used to Enrich Debtor, His Family, and Associates*

117.    The Defendants also used G-Club funds to purchase valuable assets for the Debtor and hide them in shell companies where they could not be found by creditors.





Case 24-05273    Doc 1    Filed 02/15/24    Entered 02/15/24 20:00:33    Page 36 of 139

Defendant Je and others made sure G-Club funds were laundered in other ways to benefit the Debtor and the Kwok Enterprise.





to facilitate their fraud occurred either by email or phone using interstate wires.

*Himalaya Exchange Helped Divert and Disguise Fraudulently Obtained Funds*

██████████████████████████████ ████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████

132.   In addition, as alleged in the Superseding Indictment, Defendant Je sought to transfer large sums of the Himalaya Exchange's money to an account he controlled abroad for the purpose of avoiding its imminent seizure by the United States government.   Specifically, in September 2022, Defendant Je attempted to transfer approximately $46 million from domestic bank accounts associated with the Himalaya Exchange—accounts that had not yet been seized—to a bank account in the UAE that he controlled.[14]

133.   Within approximately two days of the first judicially authorized seizures of Himalaya Exchange-related funds, on or about September 22, 2022, Defendant Je asked the management of a domestic bank that held Himalaya Exchange bank accounts to execute a wire transfer, which he and a Himalaya Exchange executive misrepresented to the domestic bank was needed for the benefit of a "VIP" client of the Himalaya Exchange.[15]   In later communications with the domestic bank, Defendant Je revealed that the VIP was, in fact, Je himself.   Je provided the domestic bank with documents purporting to show two HCN sales by Je on or about September 22, 2022—totaling 46 million HDO—which Je was hoping to "convert" into $46 million in fiat currency.   Je twice emphasized to the domestic bank's employees that the $46 million transfer needed to happen "today or it is meaningless."[16]

---

[14]   Superseding Indictment ¶ 21.

[15]   *Id.* ¶ 21 (a).

[16]   *Id.*

B. Role of Rule of Law Entities in Fraudulent Schemes

134. In order to keep the Debtor's and his co-conspirator's fraudulent schemes hidden, it was important for the Debtor and the other members of the Kwok Enterprise to take efforts to legitimize their outward appearances to the general public. To that end, in or about 2018, the Debtor founded two purported nonprofit organizations, Defendants the Rule of Law Entities, which trumpeted the Debtor's supposed mission to put an end to the Chinese Communist Party.

135. The Debtor used these nonprofit organizations to accumulate followers who were aligned with his alleged policy objectives in China and were attracted to his supposed success as a business person, and, therefore, would be interested in potential business opportunities with the Debtor or donating money to support his political views (the "Rule of Law Scheme").

136. The Debtor used the Rule of Law Entities to obtain donations from supporters in the United States and throughout the world. The Rule of Law Entities later fraudulently diverted millions of dollars of these donations to shell companies and other Defendants in furtherance of the Kwok Enterprise's ultimate objectives.





C.    Further Use of Shell Companies to Launder Funds and Conceal Assets

139.    The Debtor and Defendants William Je, Yvette Wang, Krasner, DiBattista, and Mitchell, among others, regularly transferred funds within the Kwok Enterprise, typically using the Defendant Funding Entities, Asset-Holding Entities, and Business-Front Entities, for the purpose of laundering those funds and to benefit of the Debtor, his family, and his associates, by disguising the money movements as "loans," "dividends," or "investments."

140.    To create the infrastructure necessary for these activities, the Debtor installed, or directed others in the Kwok Enterprise to install for his benefit, titular executives and/or nominal owners at entities within the Kwok Enterprise, including many of the Defendants, while such entities were, in reality, beneficially owned and/or controlled by the Debtor.  The use of nominal owners to conceal the Debtor's vast wealth and defraud creditors has long been a practice of the Kwok Enterprise, including before he arrived in the United States in or around 2015.

141.    One such individual who has served as a nominal owner of Debtor entities and is familiar with the Debtor's practices in this regard is nonparty Qu Guo Jiao (a/k/a Natasha Qu) ("Ms. Qu"), a trusted business associate of the Debtor.  Ms. Qu had worked as an accounting manager and executive assistant for the Debtor and/or entities he controlled from between in or around 2002 to September 2017.  Ms. Qu was responsible for, among other things, managing accounting and financial matters for various entities controlled by the Debtor and providing assistance to the Debtor in his personal and business affairs.  Ms. Qu's duties, and actions she took at the Debtor's direction, included managing inter-company wire transfers and similar transactions.

142.    During the time Ms. Qu worked for the Debtor between in or around 2002 to September 2017, the Debtor frequently used agreements to functionally and beneficially retain control of various companies that were nominally owned in the name of the Debtor's family members and/or associates.  Other employees and/or associates of the Debtor who purportedly (and nominally) owned companies controlled by the Debtor included, among others, Defendants Yvette Wang, Han Chunguang (the Debtor's bodyguard and family chef), Anthony DiBattista, and Max Krasner.  These individuals, like Ms. Qu, had no financial or beneficial interest in the entities they nominally owned.

143.     Just as the Debtor had used Ms. Qu from in or around 2002 to 2017, he continued to work with co-conspirator Defendants from the time of his arrival in the U.S. in 2015 to the present to expand his shell game and harm creditors by hiding his assets.  Through the use of these shell entities and the dummy figureheads at such corporate entities, the Kwok Enterprise sought to protect the Debtor's wealth.

144.     The shell entities (and dummy figureheads at such entities, *i.e.,* the Nominee Participants and Professional Participants) that the Kwok Enterprise, with the assistance of numerous individual Defendants, used to protect the Debtor's wealth were more or less organized in three categories, with some entities potentially fitting into multiple categories: (a) slush-fund and cash management entities (*i.e.,* the Funding Entities); (b) entities used to acquire and hold assets (*i.e.,* the Asset-Holding Entities); and (c) entities that claimed to be operating businesses but in reality simply protected the Debtor's wealth (*i.e.,* the Business-Front Entities).  Examples of entities in each such category are discussed in turn.

### 1.     *Slush-Fund and Cash Management Entities*

#### *Golden Spring New York Ltd.*

145.     Golden Spring was incorporated in Delaware and registered to do business in New York in March of 2015, coinciding with the Debtor's relocation to New York in January 2015. Golden Spring's nominal corporate parent was Defendant China Golden Spring, which was, in turn, nominally owned by Defendant Qiang Guo, the Debtor's son.  Despite such nominal

ownership, Golden Spring was nothing more than an alter ego for the Debtor, and this Court has already issued a judgment to that effect.[17]

146.    The Debtor created Golden Spring because he needed a domestic company to acquire cars and engage in other activities—including leasing office space, acquiring furnishings for that office space and for his home, and engaging staff—in the United States.  In this way, Golden Spring served as the Debtor's domestic "family office."

147.    While the Debtor directed the formation of Golden Spring for his own benefit, he made the decision to shield himself by having someone else sign corporate organizational documents for Golden Spring so he could avoid having his name appear on corporate documents that would have been part of the public record.  This allowed the Debtor to attempt to hide his assets at Golden Spring from creditors, including PAX and others.

148.    At all relevant times, Golden Spring had no independent source of funding; it was funded by the Debtor through entities he controlled, and would have had no capitalization absent such funding.  Indeed, the Debtor provided the initial funding for Golden Spring by ███████

---

[17]    Because Golden Spring has been found to be the Debtor's alter ego, such that all assets of Golden Spring belong to the chapter 11 estate, the Trustee has not named Golden Spring as a Defendant herein.  Golden Spring was, however, an integral member of the Kwok Enterprise.

██████████████████████████████████████████████████████████████████

██████

150.    No one familiar with the Debtor and Golden Spring doubted that the Debtor was the person who exercised control over Golden Spring (despite Defendant Qiang Guo's nominal ownership of Golden Spring's ostensible parent company, Defendant China Golden Spring). Indeed, ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

151.    As the Debtor's "family office," Golden Spring's functions were to hold his assets, pay his expenses, and conceal such assets from his creditors.  Golden Spring was thus a critical part of the Kwok Enterprise that allowed the Debtor to live a life of luxury while at the same time asserting that he was effectively judgment proof, as exemplified by the Schedules of Assets and Liabilities filed in this Chapter 11 Case, where the Debtor claimed to hold assets of $3,850.00.[19] The examples of Golden Spring functioning in this way are legion.  Among others:

a.  Golden Spring has been paying the Debtor's personal living expenses since 2015. These expenses include security/bodyguards, transportation, clothing, and other items.  For example, the Debtor testified that if he desired to buy a pair of shoes, he would arrange for Golden Spring to pay for it.

b.  The Debtor travelled in a Maybach automobile purportedly owned by Golden Spring.  Indeed, insurance documents in the possession of the Trustee indicate that Golden Spring has purportedly owned multiple luxury vehicles for use by the Debtor.

c.  Golden Spring paid numerous of the Debtor's legal fees, including through litigation funding agreements ██████████████████████████████ ████████████████████████████████████████████ This litigation funding scheme is another mechanism by which the Debtor and conspiring Defendants sought to harm the Debtor's creditors, ensuring that even if his estate recovered on a cause of action, the Kwok Enterprise would be enriched but any recovery might be beyond the reach of creditors.

---

[19]    *See* Official Form 106, at 5 (Mar. 9, 2022) [Main Case Docket No. 78].

    d.   Golden Spring paid the expenses associated with the Debtor's yacht, the Lady May, as well as the maintenance fees associated with the Sherry Netherland Apartment.

    e.   The Debtor intended to use Golden Spring as lender in connection with an $8 million DIP loan proposed in the Debtor's motion filed on March 22, 2022 [Main Case Docket No. 117]. A large portion of this loan was slated to be used for paying the Debtor's then-bankruptcy counsel at Brown Rudnick and numerous of the Debtor's proposed "ordinary course" professionals.

152. Notably, although Golden Spring as proposed DIP lender was represented in this Chapter 11 Case by counsel, Golden Spring essentially disappeared after the appointment of the Trustee, failing to respond to the Trustee's Bankruptcy Rule 2004 subpoena and eventually being held in contempt by this Court.

153. Golden Spring's employees and managers were well-known members of the Kwok Enterprise, including some of the Defendants. Golden Spring's initial directors when the company was established in March 2015 were Ms. Qu and Yan Feng Sun, who also served as the initial president/treasurer and secretary of the company, respectively. Defendant Qiang Guo was initially Executive Vice President. In more recent years, Golden Spring's president, including at the time the Debtor filed his chapter 11 petition, was Defendant Yvette Wang, who also served as one of the company's directors (along with Defendant Qiang Guo).

154. This Court has already ruled that "[t]he Debtor has control over Ms. Wang" and that he "has employed Yvette Wang for several years, and has directed her to take actions on his behalf, including directing her to act on his behalf to purchase properties such as the Sherry-Netherland apartment."[20] Defendant Wang has served the Debtor in numerous other roles, including as an officer and/or authorized signatory of Defendants Hudson Diamond Holding LLC, Hudson Diamond NY LLC, Leading Shine NY Limited, Saraca, GTV, Greenwich Land, and

---

[20]   Corp. Governance Contempt Order ¶ 4.

Genever Holdings LLC.  Defendant Wang was widely known to be the Debtor's personal assistant and, along with Defendant Aaron Mitchell, acted as critical advisors to the Kwok Enterprise on all operational decisions.  Defendant Wang has testified on multiple instances that in her capacity as president of Golden Spring she served as an administrator for the interests of the Debtor and his family.

155.    In addition, employees of Golden Spring have included, among others:

a.  Defendant Max Krasner, who, in addition to his work as a Golden Spring employee, has also served the Debtor in numerous other roles, including as employee, officer and/or authorized signatory of Defendants Greenwich Land, Hudson Diamond Holdings LLC, Hudson Diamond NY LLC, Infinity Treasury Management Inc. (parent company of Lamp Capital LLC), Rule of Law Foundation, and the HCHK Entities.

b.  Defendant Anthony DiBattista, who, in addition to his work as a Golden Spring employee, also served the Debtor as a corporate officer of Defendants GTV, GFashion, G-Club, and the HCHK Entities.

156.    Upon information and belief, other individuals employed officially or unofficially at Golden Spring have included, among others, Defendants Han ("Hank") Chunguang[21] and Alex Hadjicharalambous,[22] each of which have had roles at different entities controlled by the Debtor.

157.    Golden Spring, like the Debtor, his defendant children, and many other entities controlled by the Debtor such as GTV and Saraca, used Defendant Aaron Mitchell as its outside legal counsel.[23]  Golden Spring's general counsel during the early stages of the Chapter 11 Case was Melissa Francis, who also represented the Debtor individually.

---

[21]    Defendant Han is a long-standing bodyguard and/or chauffeur of the Debtor who has served the Debtor as, among numerous other roles, as nominal owner of Debtor-controlled entities including Eastern Profit, Anton Development, and Rosy Acme Ventures Limited, and director and officer of Saraca.

[22]    Defendant Hadjicharalambous has also worked at the HCHK Entities, G-Club, and Freedom Media Ventures Ltd.

[23]    Despite being represented by Aaron Mitchell as counsel, Golden Spring was held in contempt by this Court (along with Lamp Capital LLC), based on its failure to comply with Rule 2004 subpoenas.  *See Order Holding Golden Spring and Lamp Capital in Contempt of Court* (Apr. 26, 2023) [Main Case Docket No. 1709].

158. China Golden Spring, the Hong Kong entity ostensibly owned by the Debtor's son that is Golden Spring's corporate parent, is yet another company controlled at all relevant times by the Debtor. Upon information and belief, at the time Golden Spring was established, the Debtor ran China Golden Spring through his employee, Ms. Qu.

159. Accordingly, throughout its existence, including after the Debtor filed his bankruptcy case, Golden Spring was an integral part of the Kwok Enterprise used to fund the Debtor's luxurious lifestyle while concealing the Debtor's ownership of Golden Spring and its assets. All of the Defendants described above who held positions with or took action on behalf of Golden Spring furthered the purposes of the Kwok Enterprise's first and overarching scheme— defrauding the Debtor's creditors by concealing the Debtor's assets in shell companies like Golden Spring. Each such defendant agreed and was aware that it would take acts on behalf of Golden Spring notwithstanding such defendant's knowledge that Golden Spring, and its assets, was functionally and beneficially owned by the Debtor.

### *Leading Shine NY Ltd.*

160. Defendant Leading Shine NY was formed in Delaware on January 3, 2019, and registered to do business in New York in January 2019. Leading Shine NY is another shell entity that was beneficially owned and controlled by the Debtor at all relevant times and that knowingly agreed to serve an important role in the Kwok Enterprise.

161. Leading Shine NY has been funded entirely by the Debtor through entities he controls, and would have had no capitalization absent such funding. In particular, Leading Shine NY has received funding from Debtor-controlled entities, including, among others, Defendants ████████████████████████████████████████ Upon information and belief, Leading Shine NY received no funding other than from other Debtor-controlled entities that lack

operations and themselves are only funded by the Debtor's assets, including the proceeds of the GTV scheme, the G-Club scheme, the Farm Loan Program, and the Himalaya Exchange.  Leading Shine NY and Defendants ███████████ ███████████ ████████ ████████ agreed and knowingly directed the Kwok Enterprise to transfer fraudulently obtained monies between and among each other to pay the Debtor's expenses, enrich him, his family, and his associates, and conceal the nature and control of such funds from the Debtor's creditors.

162.    Leading Shine NY was actively involved in the movement of money to other shell companies controlled by the Debtor, ████████████████████████████



164.



166.    As discussed further herein, Leading Shine NY's only documented activities consisted of holding the Debtor's assets and paying his expenses.  Leading Shine NY did nothing other than receive funding from other Debtor-controlled companies, hold cash in bank accounts, and pay for the Debtor's expenses such that the Debtor could maintain an image as a successful billionaire and convince unwitting investor-victims or member-victims to contribute their money to the various Kwok Enterprise fraud schemes discussed herein.

### *Lamp Capital LLC*[24]

167.    Lamp Capital was formed in Delaware on September 4, 2020, and registered to do business in New York on September 14, 2020.  Lamp Capital's sole member is Infinity Treasury Management, of which Defendant Qiang Guo, the Debtor's son, is the purported sole shareholder.

---

[24]    Lamp Capital LLC has been found to be the Debtor's alter ego and is a non-party to this action.

168.    Prior to June 10, 2021, Daniel Podhaskie served as sole director, president, and treasurer of Infinity Treasury Management, the sole member of Lamp Capital. Mr. Podhaskie was also an authorized signatory for Lamp Capital.

169.    On June 10, 2021, Defendant Max Krasner replaced Daniel Podhaskie as sole director and president of Infinity Treasury Management. Krasner was an agent of the Debtor. Krasner acted on the Debtor's behalf and worked for the Debtor as a subordinate to Defendant Yvette Wang. Krasner was a Golden Spring employee who also served in roles at numerous other Debtor shell companies, including serving as an employee, officer and/or authorized signatory of Defendants Greenwich Land, Hudson Diamond Holding, Hudson Diamond NY, Rule of Law Foundation, and one or more of the HCHK Entities.

170.    Lamp Capital has been funded by the Debtor through entities he controls.



---

25    Lamp Capital used 162 East 64th Street, New York, New York, as its address. 162 East 64th Street has been used as an address by the Debtor himself, defendant Aaron Mitchell, and a number of the Debtor's shell companies, including Golden Spring, HK USA, GTV Media Group, Inc., Saraca, Hudson Diamond Holding LLC, Hudson Diamond NY LLC, and Rule of Law Foundation

171.   The Debtor used Lamp Capital to pay his expenses and keep assets concealed from his creditors, which rendered Lamp Capital a critical part of the Kwok Enterprise.  The examples of Lamp Capital helping to conceal the Debtor's finances and fuel his and his family members' luxurious lifestyles are numerous.  Among others:

a.   Lamp Capital paid the $1 million retainer of the Debtor's initial bankruptcy counsel, Brown Rudnick.

b.   Lamp Capital paid numerous of the Debtor's legal fees and expenses associated with litigation involving the Debtor, including to the Debtor's law firms such as Lawall & Mitchell, LLC, The Casper Firm, The Francis Firm PLLC, Baker Hostetler LLP, Hodgson Russ, Schulman Bhattacharya LLC, and Ganfer Shore Leeds & Zauderer LLP, and Clayman & Rosenberg LLP.  Lamp Capital has also made numerous payments of the Debtor's fees owed to other providers of legal or expert witness services such as Veritext, US Legal Support Inc., Roy D. Simon, and William Bradley Wendel.

c.   Lamp Capital paid expenses associated with the Debtor's yacht, the Lady May, as well as the maintenance fees associated with the Sherry Netherland Apartment.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

d.   Lamp Capital has also made numerous payments to ACASS Canada Ltd. ("ACASS"), Wings Insurance Agency Inc., and SAAM Verspieren Group, in connection with the operation and maintenance of the Debtor's private jet, the Bombardier Global XRS (which is subject to another adversary proceeding filed by the Trustee against Mei Guo).  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

e.   Lamp Capital made multiple transfers to the Bento for Business accounts of Debtor-controlled companies, from which pre-paid Bento debit cards were issued to the

Debtor's family members and associates and used on spending to support the Debtor's luxurious lifestyle.

f.  Lamp Capital has paid the Mar-a-Lago Club on behalf of the Debtor in connection with the membership there held in his name.

172.    As discussed further herein, defendant Lamp Capital's only documented activities consisted of holding the Debtor's assets and paying his expenses.  Lamp Capital did nothing other than receive funding from other Debtor-controlled companies, hold cash in bank accounts, and pay for the Debtor's expenses.

*Individual Defendants' Involvement in Movement of Funds*

173.    As discussed herein, numerous of the individual Defendants assisted the foregoing shell companies and other entities in the Kwok Enterprise in moving and concealing the Debtor's funds, including those he raised from fraudulent investment activities.  In addition, many of the individual Defendants themselves made or received numerous transfers using their own bank accounts, often in transactions involving other Defendants or shell companies.  Examples of such transfers are listed in Schedule 1 hereto.  Upon information and belief, some or all of these transfers involve monies belonging to the Debtor and/or that constitute proceeds of his fraudulent schemes.

**2.    *Shell Entities for Acquiring and Holding Assets***

*Bravo Luck, Eastern Profit, and HK International*

174.    Bravo Luck is a shell company incorporated in the British Virgin Islands.  In January and February 2015, the Debtor and his son each owned 50% of Bravo Luck on paper.

175.    At that time, Bravo Luck held an account (the "Bravo Luck Account") with UBS AG ("UBS").  On January 23, 2015, two Debtor shell companies, HK International Funds Investments Limited ("HK International") and Defendant Eastern Profit Corporation ("Eastern Profit"), transferred $150 million and $370 million, respectively, to the Bravo Luck Account to,

among other things, fund and conceal the Debtor's purchase of a luxury apartment and yacht, as described further below.  Prior to those transfers, that account held approximately $20,000.

176.   The $520 million transferred into the Bravo Luck Account was nothing more than the Debtor transferring money from one "pocket" to another, as he controlled both HK International and Eastern Profit.

177.   HK International was incorporated by the Debtor on October 2, 2006.  HK International was effectively controlled by the Debtor, used by the Debtor to funnel money to a number of other Debtor-controlled entities in investment projects related to the Hong Kong stock exchange, and received all its funds from other Debtor-controlled companies

178.   The Debtor remained HK International's sole shareholder and director through October 14, 2014, when he transferred his interest to Ms. Qu for no consideration.  On October 14, 2014, Ms. Qu also signed a Declaration of Trust providing that she held the shares of HK International as trustee, with the Debtor as the beneficiary, and that Ms. Qu would exercise rights in connection with the shares at the Debtor's direction.  The Debtor, therefore, continued to beneficially own and control HK International despite Ms. Qu's nominal ownership.

179.   Defendant Eastern Profit is another shell company of the Debtor incorporated in Hong Kong.  Eastern Profit was the subject of findings by Judge Liman of the U.S. District Court for the Southern District of New York, including that Eastern is "in essence, a shell corporation" for the Debtor.

180.   Among other things, in 2015, when it transferred $370 million to Bravo Luck, Eastern Profit was nominally owned by Han Chunguang, the Debtor's driver, bodyguard and cook, whom the Debtor referred to as "Little Han" and introduced as his cook.  Mr. Han would later transfer his purported ownership of Eastern Profit to the Debtor's daughter, Mei Guo, in exchange

for HK$1.00. This transfer was made on June 27, 2017, which is the same day that Ms. Qu (acting as trustee for the Debtor) "sold" HK International to the Debtor's daughter, also for HK$1.00.

181.   On February 21, 2015, another shell company of the Debtor, Genever Holdings LLC ("Genever US"), executed a contract of sale with respect to a penthouse apartment overlooking Manhattan (the "Sherry Netherland Apartment").[26]  Genever US has one member, Genever Holdings Corporation ("Genever BVI").  At the time of the purchase of the Sherry Netherland Apartment, the Debtor was the sole shareholder of Genever US.  Bravo Luck served as the funding source for the purchase.

182.   Even after the contract of sale was executed, the sale of the Sherry Netherland Apartment still had to be approved by the Board of Directors of the Sherry Netherland Hotel.  On March 3, 2015, the Board of Directors met to consider the purchase application submitted in connection with the property, and determined that it did not have sufficient financial information and "additional due diligence is required by the Board, including but not limited to obtaining financial information regarding [the Debtor]." ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████

---

[26]   The Sherry Netherland Apartment technically consists of multiple units located on the 18th floor of the Sherry Netherland Hotel that, for ease of reference, will be referred to collectively as the Sherry Netherland Apartment.

183.    ███████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████

184.    Approximately two months later, on May 26, 2015, the Debtor purportedly sold his 50% ownership interest in Bravo Luck to his son for $1.00.  Nonetheless, the Debtor (and not his son) used the Sherry Netherland Apartment as a residence from 2015 until in or around March 2023 when he was apprehended by federal law enforcement while at his Sherry Netherland Apartment.  The Debtor, Defendant Qiang Guo, and Defendant Bravo Luck all intentionally took these actions to conceal the Debtor's ultimate beneficial ownership of the Sherry Netherland Apartment and keep it from creditors.

185.    The Debtor also used Bravo Luck to hide his purchase the Lady May, a 150-foot luxury yacht.

186.    Between October 10, 2014 and June 27, 2017, Ms. Qu, the Debtor's then-executive assistant and accounting manager, was the nominal sole shareholder and director of HK International, having received "ownership" from the Debtor in a "shielding" transfer that involved no consideration.  During this time period, all material actions that Ms. Qu took in her capacity as sole shareholder and director of HK International were taken upon the request and instruction of the Debtor.  For example, if the Debtor asked or instructed Ms. Qu to sign a document in her capacity as sole shareholder and director of HK International, she did so without discussion, including with respect to the purchase of the Lady May in February 2015.

187.    On February 23, 2015—or approximately two weeks before the purchase (with funds wired from Bravo Luck) of the Sherry Netherland Apartment—HK International purchased the Lady May for €28,000,000 (or approximately $32,000,000[27]) from Apsley Yachts Limited.

188.    Also on February 23, 2015, Bravo Luck transferred no less than €25,000,000 to a representative of Apsley Yachts Limited.  This transfer was made pursuant to a wire transfer form signed by the Debtor for the purpose of enabling HK International to buy the Lady May.

189.    As noted above, HK International was always controlled by the Debtor.  Even after 2014, when he transferred his shares to Ms. Qu, the Debtor remained the beneficial owner and Ms. Qu could exercise rights in connection with the shares only at the Debtor's direction.

190.    This structure remained in place until June 27, 2017, when Ms. Qu purportedly transferred ownership of HK International to the Debtor's daughter, Defendant Mei Guo for HK$1.00.

191.    Approximately two years later, on April 1, 2019, the Defendant Mei Guo formed HK International Funds Investments (USA) Limited, LLC ("HK USA"), of which she was the sole member.  That same month, HK International transferred the Lady May to HL USA for no consideration.

192.    The Debtor, the Debtor's daughter, Mei Guo, HK USA, HK International, and Bravo Luck all took these actions to conceal the Debtor's ultimate beneficial ownership of the Lady May and keep it from his creditors.

193.    This Court has since determined that HK USA was the alter ego of the Debtor and, thus, the Lady May belonged to the chapter 11 estate.

---

[27]    ██████████████████████████████████████████████████████
██████████████████████████████████████████████
██████████████

*Greenwich Land*

194.    Defendant Greenwich Land is a Delaware limited liability company formed on July 3, 2019.  Greenwich Land operated out of 162 East 64th Street, New York, New York.  Only three individuals other than Defendant Ngok have served as officers of Greenwich Land—Defendants Yvette Wang and Max Krasner, and Daniel Podhaskie.  Each of these individuals has occupied numerous positions at Debtor-controlled entities.

195.    Agents of Greenwich Land committed numerous unlawful acts, including opening bank accounts under false pretenses and knowingly using interstate wires, in furtherance of the Kwok Enterprise's purposes of concealing the Debtor's wealth and defrauding his creditors, and furthering the various frauds advanced by the Kwok Enterprise.  Greenwich Land and its nominal owner, Defendant Hing Chi Ngok, generate no income or revenue from any operations of Greenwich Land, and it was otherwise funded only from fraudulently obtained monies collected by the Kwok Enterprise as a result of the fraudulent schemes detailed herein.

196.    Although certain Defendants have claimed that Greenwich Land's business consisted merely of owning real property, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ in furtherance of the Kwok Enterprise's scheme to defraud the Debtor's creditors and disguise the nature and ownership of fraudulently obtained monies obtained through the GTV fraud scheme, the G-Club fraud scheme, the Farm Loan Program, and the Himalaya Exchange fraud scheme. ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮  ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮



[redacted] in violation of the March 28, 2023 temporary restraining order[28] and May 26, 2023 preliminary injunction[29] prohibiting such dissipation of Greenwich Land's assets.

202. Moreover, each of Defendants [redacted] at all relevant times between October 26, 2020 and July 31, 2023 that Greenwich Land had no operations, income, or ability to generate monies absent receipt of funds from other co-conspirators and members of the Kwok Enterprise. Each of Defendants [redacted] at all relevant times between October 26, 2020 and July 31, 2023 that the funds transferred by Greenwich Land to the Bento debit card accounts of each Defendant was in fact the product of unlawful activity and each knowingly furthered the Kwok Enterprise's purpose of defrauding the Debtor's creditors by obtaining such Bento debit card accounts under false pretenses given such accounts would knowingly be funded with the proceeds of the Debtor's fraudulent schemes.

203. [redacted]

---

[28] Adv. No. 23-05005, Docket No. 14.

[29] Adv. No. 23-05005, Docket No. 53.



██████████████████████ Greenwich Land knowingly made and received such transfers in fraudulently obtained property—the monies of investor-victims of the GTV fraud—and such transfers made by Greenwich Land and received by it were designed to conceal and disguise the nature, source, and control of the proceeds of the GTV fraud, which funds were ultimately controlled by the Debtor.  This is an example of the shell game that the Debtor directs and uses to defraud creditors and conceal his assets, causing considerable harm to the Trustee and the Debtor's creditors.

204.   ██████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

---

[30]   The principal of Savio Law LLC is or was Nicholas F. Savio.  Mr. Savio currently practices with Lawall & Mitchell, the law firm of the Debtor's general counsel, Aaron Mitchell.  Previously, Mr. Savio and Mr. Mitchell were colleagues at the law firm of Cohen & Howard, L.L.P., where they represented the Debtor in litigation before the federal district court in New Jersey.  S██████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████ sum, upon information and belief, Savio Law LLC is a representative of the Debtor.



205.    One of the real properties that Greenwich Land purchased and later sold is the residential property located at 33 Ferncliff Road (the "Ferncliff Property").  The Debtor controlled the purchase, use, and sale of the Ferncliff Property, and another Debtor-controlled defendant entity, Hudson Diamond NY LLC was used for the Debtor's purchase and sale of the Ferncliff Property.

206.    Hudson Diamond NY is a Debtor shell company purportedly owned by defendant Mei Guo through Hudson Diamond Holding.

209. ████████████████████████████████████████

████████████████████████████████████████

████████████████████████ ██████████ Land executed such transfers in interstate commerce using U.S. wires, and Greenwich Land did so with knowledge that such transactions would be a fraud upon the bankruptcy court and would promote the further concealment of the Debtor's assets from the Court and the Debtor's creditors. Greenwich Land also knew that all such transactions would further conceal and disguise the nature, control of, and ownership of the Ferncliff Proceeds.

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████

| ████ | ████ | ████ | ████ | ████ | ██ |
|---|---|---|---|---|---|
| ██ | ██ | ██ | | ██ | |
| ████ ████ ████ ████ | ████ ██ ████ | ████ ██ ████ | ████ ██ ████ | ████ ██ ████ | ████ ██ ████ |
| ████ ██ ████ ██ | ████ ██ ████ | ████ ██ ████ | ████ ██ ████ | ████ ██ ████ | ████ ██ ████ |

210. ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

---

[31] A schedule of such transactions is attached hereto as _____.

211. ███████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

██  ██████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████ Thus, these payments were clearly made

for the Debtor's personal benefit.

213. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████ Specifically:

a. ████████████████████████████████████████████████
████████████████████████████████████████ Hudson
Diamond NY executed such transfer in interstate commerce using U.S. wires and,
having no operations or ability to fund itself, with knowledge that such funds were
unlawfully obtained and transferred in furtherance of the Kwok Enterprise's
scheme to defraud the Debtor's creditors;

b. ██████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████████
████████████████████████████████████. Greenwich
Land executed such transfer in interstate commerce using U.S. wires and, having
no operations or ability to fund itself, with knowledge that such funds were
unlawfully obtained and transferred in furtherance of the Kwok Enterprise's
scheme to defraud the Debtor's creditors;

c. ████████████████████████████████████████████████████
at a U.S. bank. Saraca executed such transfer in interstate commerce using U.S.
wires and, having no operations or ability to fund itself, with knowledge that such
funds were unlawfully obtained and transferred in furtherance of the Kwok
Enterprise's scheme to defraud the Debtor's creditors;

d. ████████████████████████████████████████████
████████████████████████ Hudson Diamond NY made such transfer in interstate commerce using U.S. wires and, having no operations or ability to fund itself, with knowledge that such funds were unlawfully obtained and transferred in furtherance of the Kwok Enterprise's scheme to defraud the Debtor's creditors; and

■ ████████████████████████████████████████████
████████████████████████████████████████████
█████████████████████████████. Greenwich Land executed such transfer in interstate commerce using U.S. wires and, having no operations or ability to fund itself, with knowledge that such funds were unlawfully obtained and transferred in furtherance of the Kwok Enterprise's scheme to defraud the Debtor's creditors.

*Hudson Diamond NY LLC and Hudson Diamond Holdings LLC*

██ ████████████████████████████████████████████

████████████████████████████████████████████

████████ ██████████████████████████   ██████████████

████████████████████████████████████████████

██████████████████████████

██ ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

216.    Hudson Diamond NY was another entity created on behalf of the Debtor for the purported purpose of acquiring real property.

██ ████████████████████████████████████████

████████████████████████████████████████████



218. Hudson Diamond NY has been funded by the Debtor through entities he controls. Like so many other entities he owned and controlled, the Kwok Enterprise used Hudson Diamond NY to keep assets of the Debtor from creditors while using such assets to maintain the Debtor's lavish billionaire image, such that he could market himself and the Kwok Enterprise to investor-victims as an individual and organization worth trusting and investing with.

219. Defendant Hudson Diamond NY has received funding from numerous Debtor-controlled entities, including, among others,  Upon information and belief, Hudson Diamond NY receives no funding other than from other Debtor-controlled entities. ACA

Capital executed all such transfers in furtherance of the foregoing frauds and in furtherance of the

Kwok Enterprise's purpose of concealing and disguising the nature and control of such fraudulent proceeds.

220. Defendant Hudson Diamond NY was created by the Debtor primarily to acquire real property. Specifically, the Debtor has used Hudson Diamond NY to fund real estate purchases under the name of his shell company, Greenwich Land, purportedly held in the name of the Debtor's wife, Hing Chi Ngok. ███████████████████████████

████████████████████████████████████████████████

███ ██████████████████████████████████ Having no funding mechanism of its own, Hudson Diamond NY had knowledge that such transfer was in furtherance of the Kwok Enterprise's scheme and purpose of defrauding the Debtor's creditors and concealing the nature and control of proceeds such as the funds it transferred to Greenwich Land.

b. ████████████████████████████████████
████████████████████████████████████
████ ██ ██ ████ ████ ███ █ ███ ███ ███ ███ ███ no ability to generate monies of its own, and having received such funds from Hudson Diamond NY, Greenwich Land had knowledge that such transfer was in furtherance of the Kwok Enterprise's scheme and purpose of defrauding the Debtor's creditors and concealing the nature and control of proceeds such as the funds it transferred to Whitman Breed.

███ ████████████████████████████████
████████████████████████████████
████████████████████████████
████████. Having no ability to generate monies of its own, and having received such funds from Hudson Diamond NY, Greenwich Land had knowledge that such transfer was in furtherance of the Kwok Enterprise's scheme and purpose of defrauding the Debtor's creditors and concealing the nature and control of proceeds such as the funds it transferred to Whitman Breed.

221. During her deposition, Mei Guo, purported sole member of Hudson Diamond Holding, the purported sole member of Hudson Diamond NY, asserted her rights under the Fifth Amendment when asked whether her father, the Debtor, ██████████████████████

[REDACTED]

[REDACTED]

222.    During her deposition, Mei Guo, purported sole member of Hudson Diamond Holding, the purported sole member of Hudson Diamond NY, asserted her rights under the Fifth Amendment when asked whether her father, the Debtor, [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

224.    Bank records show that, apart from funding real estate transactions, the Debtor also used Hudson Diamond NY to transfer millions of dollars to other shell companies, including, for example, [REDACTED] as well as to transfer funds to his daughter, Mei Guo, and his wife, Hing Chi Ngok.

225.    In addition, upon information and belief, Hudson Diamond NY owned one of the Debtor's Rolls Royce luxury automobiles.

226.    As discussed further herein, defendant Hudson Diamond NY's only documented activities consisted of holding the Debtor's assets and paying his expenses.  Hudson Diamond NY did nothing other than participate in the Kwok Enterprise by receiving funding from other Debtor-controlled companies, holding cash in bank accounts (in addition to holding the Debtor's Rolls Royce and potentially other assets), and paying for the Debtor's expenses.

[REDACTED]

[REDACTED]

█████████████████████████████████████████████████████████

███████████████████████████

228.    In addition, Mei Guo invoked the Fifth Amendment in testimony before this Court when asked, among other things, whether Hudson Diamond NY was created at the Debtor's direction to acquire real property and whether the Debtor at all times has controlled Hudson Diamond NY and its assets.

### *The Hamilton Entities*

229.    Integral to monetizing the G-Clubs fraud for the benefit of the Debtor and his family and associates were the "Hamilton Entities" an umbrella of investment vehicles that were funded with investor-victims' contributions to G-Clubs such that the Kwok Enterprise could (a) preserve G-Clubs' purported and preferential "membership organization" tax status in Puerto Rico (as opposed to G-Clubs being an investment entity for tax purposes) while (b) enriching the Debtor, his family, and his associates through the transfer of member-victims' monies to Debtor-controlled entities that could purchase assets (and conceal them from the Debtor's creditors).

230.    Defendant David Fallon, at the direction of the Debtor, Defendant Qiang Guo, and Defendant William Je, was the primary operating employee of the Hamilton Entities, misleading the Hamilton Entities' fund administrators, NAV Fund Administration Group, and papering "subscriptions" and other faux investments in the Hamilton Entities for the benefit of the Kwok Enterprise and the Debtor.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████

Hamilton SA Fund SP
Fortress Digital Assets Fund SP
Taurus Fund SP
Hamilton Delphi Fund SP
Hamilton Mars Fund SP
Hamilton M&A Fund SP Class A
Hamilton M&A Fund SP Class B
Hamilton PE Fund SP
Hamilton FX Fund SP
Hamilton Diversified Trading Fund SP
Hamilton Digital Assets Fund SP
Himalaya Digital Assets Fund SP Class A
Himalaya Digital Assets Fund SP Class B

232.  ████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████.  Defendant  David  Fallon  made  all  such

communications foreign wires, either by phone or e-mail, and willfully engaged with the bank under fraudulent pretenses.

*The Taurus Entities and the Mahwah Mansion*

233.   In furtherance of the G-Club fraud and by using the Hamilton Entities to conceal the fraud and benefit the Debtor, his family, and associates, on December 16, 2021 (the "Purchase Date"), Defendant Taurus Fund SP, a segregated portfolio company of Hamilton Opportunity Fund SPC, either directly or indirectly through Taurus Fund LLC ("Taurus Fund"), purchased an approximately 50,000 square foot New Jersey estate, the Mahwah Mansion, from Crocker Mansion Estate LLC for approximately $26.5 million.  The deed was recorded on the same date at Bergen County, New Jersey.  As discussed below, the purchase of the Mahwah Mansion was in fact an extension of the G-Club fraud executed by the Debtor and his co-conspirators.



234.    Taurus Fund was formed in Nevada on December 16, 2021, the same date as the Purchase Date.

235.    Besides the Mahwah Mansion, Taurus Fund also holds title to a Bösendorfer grand piano designed by F.A. Porsche (the "Porsche Piano"), which is believed to be valued at over $250,000.    The Porsche Piano was previously located at the Debtor's GSeries offices at 3 Columbus Circle in New York City.



236.    Taurus Fund is managed by (i) the Debtor's chauffeur and/or bodyguard Defendant Scott Barnett and (ii) Defendant Taurus Management LLC.  Defendant Taurus Fund, however, is owned by Taurus Fund SP, a purported segregated portfolio of Defendant Hamilton Opportunity Fund SPC.

237.    Defendant Scott Barnett is the Debtor's chauffeur and/or bodyguard, and Barnett continues to be employed by and actively work for the Debtor.  In fact, on June 20, 2023, in an email to the Trustee, Aaron A. Romney, the Debtor's counsel, notified the Trustee that "***Scott Barnett, who worked security for Mr. Kwok at the Sherry [Netherland], will be picking up [certain] boxes***" from the Sherry Netherland containing the Debtor's and his family members' clothes and personal effects.  Barnett is also listed as a covered driver under an insurance policy issued by AIG to Golden Spring (New York) Ltd., one of the Debtor's many shell companies. Barnett has also been paid by at least two other shell companies, Greenwich Land, LLC, and Lexington Property.

238.     Taurus Fund's other listed manager, Taurus Management LLC, was formed on December 15, 2021, one day before the Purchase Date, as a limited liability company in the State of New Mexico.  Despite being a New Mexico entity, Taurus Management shares the same address as Taurus Fund in Nevada at 6628 Sky Pointe Drive, Suite 129-1071, Las Vegas, NV 89131.

239.     Although Taurus Fund held nominal title to the Mahwah Mansion, the Debtor had full beneficial ownership and control over the property until his arrest on March 15, 2023.

240.     The Debtor's residence at, and his equitable ownership of, the Mahwah Mansion was revealed in the initial indictment against him containing multiple charges of securities fraud, wire fraud, and money laundering.[32]  The initial indictment identified the Mahwah Mansion as one of the Debtor's luxury residences in the United States, along with his apartment at the Sherry-Netherland and his residence in Greenwich, Connecticut.

241.     Constructed in 1907, the castle-styled Mahwah Mansion, located within 25 miles of New York City, is described as one of the world's most magnificent and rare estates.  The mansion has 21 bedrooms, more than 19 bathrooms, a great hall, library, tea room, formal dining room, restaurant-style kitchen, movie theater, billiard room, indoor lap pool with spa, massage room, wine room, game room, gym, outdoor pool with cabana, majestic gardens with two fountains, tennis court, 8-car garage, and rare wood, stone work and craftsmanship throughout the castle.  Additionally, the Mahwah Mansion has its own Wikipedia page and was listed on the National Register of Historic Places in 1997.

242.     The grandeur and lavishness of the Mahwah Mansion is consistent with the Debtor's preference for extravagant residences, just like the $70 million Sherry Netherland apartment and the Debtor's multi-million dollar residence in Connecticut.

---

[32]     *Cf.* Superseding Indictment.

243. In sum, the Debtor decided to purchase the Mahwah Mansion on December 16, 2021, two months prior to the Debtor's voluntary filing of chapter 11 petition on February 15, 2022, and while he owed huge debts to creditors, including a judgment of approximately $115 million to PAX.  He also decided to hide his purchase and equitable ownership of the Mahwah Mansion (which, unsurprisingly, is not listed on the Debtor's schedules of assets and liabilities), which would have remained hidden if not for the criminal indictment by the U.S. government on March 15, 2023.

244. Despite Taurus Fund's nominal title to the Mahwah Mansion, the Debtor directed and was personally involved in the purchase of and renovations to the mansion, using money that was under his control—the ill-gotten monies sent by member-victims to G-Club.











257.

well as various furniture and decorative items, such as Chinese and Persian rugs worth approximately $978,000, a $62,000

television, a $53,000 fireplace log cradle holder, a $59,000 watch storage box, and a $35,000 mattress.

### 3.    Purported Operating Entities Concealing Debtor's Wealth and Assets.

258.    The Debtor also utilized faux business organizations to transfer fraudulently obtained proceeds throughout the Kwok Enterprise and among his family and associates to prevent creditors from obtaining recoveries against him.

#### The HCHK Entities

259.    Defendants HCHK Technologies, HCHK Property, and Lexington Property are all entities owned by Holy City.  Notably, Defendant Yvette Wang is the (nominal) 99.9999% owner of Holy City, Defendant Anthony DiBattista is the nominal 0.0001% owner of Holy City, but the Debtor is the functional and beneficial owner of Holy City and all of its subsidiaries.

260.    Along with Defendant Yvette Wang, Defendant DiBattista is also a long-standing employee of the Debtor, serving in various roles at different Debtor-controlled companies. Defendant DiBattista was employed at Golden Spring, and has served the Debtor as a corporate officer of GTV, GFashion, and G-Clubs.

261.    In addition to Defendant DiBattista, key personnel of the HCHK Entities are former employees or officers of the Debtor's "family office," Golden Spring.  These other Golden Spring personnel who moved to the HCHK Entities include Defendant Max Krasner, Joe Wang, Bernardo Enriquez, and Defendant Alex Hadjicharalambous.  Upon information and belief, the HCHK Entities are merely a continuation of Golden Spring with new corporate letterhead.  Other HCHK personnel include Elliott Dordick, an individual this Court found to be an employee of Gettr,[33] an entity that is part of the umbrella of "G-Series" entities which this Court found "serve the purposes

---

[33]    PI Decision ¶ 13.

of the Debtor" and "serve as business vehicles for the Debtor."[34]  As the Court may recall, Mr. Dordick was involved in the Debtor's harassment campaign against the Trustee and PAX.

262.    The HCHK Entities are not independent businesses that simply happen to have done business with entities linked to the Debtor.  They are Business-Front Entities—affiliates of the Debtor's G-Series entities that, together with such entities, comprised a one cog in the Kwok Enterprise controlled by the Debtor and dedicated to promoting the Debtor's interests, enriching the Debtor, his family, and associates, concealing the Debtor's assets and wealth from creditors, and maintaining the Debtor's billionaire lifestyle and image as a successful entrepreneur and investor.

263.    The HCHK Entities' business was located at 3 Columbus Circle, in New York City, where HCHK Property and Lexington Property sublet office space.  This is the location where associates of the Debtor, acting at the Debtor's behest, filmed videos in support of the Debtor, including videos in late 2022 calling for harassment against the Trustee, PAX, and their counsel. These activities led to the Court's issuance of its preliminary injunction decision [Docket No. 133 in Adv. Proc. No. 22-05032] where the Court found, among other things, that the Debtor controlled the G-Series entities.  Upon information and belief, these videos attacking the Trustee and PAX were produced using the video and electronic equipment disclosed as purported assets of HCHK Technologies in connection with certain attempted New York state court assignment proceedings.

264.    Documents produced by the HCHK Entities' accounting firm, Marcum LLP, ("Marcum") show the degree to which the HCHK Entities and the G-Series Entities operated as an element of the Kwok Enterprise on behalf of the Debtor.  Among other things, the documents show that Marcum had no doubt who controlled the HCHK Entities and G-Series Entities.  ▮

---

[34]    PI Decision ¶ 7.

████████████████████████████████████████████████████████████████

███████████████████████████████████████████

265.    The role of the HCHK Entities was, among other things, to serve as a "piggy bank" for the Debtor's businesses.  It was for this reason that Marcum's engagement letter provided that Marcum would provide services to Lexington Property "and Affiliates," and Marcum was explicitly tasked with preparing not only the tax returns of the HCHK Entities, but also those of other Debtor-controlled entities as well, including GFashion and GTV.  Similarly, Marcum classified HCHK Technologies' assets to include bank accounts corresponding to Gettr, GFashion, and "FMV" (an acronym that, upon information and belief, refers to another Debtor-controlled company, Freedom Media Ventures).  This "piggy bank" role is consistent with the schedule of assets filed with respect to HCHK Technologies, which discloses accounts receivable of $12,559,423.06.  Upon information and belief, these accounts receivable include obligations purportedly owed to HCHK Technologies by G-Series entities or other companies controlled by the Debtor and that are co-conspirators and members of the Kwok Enterprise.

266.    For example, Defendant HCHK Technologies on multiple occasions willfully and knowingly transmitted material wire communications, including wire transfers of monies fraudulently obtained from investor-victims and/or member-victims of the Kwok Enterprise's various frauds, to conceal the Debtor's assets and wealth from his creditors and to pay the expenses of the Debtor and his family and associates, in furtherance of the Kwok Enterprise's scheme to defraud the Debtor's creditors:

a.  knew that such payment was for the benefit of the Debtor and

his family and was not a legitimate expense or obligation of HCHK Technologies.

b.  is the management company for the Lady May, which Justice Ostrager and this Court ruled was the Debtor's yacht. Upon information and belief at all relevant times HCHK Technologies knew that such payment was for the benefit of the Debtor and his family and was not a legitimate expense or obligation of HCHK Technologies.

c. . Upon information and belief, the purpose of this payment was to purchase a new private plane for the Debtor, the Cirrus SF50 jet that has been cited in filings in connection with the Debtor's criminal case. Upon information and belief at all relevant times HCHK Technologies knew that such payment was for the benefit of the Debtor and his family and was not a legitimate expense or obligation of HCHK Technologies.

267. Moreover, Lexington Property, though ostensibly only in the business of subleasing office space, on multiple occasions willfully and knowingly transmitted material wire communications, including wire transfers of monies fraudulently obtained from investor-victims and/or member-victims of the Kwok Enterprise's various frauds, to conceal the Debtor's assets and wealth from his creditors and to pay the expenses of the Debtor and his family and associates, in furtherance of the Kwok Enterprise's scheme to defraud the Debtor's creditors. For example:

a. Notwithstanding that Defendant Mitchell testified under penalty of perjury that he at no time has provided legal services to Lexington Property:

i. [REDACTED] Upon information and belief at all relevant times Lexington Property knew that such payment was for the benefit of the Debtor and Defendant Mitchell, a known associate of the Debtor and member of the Kwok Enterprise, and was not a legitimate expense or obligation of Lexington Property.

ii. ███████████████████████████████████ ███████████████████████████ █████████████████ Upon information and belief at all relevant times Lexington Property knew that such payment was for the benefit of the Debtor and Defendants Mitchell and Lawall & Mitchell LLC, co-conspirators of the Debtor and members of the Kwok Enterprise, and was not a legitimate expense or obligation of Lexington Property.

iii. ███████████████████████████████████ ███████████████████████████ █████████████████ Upon information and belief at all relevant times Lexington Property knew that such payment was in furtherance of the Himalaya Exchange fraudulent scheme and was made for the benefit of the Debtor and the Kwok Enterprise and was not a legitimate expense, obligation, or investment of Lexington Property.

268. Lexington Property also knowingly received proceeds of the Kwok Enterprise's Farm Loan Program fraudulent scheme, █████████████████ and dissipated those proceeds, which were criminally derived property, through further financial transactions, including using U.S. wires in interstate commerce to transfer fraudulently obtained funds, with the intent to promote the Farm Loan Program fraudulent scheme and the Kwok Enterprise's fraudulent scheme to defraud the Debtor's creditors and conceal the nature and ownership of the Debtor's assets. For example:





269.    HCHK Property was also a critical cog in the Kwok Enterprise's Farm Loan Program fraud scheme. ███████████████████████████████████████████████, it both knowingly received fraudulently obtained funds from the Farm Loan Program scheme, and further transferred such funds to further that scheme and the Kwok Enterprise's efforts to conceal the nature and ownership of such funds from the Debtor's creditors. ███████████████

███████████████████████████████████████████████████████

████████████████████████████████████████ Upon receiving such funds, HCHK Property, like so many other defendants and co-conspirators, further transferred the funds to other defendants and co-conspirators controlled by the Debtor, knowingly furthering the Farm Loan Program fraud, enriching the Debtor, and defrauding the Debtor's creditors by concealing the nature and ownership of the fraudulently obtained funds. For example:





270.     The funds transferred by HCHK Property in the above three financial transactions, and in similar financial transactions conducted by HCHK Property, were fraudulently obtained proceeds of the Farm Loan Program.  HCHK Property knowingly transferred such ill-gotten proceeds of the Farm Loan Program to Hamilton Opportunity Fund SPC, Hamilton M&A Fund SP to enrich the Debtor, his family, and his associates, further the Farm Loan Program scheme, and defraud the Debtor's creditors by disguising and concealing the nature and ownership of the transferred funds.

271.     Further, the Defendants and co-conspirators who received such fraudulently obtained proceeds from HCHK Property did so knowing that HCHK Property was a shell entity owned by the Debtor; it had no means of earning or raising such vast sums of money other than through Kwok Enterprise fraudulent schemes such as the Farm Loan Program; and in fact the monies such Defendants and co-conspirators received from HCHK Property had been unlawfully taken from victims of the Farm Loan Program.  For example,

a.



273. In pleadings filed in connection with its criminal prosecution against the Debtor and Defendants Yvette Wang and William Je, the U.S. Government has alleged, among other things:

      a. HCHK Technologies is a "Kwok controlled company that . . . sent employees to the [United Arab Emirates] earlier this year to establish bank accounts that, as Kwok claimed, would be beyond the 'long-arm jurisdiction' of the United States." These employees "spent more than approximately six weeks in the UAE, apparently to assist in moving Kwok's and [William] Je's operations abroad."

      b. Gettr and HCHK Technologies are "Kwok- and [William] Je-controlled companies that are funded, in part, using fraud proceeds." Gettr "is a social media company that Kwok controls through a series of shell companies," and "Gettr and the HCHK entities . . . operate out of the same office location."

c.   "Photographs of annotated documents located inside a folder in [Defendant Yvette Wang's] purse at her apartment appear to reflect, in substance and in part, certain transactions and balances for six bank accounts held in the names of HCHK Technologies and HCHK Property Management . . . GFNY, Inc. (i.e., GFashion), and GF Italy (i.e., GFashion Italy)."

d.   "A photograph of another document located inside the folder in [Defendant Yvette Wang's] purse at her apartment appears to reflect, in sum and in substance, that [Defendant Yvette Wang] signed payroll expenses associated with various Kwok-controlled entities . . . . The document further indicates how certain payroll expenses were to be allocated among affiliated entities, including HCHK."

## IV.   Obstructing and Interfering with the Bankruptcy Process

274.   The Kwok Enterprise's scheme to defraud the Debtor's creditors came to a head in February 2021, when PAX obtained a judgment of $116 million against the Debtor for breach of contract in the NY Action and sought to enforce that judgment against the Debtor's assets.

275.   In connection with such enforcement efforts, the NY Court found that the Debtor engaged "in efforts to avoid and deceive his creditors by parking his substantial personal assets with a series of corporations, trusted confidants, and family members" and had "secreted his assets in a maze of corporate entities and with family members."[35]  The NY Court determined specifically that the Lady May yacht was an asset of the Debtor and imposed a $134 million contempt fine on the Debtor for removing the yacht from U.S. waters and failing to return it.

276.   The Debtor had no way to satisfy the PAX judgment or pay the contempt fine without accessing his hidden assets and revealing the Kwok Enterprise's fraudulent shell game. Accordingly, the Debtor was desperate to stop the NY Action to prevent PAX from making further headway in its efforts to enforce the judgment and fine.

---

[35]   *See* Decision + Order on Motion, *Pacific Alliance Asia Opportunity Fund L.P. v. Ho Wan Kwok*, Index No. 652077/2017 (N.Y. Sup. Feb. 9, 2022), at 1.

277.   Faced with this predicament, the Debtor and various of his Defendant co-conspirators decided they had no choice but to execute on the final phase of the Kwok Enterprise's scheme to defraud creditors:  the filing of a chapter 11 petition in this Court to both (i) immediately stay the NY Action and (ii) give the Debtor an opportunity to try to resolve the claims of PAX and other creditors through a consensual deal that would keep the fraud hidden.

A.      Initial Failure to Disclose Assets to Bankruptcy Court

278.   The Debtor filed his chapter 11 petition on February 15, 2022.  As required by the Bankruptcy Code, his schedules and statement of financial affairs (collectively, the "Schedules") were filed a few weeks later.

279.   Despite the voluminous public evidence demonstrating the Debtor's vast wealth, the Debtor's Schedules reported that the total value of the Debtor's property was $3,850.00, as compared to unsecured claims of $373,803,498.09, over $250 million of which consisted of the claims of PAX, with the remainder including numerous claims related to, among other things, alleged securities fraud, defamation, and sexual assault.

280.   The Schedules failed to reveal the hundreds of millions of dollars (at a minimum) of assets the Debtor held in the nominal names of the Defendants and the other individuals and shell companies who formed the Kwok Enterprise, as discussed in detail above.  One particularly glaring omission from the Schedules was any mention of the Lady May being an asset of the Debtor despite the NY Court having recently reached that conclusion in the NY Action.

281.   The Debtor did not create the Schedules or otherwise prepare for his bankruptcy filing by himself, but rather he had the assistance and cooperation of his counsel, including Defendant Aaron Mitchell.  As discussed elsewhere herein, Mitchell served as the Debtor's long-time personal counsel and close advisor in numerous affairs relevant to the Kwok Enterprise.  He

coordinated closely with the Debtor's bankruptcy counsel in trying to "sell" the Debtor's story to the Court, ███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████ Mitchell thus played an important role in helping the Debtor and his bankruptcy counsel prepare the fraudulent Schedules. Mitchell allowed the Schedules to be filed with the Court, despite knowing they were false, for the purpose of defrauding the Court and the Debtor's creditors.

282. The Debtor's efforts to fraudulently conceal his true finances from the Court continued as the chapter 11 case progressed. For example, approximately two months after the Petition Date, the Debtor, with, upon information and belief, the assistance of Defendant Aaron Mitchell, orchestrated the filing of the HK USA Proceeding on April 11, 2022, in which Defendant Mei Guo, the Debtor's daughter, caused HK USA to falsely claim that the Lady May belonged to HK USA and was not property of the estate.

283. The HK USA Proceeding was designed to uphold the fiction portrayed by the Schedules that the Lady May was not already owned by the Debtor and to create a scenario in which Defendant Mei Guo could "contribute" the Lady May to the estate as consideration for creditors under a proposed chapter 11 plan. The Debtor, his advisors (including Defendant Mitchell), and Defendant Mei Guo knew the allegations in the HK USA Proceeding were false, but they allowed it to be filed anyway to perpetuate the fraud and further the Debtor's exit strategy. The Court would later agree with the Trustee that the Lady May is and always has been estate property, but not until after substantial resources were expended litigating the issue.[36]

---

[36] *See Order Granting Motion of Chapter 11 Trustee for Estate of Ho Wan Kwok for Partial Summary Judgment* [Adv. Proc. 22-05003, Docket No. 172] (as amended) and *Memorandum of Decision and Order Granting Motion for Partial Summary Judgment on Second Counterclaim* [Adv. Proc. 22-05003, Docket No. 221].

284.    Further fraudulent concealment also occurred on or about April 28, 2022, in response to PAX's motion for relief from the automatic stay to continue the enforcement of its judgment in the NY Action as against the Lady May and other assets of the Debtor.  In a last-ditch effort to avoid stay relief, the Debtor agreed to post a bond in the amount of $37 million, which Defendants Mei Guo, William Je, and Himalaya International Financial Group Ltd. conspired with the Debtor to fund to further the scheme to defraud the Debtor's creditors and keep his assets hidden.  These Defendants disguised the $37 million that provided to HK USA at Defendant Mei Guo's request as a purported "loan," even though it was in reality no such thing, and even though the funds were, in fact, property beneficially owned and controlled by the Debtor.  Again, these actions were taken to obstruct and delay the case and the Trustee's investigation and to hide assets from creditors.

B.    Obstruction By Impeding Trustee's Work and Violating Court Orders

285.    Eventually, the Debtor's representation of his financial affairs was questioned by the office of the United States Trustee (the "UST"), who moved for the appointment of an examiner or in the alternative, a chapter 11 trustee.  The UST noted the Debtor's pre-petition history of avoiding creditors and asserting the Fifth Amendment in response to questions about his financial dealing.  The UST was deeply concerned with the Debtor's "artificial self-created 'poverty'" and inability and/or unwillingness to recognize and accept his obligations to provide accurate financial information to meet his obligations as a debtor in possession.[37]  Ultimately, the Court granted the relief sought by the UST and the Trustee was appointed to investigate the financial affairs of the Debtor.[38]

---

[37]    United States Trustee's Motion for Order Directing the Appointment of an Examiner or, In the Alternative, Motion for Order Directing the Appointment of a Chapter 11 Trustee [Docket No. 102].

[38]    Order Granting Appointment of Chapter 11 Trustee [Docket No. 523].

286.    After his appointment, the Trustee immediately began his investigation into the Debtor's financial affairs while the Debtor and his co-conspirators continued to misrepresent those affairs and to obstruct and interfere with the Trustee's investigation in nearly every way possible, with the objective of insulating the Debtor's assets from his creditors.

### 1.    Failure to Comply With Corporate Governance Rights Order

287.    Shortly after the Trustee's appointment, on August 10, 2022, the Court entered an order (the "Corporate Governance Rights Order") confirming that the Debtor, as required by the Bankruptcy Code, must "cooperate with the Trustee to enable the Trustee to perform his duties" and "surrender to the Trustee all property of the estate and any recorded information, including, without limitation, books, documents, records and papers relating to property of the estate."[39]

288.    One of the Debtor's shell companies subject to the Corporate Governance Rights Order was Ace Decade, which the Debtor had used to make an investment with UBS and later commence litigation against UBS with respect to such investment.  Despite requirements of the Corporate Governance Rights Order, the Debtor refused to transfer his shares in Ace Decade to the Trustee or provide the Trustee with any corporate documents regarding Ace Decade or its wholly owned subsidiary Dawn State Limited ("Dawn State"), even though the Debtor attested on multiple occasions that he owned Ace Decade and that Ace Decade wholly owned Dawn State.

---

[39]    Order, Pursuant to Bankruptcy Code Sections 363, 521, 541, 1108, and 105, (A) Confirming that Chapter 11 Trustee Holds All of Debtor's Economic and Corporate Governance Rights in Debtor-Controlled Entities, (B) Authorizing Chapter 11 Trustee to Act in Any Foreign Country on Behalf of Estate, and (C) Granting Related Relief [Docket No. 761].

289.    On October 4, 2022, the Trustee filed a motion (the "Corporate Governance Contempt Motion") for an order holding the Debtor in civil contempt for failure to comply with the Corporate Governance Rights Order.[40]

290.    On November 17, 2022, the Court entered an order (the "Partial Resolution Order") partially resolving the Corporate Governance Contempt Motion, holding, among other things, that (i) the Debtor exclusively beneficially owned and controlled Ace Decade on the Petition Date and prior to the date of the Trustee's appointment, (ii) Defendant Yvette Wang is not and has never been a beneficial owner of the shares in Ace Decade, and (iii) but for the Trustee's appointment and his rights under the Bankruptcy Code and the Corporate Governance Rights Order, the Debtor would still exclusively beneficially own and control Ace Decade.[41]

291.    Prior to the entry of Partial Resolution Order, counsel to the Trustee emailed a copy of the proposed form of Partial Resolution order to Mr. Alex Lipman, who the Trustee understands acted as counsel for Defendant Yvette Wang at the time, and on Ace Decade c/o Trident Trust Company (B.V.I.) Limited ("Trident") in the BVI, which was the registered agent for Ace Decade in the BVI.

292.    On January 24, 2023, the Court entered an order [Docket No. 1372] (the "Contempt Order") holding the Debtor in contempt of the Corporate Governance Rights Order. The Court held, among other things, that the Debtor was obligated to comply with the Corporate Governance Rights Order and surrender to the Trustee Ace Decade, his ownership in Ace Decade and related documents, and the Debtor had the ability to do so, but did not.[42]

---

[40]    Motion of Chapter 11 Trustee for Entry of Order Holding Debtor in Civil Contempt for Failure to Comply with Corporate Governance Rights Order [Docket No. 913].

[41]    Order Regarding Partial Resolution of Trustee's Contempt Motion [Docket No. 1110]

[42]    Order Granting Motion to Hold Debtor in Contempt of Corporate Governance Order, at 6-7, 14-15 [Docket No. 1372].

293.   In addition, the Contempt Order found that (i) Defendant Yvette Wang is the nominee owner of Ace Decade for the benefit of the Debtor, (ii) the Debtor has control over Defendant Wang, including because the Debtor has employed Yvette Wang for several years, and has directed her to take actions on his behalf, including directing her to act on his behalf to purchase properties, and (iii) notwithstanding such control, the Debtor failed to cause Defendant Wang to turn over the shares in Ace Decade to the Trustee.[43]

294.   After the Contempt Order, the Trustee learned that on or around January 3, 2023, Defendant Wang transferred her nominal ownership in the sole share in Ace Decade to Rui Hao (the "Ace Decade Transfer") based, in particular, on the disclosures provided from Trident of the most recent corporate documents for Ace Decade upon Trustee's application with the BVI court, which was approved.  The Ace Decade Transfer was made without notice to or consent of the Trustee and was in violation of the Corporate Governance Rights Order.

295.   Given, among other things, her close relationship to the Debtor and integral role in the Kwok Enterprise, Defendant Wang was fully aware at the time of the Ace Decade Transfer that it was property of the estate pursuant to Court order.  By initiating the transfer anyway, she knowingly and intentionally (i) acted corruptly to obstruct and impede the chapter 11 case and the Trustee's investigation for the purpose of concealing the Debtor's assets from the estate, (ii) transferred the share, which was worth more than $5000, in foreign commerce knowing it had been converted from the estate in violation of the Corporate Governance Rights Order and the Contempt Order, and (iii) upon information and belief, facilitated the transfer using U.S. wires for the purpose of defrauding the Debtor's estate.

---

[43]   *Id.* at 4, 15.

296.    The Trustee filed an adversary complaint against Ace Decade, Yvette Wang and Rui Hao[44] to, among other things, avoid the Ace Decade Transfer as it was made in violation of the automatic stay under the Bankruptcy Code and was an unauthorized postpetition transfer of estate property.  The adversary proceeding remains pending.

### 2.    *Violations of Rule 2004 Orders*

297.    The Trustee has filed fifteen separate Rule 2004 motions seeking discovery from numerous individuals and entities, including several Defendants and co-conspirators. The Court entered orders granting each of the Rule 2004 motions (the "Rule 2004 Orders") allowing the Trustee to receive discovery from numerous entities and individuals including, among others, the Debtor and many of the Defendants.

298.    Despite the Court's Rule 2004 Orders, many of the Defendants failed to comply with the Rule 2004 subpoenas to avoid providing information that could potentially further uncover the fraudulent scheme. The Debtor was held in contempt of court[45] for failing to comply with the Rule 2004 subpoenas, as were the following Defendants and non-parties: Golden Spring (New York) Ltd. and Lamp Capital LLC[46]; GTV and Saraca[47]; Hudson Diamond NY LLC[48]; Hudson Diamond Holdings LLC[49]; G-Club US Operations LLC, G-Club US Operations, Inc., G-

---

[44]    Adv. Proc. No. 23-05028.

[45]    *See* Memorandum of Decision and Order Holding Individual Debtor in Contempt of Court and Denying Motion for Stay of Order Compelling Production [Docket No. 2035]

[46]    *See* Order Holding Golden Spring and Lamp Capital in Contempt of Court [Docket No. 1709].

[47]    *See* Order Granting Motion to Hold GTV Media Group, Inc. and Saraca Media, Inc. in Civil Contempt for Failure to Comply with Rule 2004 Subpoenas [Docket No. 2093].

[48]    *See* Order Granting in Part Motion for Entry of Order Holding Hudson Diamond NY LLC in Civil Contempt of Court [Docket No. 2009].

[49]    *See* Order Holding Hudson Diamond Holding LLC in Contempt [Docket No. 2545].

Fashion LLC, GNews LLC, New York MOS Himalaya LLC, Crane Advisory Group LLC, and Maywind Trading LLC.[50]

299.    By failing to comply with the Rule 2004 Subpoenas and related Court orders, the foregoing Defendants knowingly and intentionally acted to obstruct and impede the chapter 11 case and the Trustee's investigation for the purpose of concealing the Debtor's assets.

### 3. *Violation of Preliminary Injunction and Temporary Restraining Order in Greenwich Land Adversary Proceeding*

300.    On March 23, 2023, the Trustee commenced an adversary proceeding[51] against Defendants Greenwich Land and Hing Chi Ngok, the Debtor's wife, seeking a declaratory judgment that Greenwich Land, which is purportedly owned by Hing Chi Ngok, is the alter ego of the Debtor or, in the alterative, is equitably owned by the Debtor.

301.    On March 27, 2023, the Trustee filed an *ex parte* motion for temporary restraining order and preliminary injunction (the "Greenwich PI Motion") freezing certain assets of Defendants Greenwich Land and Hing Chi Ngok.

302.    On March 28, 2023, the Court granted the Greenwich PI Motion, in part, temporarily restraining and enjoining Defendants Greenwich Land and Hing Chi Ngok, and their respective agents, from encumbering, transferring, alienating, dissipating or assigning any of their property or assets, among other things.   On May 26, 2023, the Court entered a preliminary injunction extending such relief (the "Greenwich PI").

303.    Notwithstanding the Greenwich PI, between March 28, 2023 and July 31, 2023, approximately $34,000 was spent from Defendant Greenwich Land's account in violation of the

---

[50]    *See* Order Granting in Part Motion for Entry of Order Holding Non-Responding Parties in Civil Contempt of Court [Docket No. 1892].

[51]    Adv. Proc. No. 23-5005.

Greenwich PI.  This spending was carried out by, among others, Defendants Ngok, Chunguang Han, and Krasner for goods and services for their own personal benefit.  Such Defendants knowingly and intentionally spent such funds using U.S. wires for the purpose of concealing the Debtor's assets from the estate's creditors and to disguise the true source of the funds.

304.    Defendant Ngok, who purported to own and control Greenwich Land, allowed such spending to occur.  Each of Defendants Ngok, Chunguang Han, and Krasner was aware of the Greenwich PI and knowingly and intentionally violated it for the purpose of obstructing and impeding the chapter 11 case and the Trustee's investigation and fraudulently concealing assets from the estate.

C.    Additional Fraudulent Omissions and Misrepresentations Made in Connection with Debtor's Bankruptcy Case

305.    The Debtor and several Defendants continuously submitted false documents and information to the Trustee and Court in an attempt to keep the fraudulent scheme under wraps and to obstruct and impede the chapter 11 case and the Trustee's investigation.

306.    Defendants Bravo Luck and Qiang Guo.  Defendants Qiang Guo and Bravo Luck each filed proofs of claim in these jointly administered cases, asserting ownership of, or a financial claim with respect to, the Debtor's apartment at the Sherry Netherland Hotel.  Among other things, the proofs of claim rely on a purported trust agreement dated February 17, 2015.  As the Trustee has explained in detail in numerous pleadings, that "trust agreement" is a forged and backdated agreement that was fabricated to hide the true ownership of the apartment—a scheme the Debtor, Qiang Guo, and Bravo Luck attempted to continue even after the Genever entities and the Debtor himself filed their chapter 11 cases.  The estate ultimately incurred more than $1 million in fees to defend these spurious claims asserted by Defendants Bravo Luck and Qiang Guo.

307.    <u>Defendant Hing Chi Ngok</u>.  Defendant Ngok, the Debtor's wife, has asserted that she owns and controls Greenwich Land.  She also claimed that she "picked out" the Ferncliff Property purchased by Greenwich Land in February of 2020 and testified (at her January 5, 2023 Rule 2004 examination) that the Debtor had no involvement with Greenwich Land's purchase of the Taconic Road Property.  Yet, Defendant Ngok has also testified, among other things, that she did not know if she requested that Hudson Diamond NY transfer $1.5 million to Greenwich Land (which was used to purchase the Ferncliff Property) and, tellingly, was unable to recognize a photo of the Ferncliff Property.  Moreover, her testimony that the Debtor had no involvement with the purchase of the Taconic Road Property was directly contradicted by the detailed testimony of Mr. de Neree, the buyer-side real estate broker for the sale.

308.    <u>Defendant Mei Guo</u>.  Almost immediately after the filing of her father's chapter 11 case, Defendant Mei Guo caused HK USA (of which she was the sole shareholder) to file the above-described an adversary proceeding asserting ownership of the Lady May yacht.  In the complaint, HK USA asserts that "Ms. Guo, directly and through her representatives, is solely responsible for directing the Lady May's operations and movements."  As discussed above and at length in the Trustee's counterclaims, this statement had already been found to be false by Judge Ostrager of the New York Supreme Court, who found that Mei Guo's testimony "that she owns and controls the Lady May cannot be credited in any respect."  Mei Guo also repeatedly asserted, including under penalty of perjury, that HK USA's only asset was the Lady May—but, when confronted with facts discovered by the Trustee, ultimately conceded that HK USA also owned another boat, the Lady May II.

309.    Additionally, in the HK USA Proceeding she commenced, Mei Guo submitted certain pictures and screenshots of her personal cell phone.  Yet, in her opposition to the Trustee's

motion to enforce a Rule 2004 request, Mei Guo's counsel submitted a declaration stating that Mei Guo had not used a "smart phone" since 2017. When confronted with this contradiction, Mei Guo asserted her rights under the Fifth Amendment.

310. Mei Guo also committed perjury with regards to the proceeds of the sale of a Bombardier private jet. In an adversary proceeding brought by the Trustee, Mei Guo testified that she had sold the Bombardier for more than $10 million to buyer whose name she did not recall and that, while she was the "owner" of the proceeds, she did not recall where the proceeds were located and could not access them.[52] This was a falsehood.

311. The Trustee would later receive documents proving Mei Guo had extensive correspondence with an entity named JNFX regarding the proceeds, making clear that Mei Guo, at the time of her deposition on the subject, did know who was holding the proceeds and that she was able to control the disposition of the funds.[53] Mei Guo had previously intentionally failed to disclose the location of the sale proceeds for the purpose of obstructing and impeding the chapter 11 case and the Trustee's investigation and to conceal the Debtor's assets from the estate.

312. More recently, this court has found that "Ms. Guo has made contradictory statements under oath."[54]

313. Defendant Aaron Mitchell. Defendant Mitchell testified under oath in Court on July 18, 2023 that he does not "believe [the Debtor] has any business dealings," and that he had never seen the Debtor "do any of that [i.e., investing or owning a business] at any of the companies we've mentioned." This testimony under oath was false in light of Defendant Mitchell's

---

[52] *See* Plaintiff's Memorandum of Law in Support of Motion for Summary Judgment, ¶ 16 [Adv. Proc. 23-05008, Docket No. 91].

[53] *Id.* ¶ 17.

[54] *See* Order Holding Hudson Diamond Holding LLC in Contempt at 9 [Docket No. 2545].

involvement in the Kwok Enterprise and his intimate knowledge of the Debtor's finances and affairs. For example, as detailed above, Mitchell was intimately involved in detailed conversations relating to the Debtor's business dealings with G-Club, the opening of bank accounts at domestic financial institutions and abroad in furtherance of the G-Club scheme and others, and his efforts to have G-Club funds transferred to other shell entities for fraudulent purposes. Thus, Mitchell could not have truthfully stated to the Court in his testimony that the Debtor had no business dealings.

314.   Moreover, Defendant Mitchell directly participated in furthering the Kwok Enterprise's purposes within the Debtor's chapter 11 case through his efforts to conceal the Debtor's significant assets. ███████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████

██ ████████████████████████████████████████

██████████████████████████████████

████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████



████ ███████████████████████ course, in reality and in truth that the Debtor was the

latter—an individual directing extensive and elaborate frauds, schemes, and financial transactions

to defraud his creditors.  Yet, Defendant Mitchell continued to actively and directly participate in

furthering the Kwok Enterprise, including throughout these chapter 11 cases.

D.    Intimidation and Harassment Campaign Directed at Trustee and Others

318.    The Debtor and his supporters, including the Defendants, opposed the Trustee's

appointment and sought to have it overturned by the Court on multiple occasions.  When those

efforts failed, the Debtor and a number of the Defendants resorted to harassment to intimidate, influence, and interfere with the Trustee's work and the bankruptcy's progression. The harassment was consistent with the Debtor's past pattern and practice of attempting to intimidate through similar tactics anyone who challenged the Debtor and sought to expose his wrongful conduct.

319.  Almost immediately after the Trustee's appointment, the Debtor began posting on social media to hinder the Trustee's investigation and obstruct the bankruptcy process. The Debtor has over 1 million followers on his social media platforms, such as YouTube, GTV, X (formerly known as Twitter), and Gettr.  For example, in a July 10, 2022 post on Gettr, the Debtor called the Trustee a "scumbag" and a "garbage lawyer," and falsely proclaimed that the Trustee's firm receives 50% of its revenue from Communist China.  Later, on July 19, 2022, the @Miles Gettr account posted a statement about the Trustee stating the following: "Please spread the words about the revelations of the CCP military intelligence and the truths about the trustee of my bankruptcy case. All the U.S. DOJ officials and lawyers from various law firms who want to deport me and harm me will be sent to prison. I have the most unique voice in the world because almost every part of my body that can voice has been tortured by the CCP."

320.  These posts were just the beginning.  As the Trustee's investigation developed, the Debtor, his Defendant co-conspirators and other followers engaged in an increasingly aggressive and outright dangerous online attack consisting of false and harassing statements aimed at the Trustee and creditors of the Debtor, namely PAX, and their respective law firms and lawyers, as well as the Trustee's family members.  The Debtor and his followers engaged in this attack as a method of intimidation to deter the Trustee from acting in accordance with his statutory duties and PAX from pursuing its claims.  The online posts ended up revealing the home and office addresses of the Trustee, the Trustee's relatives' home addresses, the New York office address of Paul

Hastings LLP, the home addresses of the PAG Chairman's family members; the New York office address of PAX's counsel, O'Melveny & Myers LLP.

321. In addition to the online harassment campaign, the Debtor and his followers, including many of the Defendants, carried out worldwide protests outside the homes and places of business of the Trustee and his relatives and of PAX's owners and their relatives. The protests also occurred outside the offices of the Trustee's and PAX's counsel. At these protests, which were often broadcasted online, protesters displayed posters and shouted the same types of harassing statements being made online.

322. The numerous vile, disgusting, and defamatory statements and images made and displayed as part of the online and physical protest and harassment campaign have already been the subject of orders of this Court and will not be fully recounted herein. For purposes of this Complaint, however, it is important to note that several Defendants took part in the campaign in an attempt to influence, intimidate, and impede the Trustee's investigation. For example:

- Defendant Shih Hsin Yu's X account is @jackson66368924 and between at least November 22, 2022 and December 29, 2022, the X account @jackson66368924 made numerous posts about protests against the Trustee and the Trustee's counsel occurring at Grand Central Station in New York City and outside the Trustee's home in Greenwich, Connecticut. The posts include various edited images of the Trustee and others, e.g., with a hammer and sickle emblazoned on their foreheads or wearing Nazi uniforms. The posts discuss, among other things, proceedings in this Court, preferred outcomes on appeal, and desires regarding the Trustee.

- Defendant Yan Chun Liu has posted repeatedly and numerously on social media, including on Gettr and X, defamatory pictures of the Trustee, support of the protests, and pictures of the protests against the Trustee, his counsel, and Paul Hastings LLP.

- On or about November 21, 2022, Defendant Qidong Xia posted on his Gettr account (@changdaobrother) threatening the Trustee stating "the rest of your life will be spent in fear." Later, on or about November 24, 2022, Qidong Xia posted on Gettr encouraging Kwok's followers to join the Protest.

- Between November 28, 2022 and December 6, 2022, Defendant Xuebing Wang was posting online multiple times a day to support the Protest against the Trustee and Paul Hastings LLP. Additionally, in a video posted on January 1, 2023 by the @20minfocus Gettr account, Xuebing Wang is recorded speaking to protestors picketing outside the Trustee's home in Greenwich, Connecticut. According to his remarks, he was speaking on January 1, 2023. He discusses meetings in "New York" at "the 3C office" with other members of "the alliance" and the "ironblooded group" and his desire to "visit these comrades on the front line." He tells the picketers that the Trustee will be imprisoned and will "feel our strength."

323. Upon information and belief, the harassment campaign was funded by the Defendant Rule of Law Entities.[55] Indeed, on November 26, 2022, the Debtor appeared in a YouTube video and acknowledged that protest-related expenses are being funded by ROLF. In the video, the Debtor explains that, through ROLF, "[w]e have been helping fellow fighters with legal issues, printing anti-communism materials, and materials about CCP's military intelligence, all types of materials." The Trustee is also in possession of bank records showing that the Rule of Law Entities routinely funded past similar protests ostensibly directed at purported supporters of the Chinese Communist Party, which the Trustee and PAX were falsely alleged to be.

324. On or about December 8, 2023, Defendant ROLF transferred $200,000.00 to protester Beile Li, which was, upon information and belief, for his lead role in the harassment campaign in which he intentionally sought to impede the Trustee's investigation.

325. Upon information and belief, the Defendant Rule of Law Entities funded the protests and harassment campaign for the purpose of intimidating, impeding, and influencing the Trustee and the chapter 11 case.

---

[55] *Eastern Profit Corp., Ltd. v. Strategic Vision US LLC*, Case No. 18-cv-2185 (S.D.N.Y. April 22, 2021). Trial Tr. at 782:3–7 (testimony that Defendant Guo paid dozens of protestors to demonstrate outside of Fu's house for weeks, forcing Fu to eventually move out of the house); *see also* Dan Friedman, A Fugitive Chinese Tycoon Met Steve Bannon. Misinformation Mayhem Ensued, Mother Jones (March/April 2022, issue) https://www.motherjones.com/politics/2022/02/guo-wengui-miles-guo-gettr-steve-bannon/ (Kwok "promised to pay protesters generally $200 per day" for previous protests).

326.    In response to the protests and threats, PAX filed a complaint against the Debtor for injunctive relief along with a motion for a temporary restraining order seeking to prevent the Debtor and his associates from engaging in the harassment. The Trustee joined in support of PAX. The Court granted PAX's motion and entered the temporary restraining order (the "TRO")[56] restraining the intimidation campaign.

327.    The Court held that without the TRO, "imminent irreparable harm to both the Estate and to the integrity of the bankruptcy process is likely."[57]  Specifically, the Court found that because the conduct was threatening and defamatory, it was not protected speech and that if the TRO did not issue, the "safety of the Trustee and PAG's chairman and that of their current or former spouses, children, and counsel, will interfere with the Trustee's investigation into potential assets of the Estate" and "continuing harassment may deter witnesses from assisting with the Trustee's investigation or deter creditors from filing claims."[58]  The Court also found that the TRO was required to protect the integrity of the bankruptcy process because "intimidation of the Trustee, a court officer . . . and interested parties 'embarrass[es], burden[s], delay[s] or otherwise impede[s] the reorganization proceedings.'"[59]

328.    Despite the Court's TRO, which the Debtor had notice of, the Debtor and his followers continued with their harassment campaign in violation of the TRO.

329.    On January 13, 2023, the Court entered a memorandum of decision granting the preliminary injunction (the "PI Decision").[60]  In the PI Decision, made several findings of fact

---

[56]   Order Granting Application Temporary Restraining Order, [Adv. Proc. No. 22-05032, Docket No. 26].

[57]   TRO at 4.

[58]   *Id*. at 4-5.

[59]   *Id*. at 5.

[60]   Adv. Proc. No. 22-05032, Docket No. 133.

including that, among others, "ROLF, and Himalaya are involved in the protests"[61] and "serve the purposes of the Debtor, serve as business vehicles for the Debtor, and their members are personally loyal to the Debtor."[62]

330.    In addition to violating the Court's orders, the harassment campaign engaged in by many of the Defendants, including those identified above, constituted criminal obstruction of justice designed to intimidate, influence, and impede the Trustee, who is an officer of the Court. The participants in the harassment also violated 18 U.S.C. § 1507, which prohibits picketing outside the building or residence occupied by a court officer for the purpose of obstructing justice and influencing the court officer's performance of his duties.

E.    Frivolous and Meritless Filing of Proofs of Claims as Tactic to Interfere with Bankruptcy Case and Trustee's Investigation

331.    The Debtor and certain Defendant co-conspirators also attempted to influence the bankruptcy claims process by intimidating creditors into not filing claims and encouraging followers to file non-meritorious claims for the purpose of increasing the costs of the chapter 11 case and interfering with its administration.

332.    On January 6, 2023, Qiu Yu ("Ms. Yu") filed two proofs of claim in the Debtor's chapter 11 case.    Shortly thereafter, the Debtor began making malicious and/or harassing statements on social media directed at Ms. Yu, including the following:

- On January 10, 2023, the Debtor, on a Gettr live broadcast (the "January 10 Broadcast"), publicly threatened investors who filed claims in these chapter 11 cases, including, specifically, Ms. Yu. Among other things, during the January 10 Broadcast, the Debtor made the following statement: "Every person who reports their case must show up in court. Everything you said will be published, including everything about you. Let's see."

---

[61]    PI Decision ¶ 6.

[62]    PI Decision ¶ 7.

- On January 10, 2023, Gettr account @OXVDESIGN posted that Ms. Yu listed herself as a creditor in the case, and posted a picture of Ms. Yu with text reading "Yu Qiu (nickname is Gong Zu) went to the bankruptcy court in Connecticut, USA and joined the list of creditors using a $5000 claim (and) help Luc vilify the Whistleblower Revolution."

- On January 10, 2023, Gettr account @piaochanghai posted an image of Ms. Yu's German Identity Card stating "expose another little bastard discord called Gong Zu, real name Yu Qiu, fellow fighters dig it up, heard that (she) is very close to Dai Jian Feng. Any fellow fighter know (her)?"

333.    On January 10, 2023, an article was posted to the website of Defendant GNews, an entity founded and controlled by the Debtor, suggesting the Debtor's followers file non-meritorious claims. It stated the following:

> Mr. Guo suggested that all the comrades could register because they had invested in GTV, but GTV was pseudo-classed as a fraudulent case and the SEC investigated it, so the money invested by the comrades had been withheld from the SEC, and the comrades were looking for money from the SEC, but in the bankruptcy case, the comrades could register as creditors of Mr. Guo. accept the registration of other comrades. ***If all the comrades go to register, they will make up the majority of the creditors, then the money Mr. Guo earned will be distributed to the comrades, which Mr. Guo is very willing to do. In addition war buddies as the majority can initiate the ownership of lady may ship and the 18th floor, is also the majority will be given to the hands of war buddies, such a way of handling, all happy.***[63] In addition, after the registration of creditors, is to testify in court, some can not get a visa to come to the United States of war, can have a reasonable reason to come to the United States, if you do not want to leave, you can apply for political asylum on the spot. We can legally use the law to solve the problem.

334.    As a result, the Debtor's supporters filed numerous claims, many without support or documentation.

335.    On January 13, 2023, the Debtor posted on the @MilesGuo GETTR account that Paul Hastings was launching a "creditor registration operation" suggesting that his followers

---

[63]    *See* Mr. Guo's wisdom: war veterans can all go to register creditors in bankruptcy cases, GNews (January 25, 2023, 17:38 p.m.), https://gnews.org/articles/828166 (last accessed January 25, 2023) (emphasis added).

should file bogus claims with the Court and that doing so could result in them becoming billionaires.[64]

F.      Frivolous Lawsuits in Southern District of New York to Intimidate Trustee

336.    On November 28, 2022, certain of the Debtor's followers, including Defendants Beile Li and Linwan Feng, commenced a proceeding in the United States District Court for the Southern District of New York (Caproni, J.), (the "SDNY Court") styled *An v. Despins*, No. 22-CV-10062 (VEC), 2023 WL 4931832 (S.D.N.Y. Aug. 2, 2023).  In *An v. Despins*, Defendants Li and Feng falsely alleged the Trustee and Paul Hastings LLP are agents of the CCP or PRC.

337.    Defendant Yongbing Zhang, who has served as the Debtor's personal counsel in the past and who, upon information and belief, has been visiting the Debtor in prison while he awaits trial in his criminal case, represented Defendants Li and Feng in *An v. Despins*.

338.    Judge Caproni dismissed the complaint in *An v. Despins* for lack of standing and pursuant to Rule 11 sanctioned Defendants Li, Feng, and Zhang because it concluded that their "papers reveal that their true preoccupation is with Mr. Kwok and trying to 'defend' him by harassing those perceived to be his adversaries" and that the lawsuit was "just another part of a campaign of misbehavior designed to vex Defendants, most likely by frustrating [the Trustee's] ability to perform his duties as trustee."[65]

339.    With respect to Defendant Zhang, Judge Caproni found:

Yongbing Zhang . . . appears in numerous photos of NFSC-led protests circulating on social media, including a post on NFSC's Gettr account from November 20, 2022 showing Zhang picketing at the house of [a family member of the Trustee] . . . and holding a sign calling the trustee an "A-List Scumbag." […] Zhang also appeared in photos with Kwok from June 4, 2022 at the NFSC Second Anniversary party. [66][. . .]

---

[64]   *See* @MilesGuo, GETTR (Jan. 13, 2023, 10:45 AM), https://gettr.com/post/p24ybdca10b (last accessed January 15, 2023).

[65]   *An v. Despins*, No. 22-CV-10062 (VEC), 2023 WL 4931832, at *12-*13.

[66]   *Id.* at 13-14.

Plaintiff and his counsel Zhang are affiliated with Kwok and sympathetic to him and his interests. [. . .]

Plaintiff's counsel has engaged in repeated frivolous litigation in this Court and the District of Maryland. […] These cases are unmistakably directed at parties and lawyers, who are either involved in Kwok's bankruptcy or in the PAX litigation. They contain similar allegations and similarly frivolous claims. The inescapable conclusion is that Zhang and Freeth are targeting those with interests opposed to Kwok's with the aim of chilling what they perceive as advocacy against him.

[Additional evidence] adds force to the Court's finding that sanctions are necessary and should be applied against Plaintiff's counsel. […]

The Court finds that Zhang, alongside Freeth, is responsible for the violations of Rule 11 detailed in this Opinion and Order.[67]

340.    A similar lawsuit was filed on January 13, 2023, by Junwu Gong against Stuart M. Sarnoff, O'Melveny & Myers LLP, and others, in the United States District Court for the Southern District of New York (Liman, J.) in the civil action styled *Gong v. Sarnoff,* No. 23-cv-343 (LJL), 2023 WL 5372473 (S.D.N.Y. Aug. 22, 2023).  Defendant Yongbing Zhang also represented Junwu Gong in that case.  Judge Liman found the action was initiated not to redress injury "but to harass Moving Defendants because of their representation of a client in litigation against Kwok and to deter others from doing the same. Plaintiff and his counsel Zhang are affiliated with Kwok and sympathetic to him and his interests." Further, Judge Liman said "if there is any doubt of the harassing purpose of this lawsuit, the history of lawsuits Zhang . . .have filed in this Court and elsewhere against PAX, persons associated with PAX, PAX's counsel, and those assisting the Bankruptcy Court settles that doubt."[68]

---

[67]   *Id.* at 30-33, 35 n. 11

[68]   *Gong v. Sarnoff.* No. 23-cv-343 (LJL), 2023 WL 5372473, at *30-*32 (S.D.N.Y. Aug. 22, 2023).

341.    The foregoing frivolous lawsuits were filed by their plaintiffs, including Defendant Beile Li, and Defendant Zhang for the purpose of intimidating, impeding, and influencing the Trustee and his investigation and obstructing the chapter 11 case more generally.

342.    In addition, Defendant Zhang separately sought to impede the Trustee's investigation and obstruct the chapter 11 case by directing the actions of certain purported creditors of the Defendant HCHK Entities who sought to intervene in the Trustee's adversary proceeding against the HCHK Entities.  The Court eventually found, following an evidentiary hearing, that the purported creditors' claims were meritless and denied their intervention request, finding in the process that the creditors had either falsified documents supporting their alleged claims or that their testimony was otherwise not credible.[69]

## V.    Injury Resulting from Fraudulent Scheme

343.    The creditors of the Debtor's estate have been substantially harmed by the predicate acts constituting the Kwok Enterprise's years-long fraud and money-laundering scheme.  As discussed above, the goal of the Kwok Enterprise was to hide the Debtor's wealth and ensure that it is not made available for distribution to his creditors.

344.    To date, except to the extent the Trustee has succeeded in his litigation efforts, the Kwok Enterprise's scheme has worked, as it has led to the Debtor's estate being deeply insolvent on paper, meaning that the creditors of the estate who have asserted hundreds of millions of dollars in claims against the estate stand to receive only minimal recoveries.  Thus, the estate has suffered substantial direct damages from the Defendants' wrongful conduct.

---

[69]    Memorandum of Decision and Order Denying Motion to Intervene and Motion to Clarify Temporary Restraining Order [Adv. Proc. No. 23-5013, Docket No. 239].

345.    In addition to depriving creditors of recoveries, the Defendants' conduct described herein has caused the estate to incur tens of millions of dollars in professional fees and other costs and expenses to unravel the Kwok Enterprise's fraudulent scheme and recover assets that should have been listed on the Schedules from the beginning of the case.  These legal fees, costs, and expense thus represent additional damages for which Defendants are liable.

## CLAIMS FOR RELIEF

### COUNT 1

### Violation of Racketeering Influenced Corrupt Organizations Act
### 18 U.S.C. § 1962(c)
### (Against All Defendants)

346.    The Trustee restates and re-alleges paragraphs 1-345 of this Complaint as though fully set forth herein.

347.    Each Defendant is a person capable of holding a beneficial or legal interest in property and, accordingly, each is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

348.    As alleged below, each Defendant violated 18 U.S.C. § 1962(c) by agreeing to and conducting and participating in the conduct of the Kwok Enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of defrauding the Debtor's creditors and enriching the Debtor, his family, and his associates, at the expense of the Debtor's creditors.

### Kwok RICO Enterprise

349.    The Defendants, together with their known and unknown co-conspirators, form an association-in-fact for a common and continuing purpose of formulating and implementing a common scheme to defraud the Debtor's creditors for the enrichment of the Debtor, his family,

and other co-conspirators, through a pattern of fraud, misrepresentations, deceit, and corruption (*i.e.*, the Kwok Enterprise).

350.    The Kwok Enterprise constitutes an "enterprise" within the meaning of 18 U.S.C. § 1961(4), and it was or is engaged in, and its activities affected, interstate and foreign commerce.

351.    The common purpose of the Kwok Enterprise came into existence as early as approximately 2015, when the Debtor and other co-conspirators implemented a scheme to defraud the Debtor's creditors by exploiting a web of sham entities and concealing the Debtor's assets for the benefit of the Debtor and his co-conspirators.

352.    Each of the Defendants were employed by or associated with the Kwok Enterprise, and each conducted or participated, directly or indirectly, in the conduct of the Kwok Enterprise's affairs through a pattern of racketeering.

353.    The Kwok Enterprise has an ascertainable structure independent from the pattern of racketeering activity in which the Defendants engage.

354.    The repeated and continuous violations of federal criminal law alleged in this Complaint constitute a "pattern of racketeering activity" in violation of RICO, 18 U.S.C. § 1961, et seq.

355.    The Defendants are central and controlling figures in the RICO Enterprise, and have directed others to take actions necessary to accomplish the overall aims of the Kwok Enterprise.

**Pattern of Racketeering**

356.    The Defendants conducted or participated, directly or indirectly, in the conduct of the RICO Enterprise's affairs through a pattern of racketeering activity, as defined by 18 U.S.C. § 1961(1) and (5), consisting of multiple acts of racketeering that are interrelated, not isolated, and

perpetrated for the same or similar purposes by the same persons (the "RICO Pattern"), described in the prior paragraphs and as further described below.

357.    The racketeering activity in which the Defendants engaged in violation of 18 U.S.C. § 1962(c) consisted, *inter alia*, of:

a.   Multiple acts of wire fraud in violation of 18 U.SC § 1343;

b.   Multiple acts of bank fraud in violation of 18 U.S.C. § 1344;

c.   Multiple acts violating of National Stolen Property Act of 18 U.S.C. §§ 2314, 2315;

d.   Multiple acts of money laundering in violation of 18 U.S.C. §§ 1956, 1957;

e.   Multiple acts of obstruction of justice in violation of 18 U.S.C. §§ 1503, 1507 and 1512; and

f.   Multiple acts of bankruptcy fraud in violation of 18 U.S.C. § 152.

358.    Each Defendant had the specific intent to violate 18 U.S.C. § 1962(c) and to commit each underlying predicate act alleged.

359.    Each of the Defendants committed at least two predicate acts of racketeering.  The acts of racketeering were not isolated; rather, they were related in that they had the same or similar purpose and result, participants, victims, and/or method of commission.  Further, the acts of racketeering were continuous, and remain ongoing, spanning the period from at least in or around 2015 to the present (the "Relevant Period").

360.    Specifically, the Defendants engaged in a pattern of racketeering activity consisting of at least the following predicate acts:

**Predicate Acts: 18 U.S.C. § 1343 –Wire Fraud**

**(Qiang Guo, William Je, Yvette Wang, Aaron Mitchell, Max Krasner, Alex Hadjicharalambous, David Fallon, Haitham Khaled, Jessica Mastrogiovanni, Bravo Luck, Greenwich Land LLC, Hudson Diamond NY LLC, Ana C. Izquierdo-Henn, David Fallon, Saraca Media Group, Inc., ACA Capital Group Ltd., Hamilton Opportunity Fund SPC,**

**Hamilton PE Fund SP, Hamilton Digital Assets Fund SP, HCHK Technologies, Inc., HCHK Property Management, Inc., Leading Shine NY Limited, Lexington Property and Staffing, Lawall & Mitchell, LLC)**

361.    The RICO Pattern included several acts of wire fraud in violation of 18 U.S.C. § 1343.

362.    The Defendants voluntarily and intentionally devised and participated in one or more criminal schemes to execute transfers of the Debtor's assets and property, including unlawfully obtained property, to conceal such assets from the Debtor's creditors during and after the Relevant Period, including without limitation, the transfers described below and in Appendix A.

363.    In furtherance of the fraudulent schemes, Qiang Guo, William Je, Yvette Wang, Aaron Mitchell, Max Krasner, Alex Hadjicharalambous, David Fallon, Haitham Khaled, Jessica Mastrogiovanni, Greenwich Land LLC, Hudson Diamond NY LLC, Ana C. Izquierdo-Henn, David Fallon, Saraca Media Group, Inc., ACA Capital Group Ltd., Hamilton Opportunity Fund SPC, Hamilton PE Fund SP, Hamilton Digital Assets Fund SP, HCHK Technologies, Inc., HCHK Property Management, Inc., Leading Shine NY Limited, and Lexington Property and Staffing willfully and knowingly transmitted, or caused to be transmitted, writings, signs, signals, pictures, and/or sounds by means of wire communications in interstate or foreign commerce.

364.    The wire activity supporting such fraudulent scheme included monetary wire transfers, shipments of assets, telephone and electronic communications, and other documents and communications.

365.    The use of interstate and international wires to perpetrate the activity and to connect the racketeering conspiracy was foreseeable.

366.    Qiang Guo voluntarily and intentionally devised and participated in one or more criminal schemes to defraud the Debtor's creditors during the relevant period, including without limitation, the activity described in paragraphs 112, 114-116.

367.    William Je voluntarily and intentionally devised and participated in one or more criminal schemes to defraud the Debtor's creditors during the relevant period, including without limitation, the activity described in paragraph 124.

368.    Yvette Wang voluntarily and intentionally devised and participated in one or more criminal schemes to defraud the Debtor's creditors during the relevant period, including without limitation, the activity described in paragraphs 107-113.

369.    Aaron Mitchell voluntarily and intentionally devised and participated in one or more criminal schemes to defraud the Debtor's creditors during the relevant period, including without limitation, the activity described in paragraphs 107-113, 244-249.

370.    Max Krasner voluntarily and intentionally devised and participated in one or more criminal schemes to defraud the Debtor's creditors during the relevant period, including without limitation, the activity described in paragraphs 118.

371.    Alex Hadjicharalambous voluntarily and intentionally devised and participated in one or more criminal schemes to defraud the Debtor's creditors during the relevant period, including without limitation, the activity described in paragraphs 103, 104, 112, 120, 122 and 123.

372.    David Fallon voluntarily and intentionally devised and participated in one or more criminal schemes to defraud the Debtor's creditors during the relevant period, including without limitation, the activity described in paragraphs 229-231.

373. Haitham Khaled voluntarily and intentionally devised and participated in one or more criminal schemes to defraud the Debtor's creditors during the relevant period, including without limitation, the activity described in paragraphs 103, 104, 107-110, 112-116 and 244.

374. Jessica Mastrogiovanni voluntarily and intentionally devised and participated in one or more criminal schemes to defraud the Debtor's creditors during the relevant period, including without limitation, the activity described in paragraphs 103-105.

375. Greenwich Land LLC voluntarily and intentionally devised and participated in one or more criminal schemes to defraud the Debtor's creditors during the relevant period, including without limitation, the activity described in paragraphs 194-211, 218.

376. Hudson Diamond NY LLC voluntarily and intentionally devised and participated in one or more criminal schemes to defraud the Debtor's creditors during the relevant period, including without limitation, the activity described in paragraphs 170, 212 and 218.

377. Ana C. Izquierdo-Henn voluntarily and intentionally devised and participated in one or more criminal schemes to defraud the Debtor's creditors during the relevant period, including without limitation, the activity described in paragraphs 110, 111, 113, 122 and 123.

378. Saraca Media Group, Inc. voluntarily and intentionally devised and participated in one or more criminal schemes to defraud the Debtor's creditors during the relevant period, including without limitation, the activity described in paragraphs 149, 213, and 219.

379. G-Club Operations LLC voluntarily and intentionally devised and participated in one or more criminal schemes to defraud the Debtor's creditors during the relevant period, including without limitation, the activity described in paragraphs 127.

380.     GS Security Solutions voluntarily and intentionally devised and participated in one or more criminal schemes to defraud the Debtor's creditors during the relevant period, including without limitation, the activity described in paragraphs 270 and 271.

381.     ACA Capital Group Ltd. voluntarily and intentionally devised and participated in one or more criminal schemes to defraud the Debtor's creditors during the relevant period, including without limitation, the activity described in paragraphs 105, 201, 217, and 266.

382.     Hamilton Opportunity Fund SPC, including its segregated portfolios such as Hamilton PE Fund SP and Hamilton Digital Assets Fund SP, voluntarily and intentionally devised and participated in one or more criminal schemes to defraud the Debtor's creditors during the relevant period, including without limitation, the activity described in paragraphs 108-110, 229-232, 246-257, and 269-270.

383.     HCHK Technologies, Inc. voluntarily and intentionally devised and participated in one or more criminal schemes to defraud the Debtor's creditors during the relevant period, including without limitation, the activity described in paragraphs 265 and 272.

384.     HCHK Property Management, Inc. voluntarily and intentionally devised and participated in one or more criminal schemes to defraud the Debtor's creditors during the relevant period, including without limitation, the activity described in paragraphs 268, 269 and 271.

385.     Lawall & Mitchell, LLC voluntarily and intentionally devised and participated in one or more criminal schemes to defraud the Debtor's creditors during the relevant period, including without limitation, the activity described in paragraph 266.

386. Leading Shine NY Limited voluntarily and intentionally devised and participated in one or more criminal schemes to defraud the Debtor's creditors during the relevant period, including without limitation, the activity described in paragraphs 162, 163 and 165.

387. Lexington Property and Staffing voluntarily and intentionally devised and participated in one or more criminal schemes to defraud the Debtor's creditors during the relevant period, including without limitation, the activity described in paragraphs 266 and 267.

388. Accordingly, Qiang Guo, William Je, Yvette Wang, Aaron Mitchell, Max Krasner, Alex Hadjicharalambous, David Fallon, Haitham Khaled, Jessica Mastrogiovanni, GS Security Systems, Greenwich Land LLC, G-Club Operations LLC, Hudson Diamond NY LLC, Ana C. Izquierdo-Henn, Saraca Media Group, Inc. ACA Capital Group Ltd., Hamilton Opportunity Fund SPC, Hamilton PE Fund SP, Hamilton Digital Assets Fund SP, HCHK Technologies, Inc., HCHK Property Management, LLC, Leading Shine NY Limited, Lexington Property and Staffing, and Lawall & Mitchell, LLC  committed numerous violations of wire fraud in violation of 18 U.S.C. § 1343.

389. The violations of 18 U.S.C. § 1343 directly and proximately caused injury to the creditors of the Debtor by unjustifiably and irrevocably depleting the assets of the estate in the amount of such transfers and ultimately caused the Debtor's estate to incur professional fees substantially greater than would otherwise have been necessary to recover estate property for their benefit.

### Predicate Acts: 18 U.S.C. § 1344 – Bank Fraud

### (Mei Guo, Yvette Wang, David Fallon)

390. The RICO Pattern included numerous acts of bank fraud in violation of 18 U.S.C. § 1344.

391. Mei Guo, Yvette Wang, and David Fallon knowingly executed or attempted to execute, a scheme or artifice to defraud a financial institution and/or to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises.

392. Based on the allegations set forth in paragraph 214, *inter alia*, Mei Guo and Yvette Wang knowingly executed a scheme and/or artifice by opening bank accounts under false pretenses.

393. Based on the allegations set forth in paragraphs 228-230, *inter alia*, David Fallon knowingly executed a scheme and/or artifice by opening a bank account under false pretenses.

394. Accordingly, there were numerous violations of 18 U.S.C. § 1344, which directly and proximately caused injury to the creditors of the Debtor's estate and property by aiding in the facilitation of the fraudulent scheme and ultimately caused the Debtor's estate to incur professional fees substantially greater than would otherwise have been necessary to recover estate property for the benefit of the Debtor's creditors.

**Predicate Acts: 18 U.S.C. §§ 2314, 2315 – Violations of National Stolen Property Act**

**(Qiang Guo, William Je, Yvette Wang, Xuebing Wang, Greenwich Land LLC, GS Security Solutions, Inc., Gypsy Mei Food Services LLC, Hamilton Opportunity Fund SPC, Hamilton PE Fund SP, Hamilton Digital Assets Fund SP, HCHK Technologies, Inc., HCHK Property Management, Inc., Hudson Diamond NY LLC, Leading Shine NY Ltd., Lexington Property and Staffing, Rule of Law Foundation III, Inc., Rule of Law Society IV, Inc., Saraca Media Group)**

395. The RICO Pattern included several violations of the National Stolen Property Act, 18 U.S.C. §§ 2314, 2315.

396. Qiang Guo, William Je, Yvette Wang, Xuebing Wang, Greenwich Land LLC, GS Security Solutions, Inc., Gypsy Mei Food Services LLC, Hamilton Opportunity Fund SPC, Hamilton PE Fund SP, Hamilton Digital Assets Fund SP, HCHK Technologies, Inc., HCHK

Property Management, Inc., Hudson Diamond NY LLC, Leading Shine NY Ltd., Lexington Property and Staffing, Rule of Law Foundation III, Inc., Rule of Law Society IV, Inc., and Saraca Media Group willfully and knowingly transported, transmitted, or transferred in interstate or foreign commerce—or received, possessed, concealed, stored, bartered, sold, disposed of, or pledged as security for a loan—goods, wares, merchandise, securities, or money that crossed an interstate or international boundary after being stolen, converted, or taken by fraud.

397.    In many cases, these Defendants transferred goods or money across interstate or international boundaries.

398.    In many cases, these Defendants received, possessed, concealed, stores, sold, and/or disposed of assets that crossed an interstate or international boundary.

399.    For each transfer, Qiang Guo, William Je, Yvette Wang, Xuebing Wang, Greenwich Land LLC, GS Security Solutions, Inc., Gypsy Mei Food Services LLC, Hamilton Opportunity Fund SPC, Hamilton PE Fund SP, Hamilton Digital Assets Fund SP, HCHK Technologies, Inc., HCHK Property Management, Inc., Hudson Diamond NY LLC, Leading Shine NY Ltd., Lexington Property and Staffing, Rule of Law Foundation III, Inc., Rule of Law Society IV, Inc., and Saraca Media Group knew that the funds involved had been stolen, converted, or taken by fraud.

400.    Each transfer involved money or property having a value of $5,000 or more.

401.    Accordingly, there were numerous violations of the National Stolen Property Act, 18 U.S.C. §§ 2314, 2315, which directly and proximately caused injury to the creditors of the Debtor's estate and property by impairing the Trustee's ability to recover the value of the transfers and ultimately caused the Debtor's estate to incur professional fees substantially greater than

would otherwise have been necessary to recover estate property for the benefit of the Debtor's creditors.

## Predicate Acts: 18 U.S.C. §§ 1956, 1957 – Money Laundering

**((Hing Chi Ngok, Mei Guo, Qiang Guo, William Je, Yvette Wang, Aaron Mitchell, Max Krasner, Bravo Luck Limited, Saraca Media Group, Greenwich Land LLC, G-Club Operations LLC, GS Security Solutions Inc., Gypsy Mei Food Services LLC, HCHK Technologies Inc., HCHK Property Management, Lexington Property and Staffing, Hamilton Opportunity Fund SPC, Hudson Diamond NY LLC, Taurus Fund LLC, Leading Shine NY Ltd., ACA Capital Group Limited, Rule of Law Foundation III, Inc., Rule of Law Society IV, Inc.)**

402.     The RICO Pattern included numerous acts of money laundering in violation of 18 U.S.C. §§ 1956, 1957.

403.     Each fraudulent transaction referenced below supported and furthered the fraudulent scheme, at a minimum to conceal the source and destination of the unlawfully obtained funds by layering and cleansing money to make it difficult to trace and/or converting illegal funds into seemingly legitimate assets for the benefit of the Debtor and his co-conspirators and to defraud creditors.

404.     Each fraudulent transaction described herein was conducted knowing that the property involved represented the proceeds of some form of unlawful activity, namely violations of 18 U.S.C. §§ 152, 1343, 1344, 1503, 1512, 1519, 2314 and/or 2315 which transactions in fact involved the proceeds of such unlawful activity as alleged throughout this Complaint with the intent to promote the carrying on of said specified unlawful activity in furtherance of the Kwok Enterprise and, knowing and having reason to know that the transactions were designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity, all as alleged elsewhere in this Complaint.

405. Accordingly, each transfer constituted, involved, or was the result of specified unlawful activity within the meaning of 18 U.S.C. § 1956(c)(7).

406. Each transfer involved a monetary transaction in criminally derived property of a value greater than $10,000 and derived from specified unlawful activity.

407. Each Defendant knew that the monies involved in the fraudulent transactions were criminally derived from the proceeds of some form of unlawful activity.

408. Each Defendant knew that each fraudulent transfer was designed, in whole or in part, to conceal or disguise the nature, location, source, ownership, or control of the proceeds from the acts of wire fraud.

409. Hing Chi Ngok conducted the series of financial transactions described herein including, but not limited to allegations contained in paragraphs 193-201, 206, 208, 211.

410. Mei Guo conducted the series of financial transactions described herein including, but not limited to allegations contained in paragraphs 193-201, 205.

411. Qiang Guo conducted the series of financial transactions described herein including, but not limited to allegations contained in paragraphs 112, 114-116, 181-183.

412. William Je conducted the series of financial transactions described herein including, but not limited to allegations contained in paragraphs 124, 137, and 139.

413. Yvette Wang conducted the series of financial transactions described herein including, but not limited to allegations contained in paragraphs 139,154.

414. Aaron Mitchell conducted the series of financial transactions described herein including, but not limited to allegations contained in paragraphs 244-249.

415. Chunguang Han conducted the series of financial transactions described herein including, but not limited to allegations contained in paragraphs 192, 195, 198, 201 and 208.

416.     Max Krasner conducted the series of financial transactions described herein including, but not limited to allegations contained in paragraphs 193-201, 208.

417.     ACA Capital Group Limited conducted the series of financial transactions described herein including, but not limited to allegations contained in paragraphs 201, 217, and 266.

418.     Greenwich Land LLC conducted the series of financial transactions described herein including, but not limited to allegations contained in paragraphs 193-212.

419.     Crane Advisory Group L.L.C. conducted the series of financial transactions described herein including, but not limited to allegations contained in paragraph 243.

420.     Bravo Luck Limited conducted the series of financial transactions described herein including, but not limited to allegations contained in paragraphs 173-191.

421.     Saraca Media Group conducted the series of financial transactions described herein including, but not limited to allegations contained in paragraphs 149, 213, and 219.

422.     G-Club Operations LLC conducted the series of financial transactions described herein including, but not limited to allegations contained in paragraphs 103-128, 130-131, 231-232, and 245-257.

423.     GS Security Solutions Inc. conducted the series of financial transactions described herein including, but not limited to allegations contained in paragraphs 270 and 271.

424.     Gypsy Mei Food Services LLC conducted the series of financial transactions described herein including, but not limited to allegations contained in paragraph 210.

425.     Hamilton Opportunity Fund SPC, including its segregated portfolios such as Hamilton PE Fund SP and Hamilton Digital Assets Fund SP, conducted the series of financial

transactions described herein including, but not limited to allegations contained in paragraphs 108-110, 229-232, 246-257, and 269-270.

426. HCHK Technologies Inc. conducted the series of financial transactions described herein including, but not limited to allegations contained in paragraphs 258-272.

427. HCHK Property Management conducted the series of financial transactions described herein including, but not limited to allegations contained in paragraphs 258-272.

428. Lexington Property and Staffing conducted the series of financial transactions described herein including, but not limited to allegations contained in paragraphs 266 and 267.

429. Hudson Diamond NY LLC conducted the series of financial transactions described herein including, but not limited to allegations contained in paragraphs 170, 204, 205, 212-227.

430. Taurus Fund LLC conducted the series of financial transactions described herein including, but not limited to allegations contained in paragraphs 233-243.

431. Leading Shine NY Ltd. conducted the series of financial transactions described herein including, but not limited to allegations contained in paragraphs 149, 160-166.

432. Rule of Law Foundation III, Inc. conducted the series of financial transactions described herein including, but not limited to allegations contained in paragraphs 136, 137.

433. Rule of Law Society IV, Inc. conducted the series of financial transactions described herein including, but not limited to allegations contained in paragraphs 136, 138.

434. The violations of 18 U.S.C. §§ 1956 and 1957 directly and proximately caused injury to the Debtor's estate by impairing the Trustee's ability to recover the value of the transfers for creditors and ultimately caused the Debtor's estate to incur professional fees

substantially greater than would otherwise have been necessary to recover estate property for their benefit.

**Predicate Acts: 18 U.S.C. §§ 1503, 1512, 1519 – Obstruction of Justice**

**(Hing Chi Ngok, Mei Guo, Qiang Guo, Yvette Wang, Max Krasner, Chunguang Han, Yongbing Zhang, Aaron Mitchell, Beile Li, Yan Chun Liu, Qidong Xia, Xuebing Wang, Rule of Law Foundation III, Inc., GTV Media Group, Inc., Saraca Media, Inc., Hudson Diamond NY LLC, G-Club US Operations LLC, Bravo Luck)**

435.    The RICO Pattern included more than one act of obstruction of justice in violation of 18 U.S.C. §§ 1503, 1507, 1512, and 1519.

436.    Based on the allegations set forth in paragraphs 289-295, among others, Yvette Wang endeavored to influence, obstruct, or impede the due administration of justice by violating the Corporate Governance Rights Order in furtherance of the fraudulent scheme.

437.    Based on the allegations set forth in paragraphs 296-298, among others, GTV Media Group, Inc., Saraca Media, Inc., Hudson Diamond NY LLC, and G-Club US Operations LLC corruptly endeavored to influence, obstruct, or impede the due administration of justice by withholding information, including documents, thereby failing to comply with the Rule 2004 Subpoenas and violating the Court's Rule 2004 Orders in furtherance of the fraudulent scheme.

438.    Based on the allegations set forth in paragraphs 299-303, among others, Hing Chi Ngok, Max Krasner, and Chunguang Han corruptly endeavored to influence, obstruct, or impede the due administration of justice by violating the Greenwich TRO and Greenwich PI in furtherance of the fraudulent scheme

439.    Based on the allegations set forth in paragraphs 322 and 324, among others the Rule of Law Foundation III, Inc. corruptly endeavored to influence, intimidate, or impede an officer of this Court, including the Trustee, as alleged in more detail above, by engaging, supporting and/or funding false and harassing online materials as a method of intimidation to

deter the Trustee from acting in accordance with his statutory duties. Moreover, based on the same allegations, the Rule of Law Foundation III, Inc. corruptly endeavored to influence, obstruct, or impede the due administration of justice.

440. Based on the allegations set forth in paragraphs 335-341, among others, Yongbing Zhang, corruptly endeavored to influence, intimidate, or impede an officer of this Court, including the Trustee, in the discharge of his duty by, as alleged in more detail above, filing frivolous lawsuits. Moreover, based on the same allegations, Yongbing Zhang corruptly endeavored to influence, obstruct, or impede the due administration of justice.

441. Based on the allegations set forth in paragraphs 317-329, Beile Li, corruptly endeavored to influence, intimidate, or impede an officer of this Court, including the Trustee, in the discharge of his duty by, as alleged in more detail above, engaging in a picketing and a harassment campaign outside the Trustee's residence and place of business. Moreover, based on the same allegations, Beile Li corruptly endeavored to influence, obstruct, or impede the due administration of justice and the Trustee's performance of his official duties.

442. Based on the allegations set forth in paragraphs 317-329, Yan Chun Liu, corruptly endeavored to influence, intimidate, or impede an officer of this Court, including the Trustee, in the discharge of his duty by, as alleged in more detail above, engaging in a picketing and a harassment campaign outside the Trustee's residence and place of business. Moreover, based on the same allegations, Yan Chun Liu corruptly endeavored to influence, obstruct, or impede the due administration of justice and the Trustee's performance of his official duties.

443. Based on the allegations set forth in paragraphs 317-329, Qidong Xia, corruptly endeavored to influence, intimidate, or impede an officer of this Court, including the Trustee, in the discharge of his duty by, as alleged in more detail above, engaging in a picketing and a

harassment campaign outside the Trustee's residence and place of business.  Moreover, based on the same allegations, Qidong Xia corruptly endeavored to influence, obstruct, or impede the due administration of justice and the Trustee's performance of his official duties.

444.    Based on the allegations set forth in paragraphs 317-329, Xuebing Wang, corruptly endeavored to influence, intimidate, or impede an officer of this Court, including the Trustee, in the discharge of his duty by, as alleged in more detail above, engaging in a picketing and a harassment campaign outside the Trustee's residence and place of business.  Moreover, based on the same allegations, Xuebing Wang corruptly endeavored to influence, obstruct, or impede the due administration of justice and the Trustee's performance of his official duties.

445.    Based on the allegations set forth in paragraph 281-283, 307-311, among others, Mei Guo corruptly obstructed, influenced, or impeded an official proceeding, including the Chapter 11 Case, by, as alleged in more detail above, knowingly and intentionally making material misstatements, misrepresentations, and omissions under penalty of perjury in connection with the Chapter 11 Case concerning the Debtors' financial affairs, the Debtor's and their own relationship with the Asset-Holding Entities and Funding Entities. Moreover, based on the same allegations, Mei Guo endeavored to influence, obstruct, or impede the due administration of justice in furtherance of the fraudulent scheme.

446.    Based on the allegation set forth in paragraph 280-282, 312-315, among others, Aaron Mitchell corruptly obstructed, influenced, or impeded an official proceeding, including the Chapter 11 Case, by, as alleged in more detail above, knowingly and intentionally making material misstatements, misrepresentations, and omissions under penalty of perjury in connection with the Chapter 11 Case concerning the Debtors' financial affairs, and/or endeavored to

influence, obstruct, or impede the due administration of justice in furtherance of the fraudulent scheme.

447.    Based on the allegations set forth in paragraph 305, among others, Qiang Guo and Bravo Luck knowingly falsified a record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of the Chapter 11 Case. Moreover, based on the same allegations, Qiang Guo and Bravo Luck corruptly endeavored to influence, obstruct, or impede the due administration of justice in furtherance of the fraudulent scheme.

448.    Accordingly, Hing Chi Ngok, Mei Guo, Yvette Wang, Qiang Guo, Yongbing Zhang, Chunguang Han, Aaron Mitchell, Max Krasner, Rule of Law Foundation III, Inc., GTV Media Group, Inc., Saraca Media, Inc., Hudson Diamond NY LLC, G-Club US Operations LLC and Bravo Luck committed acts of obstruction of justice in violation of 18 U.S.C. §§ 1503, 1512, 1519, which directly and proximately caused injury to the estate by, among other things, impairing the Trustee's ability to investigate the assets of Kwok and causing Kwok's estate to incur substantial professional fees and expenses related to the obstruction, which directly impacts all creditors.

**Predicate Acts: 18 U.S.C. § 152 – Bankruptcy Fraud**

**(Mei Guo, Hing Chi Ngok, Qiang Guo, William Je, Yvette Wang, Aaron Mitchell, Bravo Luck and Greenwich Land LLC)**

449.    The RICO Pattern included more than one act of bankruptcy fraud in violation of 18 U.S.C. § 152.

450.    Based on the allegations set forth in, inter alia, paragraphs 307-311 of this Complaint, Mei Guo knowingly and fraudulently made one or more false oaths or accounts in or

relation to the Chapter 11 Case, as demonstrated by the following actions, which are alleged in more detail above, among others:

    a. Mei Guo made false statements under penalty of perjury regarding the ownership of the Lady May yacht.

    b. Mei Guo made false statements in a declaration regarding her use and ownership of a smart phone.

    c. Mei Guo committed perjury with regards to the proceeds of the sale of a Bombardier private jet.

451. Based on those same allegations, Mei Guo knowingly and fraudulently made one or more false declarations, certificates, verifications, or statements under penalty of perjury in or in relation to the Chapter 11 Case.

452. Moreover, based on the allegations set forth in, inter alia, paragraphs 281-283, and 308 of this Complaint, Mei Guo fraudulently concealed from creditors, the United States Trustee, the Trustee, and this Court property belonging to the Debtor's estate, including, among others, the following assets and/or related proceeds, as alleged in more detail above: the Lady May and the Bombardier jet

453. Based on the allegations set forth in, inter alia, paragraphs 306 of this Complaint, Hing Chi Ngok knowingly and fraudulently made one or more false oaths or accounts in or relation to the Chapter 11 Case , including by (i) her assertion that she took certain actions in relation to the Ferncliff Property purchased by Greenwich Land, which was contradicted by the fact she was unable to recognize what the Ferncliff Property looked like; and (ii) her statement the Debtor had no involvement with Greenwich Land's purchase of the Taconic Road Property, which was contradicted by the detailed testimony of Mr. de Neree, the buyer-side real estate broker for the sale of the Taconic Road Property.

454.     Based on those same allegations, Hing Chi Ngok knowingly and fraudulently made one or more false declarations, certificates, verifications, or statements under penalty of perjury in or in relation to the Chapter 11 Case.

455.     Moreover, based on the allegations set forth in, inter alia, paragraphs 204-208 of this Complaint, Hing Chi Ngok and Greenwich Land LLC knowingly and fraudulently concealed from creditors, the United States Trustee, the Trustee, and this Court property belonging to the Debtor's estate, including, among others, the assets and/or related proceeds from the sale of the Ferncliff Property.

456.     Based on the allegations set forth in, inter alia, paragraphs 305 of this Complaint, Qiang Guo and Bravo Luck, each knowingly and fraudulently made one or more false oaths or accounts in or relation to the Chapter 11 Case, including by submitting proofs of claim that rely on a purported trust agreement that is a forged and backdated agreement.

457.     Based on those same allegations, Qiang Guo knowingly and fraudulently made one or more false declarations, certificates, verifications, or statements under penalty of perjury in or in relation to the Chapter 11 Case.

458.     Based on the allegations set forth in, inter alia, paragraphs 139 of this Complaint, William Je knowingly and fraudulently concealed from creditors, the United States Trustee, the Trustee, and this Court property belonging to the Debtor's estate, including, among others, the assets held in Defendant and/or co-conspirator entities and transfers of fraudulently obtained property.

459.     Based on the allegations set forth in, inter alia, paragraphs 286-295 of this Complaint, Yvette Wang knowingly and fraudulently concealed from creditors, the United States

Trustee, the Trustee, and this Court property belonging to the Debtor's estate, including through, among others, the Ace Decade Transfer.

460.    Based on the allegations set forth in, inter alia, paragraphs 312 of this Complaint, Aaron Mitchell, knowingly and fraudulently made one or more false declarations, certificates, verifications, or statements under penalty of perjury in or in relation to the Chapter 11 Case related to the Debtor's affairs.

461.    Accordingly, these Defendants committed acts of bankruptcy fraud in violation of 18 U.S.C. § 152, which directly and proximately caused injury to the estate by, among other things, impairing the Trustee's ability to investigate and recover the assets belonging to the Debtor's estate and causing the estate to incur substantial professional fees and expenses related to the investigation of information these Defendants failed to disclose and actively endeavored to conceal, destroy, or otherwise render unavailable for use in connection with the Chapter 11 Case.

### Continuity of the RICO Pattern

462.    The Defendants' violations of law as set forth herein, each of which directly and proximately injured the Debtor's creditors, constituted a continuous course of conduct in the United States beginning no later than 2015 and continuing through the filing of this Complaint, which has been intended to defraud creditors through false representations, fraud, deceit, and other improper and unlawful means, for the benefit of the Debtor and his co-conspirators.

463.    Additionally, the Defendants' violations of law as set forth herein poses a threat of continuing criminal activity.

464.    Accordingly, the violations were a part of pattern of racketeering activity under 18 U.S.C. §§ 1961(1) and (5).

**COUNT 2**

**Conspiracy to Violate the Racketeering Influenced Corrupt Organizations Act**
**18 U.S.C. § 1962(d)**
**(Against All Defendants)**

465.    The Trustee restates and re-alleges paragraphs 1 through [   ] of this Complaint as though fully set forth herein.

466.    Each Defendant violated 18 U.S.C. § 1962(c) by agreeing to join, participate in, or support a conspiracy under which one or more persons would conduct or participate in the conduct of the affairs of an enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d) (the "RICO Conspiracy").

467.    In particular, each Defendant was a knowing, willing, and active participant in the Kwok Enterprise and its affairs, and each of the Defendants shared a common purpose, namely, the orchestration, planning, preparation, and execution of the fraudulent scheme of transferring and dispersing the Debtor's property, including fraudulently obtained funds, through a web of sham entities for the benefit of the Debtor and other co-conspirators and to conceal such property and funds from the Debtor's creditors.

468.    The participation and agreement of each of Defendant was necessary to allow the commission of this scheme.

469.    Each Defendant knew about and agreed to facilitate the Kwok Enterprise by way of the acts in which he or she engaged as alleged herein and/or through explicit agreement amongst some or all of the Defendants. Evidence of an agreement among the Defendants is particularly within the knowledge and control of each Defendant.

470.    Each Nominee Participant Defendant's agreement to join and support the RICO Conspiracy is demonstrated by or can be inferred from, among other things, the following:

a. Each Nominee Participant Defendant acted as purported nominal owners, executives, directors, employees and/or appointees of entities the Debtor functionally and beneficially controlled, including certain of the Asset-Holding Entities, Funding Entities, and Business-Front Entities that were used to facilitate the fraudulent scheme.

b. Each Nominee Participant Defendant had knowledge of and facilitated and authorized the unlawful endeavors with respect to the Asset-Holding Entities, Funding Entities, and Business-Front Entities they were purported nominal owners, executives, directors, employees and/or appointees of by engaging in the unlawful conduct described above.

471.    Each Asset-Holding Entity's agreement to join and support the RICO Conspiracy is demonstrated by or can be inferred from, among other things, the following:

a. The Debtor enjoys complete control over each Asset-Holding Entity directly or through his dominance and control over the Nominee Participants.

b. The Nominee Participants associated with the Asset-Holding Entity's directly participated in the Kwok Enterprise's fraudulent scheme.

c. Each Asset-Holding Entity had knowledge of and directly engaged in the unlawful endeavors of the Kwok Enterprise by engaging in millions of dollars in fraudulent import and export transactions with the Funding Entities and Business-Front Entities during to further the fraudulent scheme to enrich the Debtor, his family and other co-conspirators and defraud creditors.

d. Each Asset-Holding Entity was established and operated for the sole purpose of furthering the fraudulent scheme to enrich the Debtor, his family and other co-conspirators and defraud creditors.

472.    Each Business-Front Entity's agreement to join and support the RICO Conspiracy is demonstrated by or can be inferred from, among other things, the following:

a. Each Business-Front Entity had knowledge of and facilitated and directly engaged in the unlawful endeavors of the Kwok Enterprise by concealing the Debtor's assets from creditors and passing-through unlawfully obtained funds for the benefit of the Debtor, his family, and associates, while nominally being operating media, real estate, technology, and social media enterprises, but functionally being owned and controlled by the Debtor to further the Kwok Enterprise.

473.    Each Professional Participant Defendant's agreement to join and support the RICO Conspiracy is demonstrated by or can be inferred from, among other things, the Professional

Participant Defendants' knowledge of and direct engagement in the unlawful endeavors of the Kwok Enterprise as detailed herein, including, *inter alia*, transferring or receiving fraudulently-obtained assets and/or orchestrating such transactions.

474.    Each Additional Participant Defendant's agreement to join and support the RICO Conspiracy is demonstrated by or can be inferred from, among other things, Additional Participant Defendants' had knowledge of and direct engagement in the unlawful endeavors of the Kwok Enterprise as detailed herein, including, *inter alia*, their fraudulent activity and/or other acts taken in support of, and to further, the fraudulent scheme.

475.    Each Funding Entity Defendant's agreement to join and support the RICO Conspiracy is demonstrated by or can be inferred from, among other things, the following:

   a. The Debtor enjoys complete control over each Funding Entity Defendants directly or through his dominance and control over the Nominee Participants.

   b. Each Funding Entity Defendant had knowledge of and facilitated and directly engaged in the unlawful endeavors of the Kwok Enterprise by transferring substantial sums to various entities and individuals to enrich the Debtor, his family and other co-conspirators.

   c. Each Funding Entity Defendant was established for the sole purpose of furthering the fraudulent scheme to enrich the Debtor, his family and other co-conspirators and defraud creditors.

476.    By and through each of the Defendants' business and/or personal relationships with one another, their close coordination with one another in the affairs of the Kwok Enterprise, and involvement in the Debtor's fraudulent scheme, each Defendant knew the nature of the Kwok Enterprise and each Defendant knew that the Kwok Enterprise extended beyond each Defendant's individual role.

477.    Each Defendant engaged in the acts as alleged herein, knowing of at least the general contours of the conspiracy, with the intent to further or facilitate the Kwok Enterprise.  The

participation and agreement of each Defendant was necessary to allow the commission of this pattern of racketeering activity. All Defendants played key roles and directly participated in the racketeering activity because they all had knowledge of the unlawful scheme and given their authority and discretion over the conduct and affairs of various Defendant entities and themselves, the scheme would not have been allowed to continue without their consent and active encouragement and participation.

478. To the extent any one or more of the entity Defendants (*i.e.* the Funding Entities, Asset-Holding Entities, Business-Front Entities, and certain Professional Participants) are not directly liable for conspiring to violate RICO's substantive provisions in violation of 18 U.S.C. § 1962(d), they are vicariously liable for the Section 1962(d) violations of other individual Defendants to the extent an individual Defendant committed a predicate act within the scope of those individuals' employment, officership, or directorship position at or agency relationship with an entity Defendant. The predicate acts alleged to have been committed herein were each committed in furtherance of a scheme intended to and which did in fact benefit the Debtor, his family, and his associates by concealing and disguising the nature and ownership of assets of the Debtor through shell entities and a scheme to defraud creditors. Accordingly, such entity Defendant(s) are vicariously liable for the RICO violations of certain individual Defendants as alleged herein.

479. As a direct and proximate result of the Defendants' RICO Conspiracy, the pattern of racketeering activity through which they agreed the affairs of the RICO Enterprise would be conducted, and violations of 18 U.S.C. § 1962(d), the Debtor's creditors have been harmed.

480. The Debtor's estate continues to be deprived of monies that should contribute to recoveries for the Debtor's creditors, as a direct and proximate result of the foregoing violations

of 18 U.S.C. § 1962(d), as it continues to be deprived of monies that belong to the estate.  As alleged herein, absent Defendants' willfully criminal conduct, the recoveries the Debtor's creditors may receive as a result of the Trustee's efforts, if any, would be materially greater.  The damages to the Debtor's creditors include, but are not limited to, the costs and expenses, including attorneys' fees, the Trustee was forced to expend from the estate as a direct and proximate result of the foregoing violations of 18 U.S.C. § 1962(d) and in order to recover the property and assets unlawfully concealed and disguised by the Defendants, including as a result of Defendants' pre- and post-bankruptcy unlawful conduct.

481.    It was a foreseeable, natural, direct, and intended consequence of Defendants' scheme to defraud the Debtor's creditors and conceal the ownership and nature of the Debtor's assets that the Trustee would have to incur more professional fees to recover the Debtor's assets, if identifiable and recoverable notwithstanding Defendants' unlawful conduct, and, thus, recoveries for the Debtor's creditors, if any, would be materially reduced.  There are no independent factors that account for the injuries to the Debtor's creditors caused by the Defendants' unlawful conduct, nor are those injuries in any way derivative of any injury to any other entity or individual.  No immediate victim is better situated than the Trustee to sue—and indeed the Defendants' misconduct has been brought to light by the Trustee's efforts, as well as those of the U.S. Department of Justice—nor is there any risk of duplicative recoveries by plaintiffs removed at different levels of injury from the violations.

482.    Under 18 U.S.C. § 1964(c), the Trustee is entitled to recover treble damages, together with the costs of this suit and reasonable attorneys' fees and costs.

### PRAYER FOR RELIEF

**WHEREFORE,** the Trustee prays for relief and judgment as follows:

(a) General and compensatory damages according to proof at trial;

(b) Treble damages pursuant to 18 U.S.C. § 1964(c);

(c) Necessary and appropriate injunctive relief, including an injunction requiring the Defendants to cease and desist from all of the foregoing unlawful conduct;

(d) Disgorgement of all moneys received by Defendants as a result of their unlawful activities;

(d) An award of the Trustee's reasonable attorneys' fees and costs and expenses, pursuant to 18 U.S.C. § 1964(c);

(e) Prejudgment interest; and

(f) Such other and further relief as the Court deems just and proper.

Dated:  February 15, 2024
   New York, New York

        LUC A. DESPINS
        CHAPTER 11 TRUSTEE


        By: */s/ Douglass Barron*
          Avram E. Luft (admitted *pro hac vice*)
          Douglass Barron (admitted *pro hac vice*)
          PAUL HASTINGS LLP
          200 Park Avenue
          New York, New York 10166
          (212) 318-6000
          aviluft@paulhastings.com
          douglassbarron@paulhastings.com

           *and*

          Nicholas A. Bassett (admitted *pro hac vice*)
          PAUL HASTINGS LLP
          2050 M Street NW
          Washington, D.C. 20036
          (202) 551-1902
          nicholasbassett@paulhastings.com

           *and*

          Douglas S. Skalka (ct00616)
          Patrick R. Linsey (ct29437)
          NEUBERT, PEPE & MONTEITH, P.C.[70]
          195 Church Street, 13th Floor
          New Haven, Connecticut 06510
          (203) 781-2847
          dskalka@npmlaw.com
          plinsey@npmlaw.com

          *Counsel for the Chapter 11 Trustee*

---

[70] Neubert, Pepe & Monteith, P.C. serves as the Trustee's exclusive counsel for all allegations regarding and counts asserted against GTV in this complaint.