**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**BRIDGEPORT DIVISION**

| | |
|---|---|
| IN RE:<br>HO WAN KWOK, et al.,<br>*Debtors*.[1] | Chapter 11<br>Case No. 22-50073 (JAM)<br>(Jointly Administered) |
| LUC A. DESPINS, CHAPTER 11 TRUSTEE<br>*Plaintiff,*<br>—v.—<br>NGOK ET AL.,<br>*Defendants.* | Adv. Proc. No. 24-05273 (JAM)<br><br><br><br>September 18, 2024 |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS G CLUB OPERATIONS, LLC AND G CLUB INTERNATIONAL LIMITED'S MOTION TO DISMISS ADVERSARY COMPLAINT**

Defendants G Club Operations LLC ("G Club") and G Club International Limited ("GCI" and together with G Club, the "Defendants") respectfully file this memorandum of law in support of their *Motion to Dismiss Adversary Complaint* (the "Motion"). This adversary proceeding (the "Adversary Proceeding") was initiated by an adversary complaint (ECF No. 1, the "Complaint"), filed by Luc A. Despins, Chapter 11 Trustee (the "Plaintiff" or "Trustee"). For the following reasons, the Court should grant the Motion.

[1] The Debtors in the main Chapter 11 case are Ho Wan Kwok (also known as Guo Wengui, Miles Guo, and Miles Kwok) (last four digits of tax identification number: 9595), Genever Holdings LLC (last four digits of tax identification number: 8202) and Genever Holdings Corporation. The mailing address for the Trustee, Genever Holdings LLC, and the Genever Holdings Corporation is Paul Hastings LLP, 200 Park Avenue, New York, NY 10166 c/o Luc A. Despins, as Trustee for the Estate of Ho Wan Kwok.

## I. INTRODUCTION

In this Adversary Proceeding, the Trustee incredibly resorts to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq. ("RICO") hoping to take from nearly 8000 G Club members –whose assets and claims are not part of this estate – their membership payments to G Club, by impermissibly lumping 50 defendants together. That effort fails, however, for multiple reasons. First, the RICO claims are not pled with the specificity required to sustain a RICO claim. The Complaint is devoid of any specific allegations that would satisfy the requisite pleadings standards under either Rule 8 and *Iqbal*, or Rule 9(b). There are no specific allegations of the basics: who did what and when. Indeed, there are no specific allegations against GCI at all.

Second, the Trustee fails to meet the requisite elements of RICO claims as the Trustee has alleged no predicate acts that can satisfy RICO pleading requirements nor has the Trustee asserted injury and proximate cause. The Trustee has pled that G Club, a limited liability company, was used by Debtor and his henchmen to steal money from G Club's members. The claims against GCI are completely opaque and it is unclear why it was sued other than for having an association with G Club. There are no material allegations against GCI and the claims against it must fail for a simple lack of any real attempt to allege facts concerning its alleged role in this case. Indeed, as it reads, the Complaint portrays G Club as a victim, not a perpetrator, of any misdeeds.

Third, the Trustee misapplies RICO in connection with common law causes of action to seek that which is properly done by way of criminal forfeiture. To state a RICO claim, causation and damages must be pled clearly. Here, the Trustee alleges general damages, but does not take into account the potential recoveries for the actually injured parties (G Club members under the Complaint) by way of the 250 plus avoidance actions, claims by the Securities and Exchange

Commission (the "SEC"), and forfeiture actions by the Government. Thus, the Trustee has not, and cannot, meet the pleadings standard for either causation or damages.

Fourth, even if the Trustee could satisfy all of the pleading requirements for RICO the claims fail as a matter of law under the well-established principle of *in pari delicto*. In this Adversary Proceeding, the Trustee stands in Debtor's shoes, and he seeks to hold G Club liable based on alleged fraudulent conduct of Debtor. Debtor's estate is barred from prosecuting and collecting on claims against its allegedly co-liable affiliates where Debtor is also liable for the bad acts. Finally, the Second Circuit has held that Section 107 of the Private Securities Litigation Reform Act of 1995 ("PSLRA") bars RICO claims that implicate securities fraud. Because the entire claim against G Club (and most other defendants) relates to securities fraud, there is no basis for this claim.

In sum, the Complaint does not plausibly allege any valid claims. Despite what he may think, the Trustee has not been granted a roving commission to do justice on behalf of the alleged victims of Debtor – that is the job of the U.S. government, which has pursued Debtor criminally, sought to forfeit more than $200 million of alleged fraudulent "membership fees" on behalf of G Club members, and brought a Securities and Exchange Commission ("SEC") action. Rather, the Trustee is empowered by the Bankruptcy Code, specifically § 544(a) and (b), which permits him to bring claims on behalf of Debtor's creditors. Thus, the Complaint must be dismissed, with prejudice, as it does not set forth any facts that could possibly sustain the claims alleged.[2]

---

[2] Within the next several days, Defendants will be filing a jury claim and motion to withdraw the bankruptcy reference. The Defendants join in the prior motions to withdraw the bankruptcy references previously filed in this case. *See* ECF No. 18.

## II. FACTS AND BACKGROUND

### A. The Bankruptcy Case

On February 15, 2022 (the "Petition Date"), Debtor Ho Won Kwok ("Debtor") filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. On July 8, 2022, the Trustee was appointed (Main Case, ECF No. 523). The Trustee filed more than 250 adversary proceedings seeking to avoid and recover payments made to the defendants in those actions. Additionally, the Trustee has brought the so-called "Omnibus Alter Ego Case" asserting that more than 40 entities are actually alter egos of Debtor. *Despins v. ACA Capital Group, Ltd.,* 5:24-ap-05249 (the "Omnibus Alter Ego Case"). All of the various litigation brought by the Trustee seek effectively the same relief as sought in the RICO Case.

### B. The Criminal Action

The United States of America, by and through the United States Attorney's Office for the Southern District of New York (the "Government") prosecuted Debtor for various crimes pursuant to an indictment handed down by a Grand Jury in the matter of USA v. Kwok, 23-cr-118 (the "Criminal Case"). The Criminal Case proceeded to trial and on July 16, 2024, a jury returned a guilty verdict on various counts against Debtor. *See Trustee's Status Report re: Criminal Case* at 6-12, Main Case ECF No. 3321.

Contemporaneous with the initiation of the Criminal Case, the Government also sought to forfeit, for the benefit of alleged victims of Debtor's crimes, certain funds held by various entities. As stated by the Government: "between September 2022 and March 2023, the U.S. Government seized approximately $634 million from 21 different bank accounts. The $634 million constitutes proceeds of [Debtor]'s alleged fraud, which the Government will seek to forfeit. [On March 15,

2023], law enforcement also seized assets that were purchased with proceeds of [Debtor]'s alleged fraud, including a Lamborghini Aventador SVJ Roads." Over $630 Million of Alleged Fraud Proceeds Seized by U.S. Government, U.S. Attorney's Office Press Release, available at: https://www.justice.gov/usao-sdny/pr/ho-wan-kwok-aka-miles-guo-arrested-orchestrating-over-1-billion-dollar-fraud-conspiracy (visited Sept. 18, 2024).

**C. The Securities Fraud Case**

By a complaint filed in the United States District Court, Southern District of New York (the "SEC Complaint" a copy of which is attached hereto as Exhibit A) on March 15, 2023 in SEC v. Kwok et al., Case No. 23-cv-02200, the SEC made various allegations of securities fraud against Debtor and others. The SEC Complaint alleged "multiple offering frauds orchestrated by [Debtor]," referred to as the "Subject Offerings." SEC Complaint ¶ 1. First, the SEC Complaint alleged fraud in connection with the unregistered offering of common stock in GTV Media Group, Inc. ("GTV"), referred to as the "GTV Private Placement." *Id.* ¶¶ 3 & 34-76. Second, the SEC Complaint alleged fraud in connection with the unregistered offering of convertible loans that could be exchanged for GTV common stock, referred to as the "Convertible Loan Program." *Id.* ¶¶ 4 & 77-93. Third, the SEC Complaint alleged fraud in connection with the sale of memberships in a concierge service called G-Clubs, referred to as the "G-Clubs Offering." *Id.* ¶¶ 5 & 94-106. Finally, the SEC Complaint alleged that Debtor "made material misrepresentations to prospective purchasers of a crypto asset security called H-Coin (a/k/a Himalaya Coin or HCN)." *Id.* ¶ 6; see also *id.* ¶¶ 107-28. As set forth below these species of "securities fraud" alleged by both the SEC and the Government (in the Criminal Case) form the core of the claims against Defendants in the

RICO Complaint brought by the Trustee. Indeed, much of the RICO Complaint simply refers parties to the "Superseding Indictment." Complaint ¶¶ 77, 80, 81. 85, 87, 88, 90, 91, 132, 240.

**D. <u>The Present Adversary Proceeding</u>**

The Trustee claims that Debtor and all the named defendants have operated a "racketeering enterprise" so that Debtor could enjoy a "billionaire's lifestyle." Complaint ¶ 3. The Trustee alleges that Debtor engaged in "fraudulent money-raising schemes" to fund his "extravagant lifestyle." Complaint ¶ 5. The Trustee further claims that Debtor and all defendants created a complex network of shell companies and acted "for the purpose of concealing and shielding Debtor's vast wealth" from creditors. Complaint ¶ 7. The Trustee commenced this RICO Action *"to recover damages suffered by the Debtor's creditors as a result of an extensive years' long racketeering conspiracy involving multiple fraudulent schemes facilitated by the Defendants in violation of [RICO]."* Complaint ¶ 1 (emphasis added). The Trustee further alleges that the RICO Action "relates to how the Debtor and his co-conspirators were able to amass vast amounts of money and then, through widespread criminal conduct, use it to enrich themselves while hiding it from the Debtor's creditors." *Id.* ¶ 2. Rather than claiming that Debtor had been harmed by the RICO violations, the Trustee repeatedly asserts that Debtor benefitted from the RICO enterprise. For the reasons explained below, RICO relief is not available to the Trustee to recover damages *allegedly caused to Debtor's creditors*.

The Trustee categorizes the alleged participants in the RICO enterprise into five groups: (1) funding entities; (2) asset-holding entities; (3) business-front entities; (4) nominee participants; (5) professional participants and (6) additional participants. Complaint ¶ 98. The Trustee places G Club and GCI in the "business-front entities" group, which he describes as entities used to

conceal Debtor's assets from creditors and pass-through fraudulently obtained funds for Debtor's benefit. Complaint ¶ 98.

The Trustee alleges that G Club was a "world-wide fraudulent scheme" in which members paid various membership fees at different tiers to G Club for purportedly no benefit. Complaint ¶ 88. Debtor officially provided consulting services to G Club and was a spokesperson, key host, and promotional contact. Complaint ¶ 89. The members' contributions were transferred from G Club to CGI. Complaint ¶ 88. In a conclusory fashion, the Trustee alleges that Defendants used G Club funds to purchase valuable assets for Debtor and hide them in shell companies, but does not allege any specifics regarding these alleged purchases and concealment. Complaint ¶ 117. Similarly, the Trustee alleges G Club funds were laundered for the benefit of Debtor, but does not allege any details as to how. Complaint ¶ 124. Further, the Trustee states that G Club "voluntarily and intentionally devised and participated in one or more criminal schemes to defraud the Debtor's creditors" but does not explain the details of any such scheme, except perhaps under seal. Complaint ¶ 379.

The Trustee claims that G Club violated RICO, premised on the predicate acts of violations of 18 U.S.C. §§ 1343 (wire fraud), 1956 and 1957 (money laundering), and 1503, 1512 and 1519 (obstruction of justice). Complaint ¶¶ 379, 388, 402-408, 422, 434, 435, 437.

## III. <u>LAW AND ARGUMENT</u>

### A. <u>Dismissal Pursuant to Fed. R. Civ. P. 12(b)(6) Generally</u>

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), made applicable to bankruptcy proceedings through Fed. R. Bankr. P. 7012(b), a pleading must contain a short, plain statement of the claim showing the pleader is entitled to relief, and a complaint must contain

sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *In re: Fuschi-Aibel*, 2018 WL 3965155, *1 (Bankr. D. Conn. Aug. 16, 2018) (*quoting Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A pleading cannot merely recite the elements of a cause of action, or provide naked assertions devoid of further factual enhancement. *Id.* However, "[a] court's focus on a motion to dismiss under Rule 12(b)(6) is 'not whether the plaintiff will ultimately prevail but whether the plaintiff is entitled to offer evidence to support the claims.'" *A. ex rel. A. v. Hartford Bd. of Educ.*, 976 F. Supp. 2d 164, 174 (D. Conn. 2013) (quoting *Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 378 (2d Cir.1995)). "For this reason, when 'deciding a motion to dismiss under Rule 12(b)(6), the court must accept as true all factual allegations in the complaint and must draw inferences in a light most favorable to the plaintiff.'" *Id.*, *quoting Moore v. Mara,* 2010 WL 3270223 at *3 (D. Conn. August 17, 2010).

In *Iqbal*, the United States Supreme Court described a two-step analysis to evaluate the sufficiency of a complaint. First, all allegations in the complaint, except legal conclusions or "naked assertions," must be accepted as true, and second, the complaint must state a plausible claim for relief. *Iqbal*, 556 U.S. at 678-79. "A claim is facially plausible where the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *In re Sagarino*, 2017 WL 3865625, at *2 (Bankr. D. Conn. Aug. 29, 2017) (*quoting Iqbal*, 556 U.S. at 678). Determining the plausibility of a claim for relief is context-specific and "requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. The chief inquiry when ruling on a motion to dismiss is not whether a plaintiff will ultimately prevail but whether the claimant may offer evidence to support the claims. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), abrogated on other grounds by *Harlow v. Fitzgerald*,

457 U.S. 800 (1982). The movant carries the burden of demonstrating that dismissal is appropriate. *Paul v. Intel Corp. (In re Intel Corp. Microprocessor Anti–Trust Litig.)*, 496 F.Supp.2d 404, 408 (D. Del. 2007).

### B. Pleading RICO Claims Generally

"To plead a civil RICO claim, a plaintiff must adequately allege an injury caused by a violation of 18 U.S.C. § 1962. A § 1962 violation requires allegations that the defendant engaged in actions that qualify as RICO predicates. To the extent that [the plaintiff] alleges mail and wire fraud claims as RICO predicates, the elements of such claims must be pled with particularity." *Hao Zhe Wang v. Verizon Communs. Inc.*, 2023 U.S. App. LEXIS 1258, at *4 (2d Cir. Jan. 19, 2023) (internal citations omitted). "To sustain a RICO claim under 18 U.S.C. § 1962(c), a plaintiff must show (1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce." *Williams v. Affinion Grp., LLC*, 889 F.3d 116, 123-24 (2d Cir. 2018) (internal punctuation omitted). "A plaintiff must also demonstrate injury and causation." *Rivera v. NCB Mgmt. Servs., Inc.*, 2023 U.S. Dist. LEXIS 203434, at *20 (D. Conn. Nov. 14, 2023).

### C. The Complaint Does Not Allege Any Particular Conduct by Defendants

The Complaint makes no specified allegations against either of the Defendants. Indeed, as alleged, G Club appears to be the victim of Debtor's alleged misconduct. The Complaint also alleges Defendants are "Front Entities" that undertook certain conduct but does not allege either Defendants did any act with particularity. Specifically, the Complaint alleges:

- ¶ 27: "Defendant Alex Hadjicharalambous is an individual who is alleged herein to be an Additional Participant and served the Debtor as, among other things, Financial Controller of G Club Operations, as well as holding positions at certain of the HCHK Entities and Golden Spring. Mr. Hadjicharalambous was also, among other things, a bank account signatory for G Fashion LLC, G Music LLC, and G Club Operations LLC. Mr. Hadjicharalambous resides in New York."
- ¶38: Defendant Jessica Mastrogiovanni is an individual who is alleged herein to be an Additional Participant and served the Debtor in multiple roles including as general counsel of GTV and as corporate officer and authorized signatory of GTV and Saraca. She also served in an inhouse legal role at G Club Operations and G Club International."
- ¶ 81: "According to the Superseding Indictment, the Debtor's and his co-conspirators' investment schemes involved several interrelated parts, including fundraising activities involving the GTV Private Placement (as defined below), the Farm Loan Program (as defined below), the G Club membership program, and the Himalaya Exchange (as defined below)."
- ¶ 88: "As alleged in the Superseding Indictment, in truth and in reality, G-Club was a world-wide fraudulent scheme designed to enrich the Debtor that provided no discernable benefits to its 'members.' Rather, 'members' paid various membership fees to G-Club to obtain certain 'tiers' or status's within the purported organization, with each alleged 'tier' providing greater benefits (there were none) to the member, but costing more money as well. The 'members'' contributions were ultimately transferred from G-Club to G-Club BVI or other locations where they could be used to enrich the Debtor, his family, and his associates."
- ¶ 89: "G-Club was functionally and beneficially owned and controlled by the Debtor, although the Debtor held no formal executive position at G-Club. The Debtor 'officially' provided consulting services for G-Club and held titles as spokesperson, key host and promotional contact."
- ¶ 90: "The Debtor and his co-conspirators allegedly obtained more than approximately $250 million through the G-Club membership scheme from would-be members." Paragraph 90 further states that G Club provided no services to its member.
- ¶ 102: "From the outset, G-Club's fraudulent nature gave rise to significant difficulties maintaining banking relationships with FDIC-insured domestic financial institutions." The Trustee has redacted any specific allegations concerning this conclusion.

- ¶ 117: "The Defendants also used G-Club funds to purchase valuable assets for the Debtor and hide them in shell companies where they could not be found by creditors." The Trustee has redacted any specific allegations concerning this conclusion.
- ¶ 229: The Trustee claims that G Club's fraudulently obtained funds were invested in cryptocurrency. The Trustee has redacted any specific allegations concerning this conclusion.
- ¶ 233: "As discussed below, the purchase of the Mahwah Mansion was in fact an extension of the G-Club fraud executed by the Debtor and his co-conspirators."
- ¶ 379: "G-Club Operations LLC voluntarily and intentionally devised and participated in one or more criminal schemes to defraud the Debtor's creditors during the relevant period, including without limitation, the activity described in paragraphs 127." Paragraph 127 appears to have been redacted.
- ¶ 422: G Club engaged in money laundering: "G-Club Operations LLC conducted the series of financial transactions described herein including, but not limited to allegations contained in paragraphs 103-128, 130-131, 231-232, and 245-257."
- ¶ 437: G Club engaged in obstruction of justice: "Based on the allegations set forth in paragraphs 296-298, among others, GTV Media Group, Inc., Saraca Media, Inc., Hudson Diamond NY LLC, and G-Club US Operations LLC corruptly endeavored to influence, obstruct, or impede the due administration of justice by withholding information, including documents, thereby failing to comply with the Rule 2004 Subpoenas and violating the Court's Rule 2004 Orders in furtherance of the fraudulent scheme."
- ¶472(a): "Each Business-Front Entity had knowledge of and facilitated and directly engaged in the unlawful endeavors of the Kwok Enterprise by concealing the Debtor's assets from creditors and passing-through unlawfully obtained funds for the benefit of the Debtor, his family, and associates, while nominally being operating media, real estate, technology, and social media enterprises, but functionally being owned and controlled by the Debtor to further the Kwok Enterprise."

Thus, the Trustee has publicly pled only conclusions, and the Complaint contains "threadbare" factual allegations that do not pass muster under Fed. R. Civ. P. 9(b).

More concerning is that the Trustee has hidden allegations he relies on to plead his Complaint. Secret lawsuits are not permitted. Courts may allow pleadings to be sealed *so that the*

*public cannot access them* if a movant can overcome the "strong presumption of public access to documents covered by the First Amendment right of access." *Metro Risk Mgmt. Agency v. Hudson Specialty Ins. Co.*, No. 23-CV-1944 (VSB), 2023 U.S. Dist. LEXIS 46019, at *3 (S.D.N.Y. Mar. 16, 2023) ("Complaints are subject to a First Amendment right of access"). However, unlike sealing documents from the public, there is no procedure or test that a movant can overcome in order for the court to seal allegations from a defendant that the Plaintiff may still rely upon. Such an outcome would run contrary to the foundation of our current legal system, where defendants must be served with the allegations against them. Further, "Rule 9(b) serves at least three important purposes: *first, it ensures that a defendant is aware of the actions upon which the allegations of fraud are based*; second, it helps protect a defendant's reputation by preventing insufficient allegations of fraud; and third, it prevents strike suits." *Philan Ins., Ltd. v. Frank B. Hall & Co.*, 712 F. Supp. 339, 342 (S.D.N.Y. 1989) (emphasis added). The Trustee's reliance on information ostensibly contained in sealed exhibits, the Government's Criminal Case filings, and other lawsuits do not meet the requirements of Fed. R. Civ. P. 9(b) or 10.

Notably, in his Complaint the Trustee relies on sealed information contained in sealed filings. There is no special rule that allows pleadings to be sealed to obscure information from defendants. While the Trustee may cite the *Court's Order Directing Parties to Mediation, Appointing the Honorable James J. Tancredi as Mediator, and Amending Order Approving Procedures Applicable to Avoidance Claim Adversary Proceedings* (Main Case ECF No. 3163, the "Avoidance/Mediation Procedures Order") at ¶ 2(d), the underlying motion (Main Case ECF No. 2532 at 6, ¶ 16) seeking the entry of the Avoidance/Mediation Procedures Order contained no legal support whatsoever for redacting or sealing the Complaint and the only cases cited are unreported

procedures orders from other cases that, similarly, do not support sealing information that is needed in a pleading to meet the requirements of Fed. R. Civ. P. 8 and 9, and *Iqbal*.

Further, the Trustee claims that the entire relationship among Debtor and Defendants was based in fraud, but does not make any attempt to comply with Fed. R. Civ. P. 9(b) or, even, 8. "In the RICO context, a plaintiff must plead predicate acts sounding in fraud or mistake according to the particularity requirement of Rule 9(b); for other elements of a RICO claim—such as non-fraud predicate acts or, as relevant here, the existence of an 'enterprise'—a plaintiff's complaint need satisfy only the 'short and plain statement' standard of Rule 8(a)." *D. Penguin Bros. v. City Nat'l Bank*, 587 F. App'x 663, 666 (2d Cir. 2014).

Based on the allegations of the Complaint, G Club, a limited liability company with no existence other than through its agents, was hijacked by Debtor and his acolytes and used as a Trojan horse to obtain and funnel money elsewhere. Far from perpetrating any misconduct, *G Club, as an entity, was the victim here.* While the Trustee can plead his case however he wants, G Club must act through individuals and those individuals harmed G Club and its members.

**E. <u>The Complaint Does Not Allege Any Predicate Acts Committed by Defendants</u>**

The Complaint does not allege the elements of either money laundering, obstruction of justice, or wire fraud, the predicate acts alleged to have been committed by Defendants. The elements of money laundering are: "[t]o establish money laundering under 18 U.S.C. § 1956(a)(1), a plaintiff must allege and ultimately prove that defendants: (1) engaged in a financial transaction which involved proceeds from specified illegal activity, (2) knew the proceeds were from illegal activity, and (3) intended the transaction either to promote the illegal activity or to conceal the nature, source, or ownership of the illegal proceeds." *RJ v. Cigna Health & Life Ins. Co.*, 625 F.

Supp. 3d 951, 964 (N.D. Cal. 2022). These elements must be pled with particularity. *Id.* "[F]unds become proceeds [for purposes of Section 1956] when they are derived from an already completed offense, or a completed phase of an ongoing offense." *Berman v. LaBonte*, 622 B.R. 503, 529 (D. Conn. 2020) (money laundering must be the second step in the scheme and one cannot launder money until it is stolen.)

The elements of obstruction of justice are: "(1) that there is a pending judicial or grand jury proceeding constituting the administration of justice, (2) that the defendant knew or had notice of the proceeding, and (3) that the defendant acted with the wrongful intent or improper purpose to influence the judicial or grand jury proceeding, whether or not the defendant is successful in doing so—that is, that the defendant corruptly intended to impede the administration of that judicial proceeding." *Id.* at 525. Obstruction of justice allegations are tested under Rule 8. *Alix v. McKinsey & Co.*, 2023 U.S. Dist. LEXIS 145872, at *59 (S.D.N.Y. Aug. 18, 2023).

"Wire fraud, 18 U.S.C. § 1343, has three elements: (1) a scheme to defraud, (2) money or property that is the object of the scheme, and (3) use of the wires to further the scheme." *Empire Merchs., LLC v. Reliable Churchill LLLP*, 902 F.3d 132, 137 (2d Cir. 2018). "[A] claim predicated on mail or wire fraud involves sufficient domestic conduct when (1) the defendant used domestic mail or wires in furtherance of a scheme to defraud, and (2) the use of the mail or wires was a core component of the scheme to defraud." *Bascunan v. Elsaca*, 927 F.3d 108, 122 (2d Cir. 2019).

Here, the Trustee has not pled the requisite elements of any alleged predicate act. As to money laundering, the conclusions (not any facts) assert that G Club was used to solicit the funds that were later laundered through Himalaya International Clearing Limited ("Himalaya"). Taking these non-factual allegations as true, G Club could not have both generated funds, and also, at the

same time, laundered them. This is precisely the holding in *Berman*, where the court held that funds can be laundered only after they are already derived from a completed offense. *Id.* At 529. As the *Berman* court explained, "for pleading purposes, Plaintiff alleged that the fraudulent transfer of assets to the purportedly irrevocable Scott A. Dynasty Trust constituted bankruptcy fraud in violation of 18 U.S.C. § 152(7). Thus, at the time of the completed transfers, the assets were 'proceeds' for purposes of § 1956. Thereafter, like *Ledee*, the enterprise enabled Scott to liquidate the assets in the Scott A. LaBonte Dynasty Trust for Scott's benefit, which were financial transactions with those proceeds." *Id.* at 530. Here, the Complaint alleges that Debtor and others used G Club to steal money. *Thereafter*, G Club transferred funds to Himalaya, which laundered the funds. The only alleged conduct of G Club was to steal money, creating the proceeds. The Trustee alleges that Debtor later laundered the money.

As to obstruction of justice, nothing is alleged in the Complaint and the docket in the Main Case shows that G Club complied with all 2004 Examination requests by the Trustee.

As to wire fraud, the Trustee has failed to allege any of the necessary elements. The Trustee alleges that G Club engaged in criminal schemes to defraud as described in Complaint ¶ 127, but that paragraph is redacted. Aside from the conclusion that G Club engaged in wire fraud, the Trustee has plead no details of any scheme to defraud or that the use of wires was a central component of any such scheme.

As to GCI, there are no specific allegations made whatsoever.

**F. <u>The Trustee Has Not Pled Damages Caused by G Club and Lacks Standing</u>**

"Proximate cause, in this context, refers not to the foreseeability of harm to a plaintiff, but instead to the directness of the relationship between the purported enterprise's alleged criminal

acts and the plaintiff's injuries." *Picard v. Kohn*, 907 F. Supp. 2d 392, 397 (S.D.N.Y. 2012). As set forth above, the Complaint alleges facts to suggest G Club and its members are victims of a fraudulent scheme, not the perpetrators. To the extent anyone was harmed (other than G Club) it was the members of G Club as their money was allegedly stolen. However, the Trustee is not the representative of the G Club members. He has no standing to sue on behalf of them. A bankruptcy trustee may only pursue "claims that properly belonged to the debtor before [he] entered bankruptcy," and lacks the power to pursue claims that are not the debtor's property. *Picard*, 460 B.R. at 91. Stated differently: "a bankruptcy trustee… may only assert claims held by the bankrupt [person or entity] itself." *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 118 (2d Cir. 1991). The key argument made by the Trustee is that he, and he alone, is best situated to recovery on *behalf of Debtors' creditors*.[3] This admission means the case must be dismissed as the Trustee has no standing to bring it.

Notwithstanding, the gravamen of the RICO Complaint is the alleged harm caused to Debtor's creditors, not Debtor himself. This means that, as a matter of law, the Complaint is insufficient to establish the Trustee's RICO claims. Indeed, the Government has forfeited more than $600 million to protect whatever rights and recovery the G Club members may have. None of the G Club members are creditors of Debtors' estate and, thus, the Trustee has no ability to "stand in their shoes" to pursue a claim under Bankruptcy Code § 544(a) or (b). Moreover, the

---

[3] "There are no independent factors that account for the injuries to the Debtor's creditors caused by the Defendants' unlawful conduct, nor are those injuries in any way derivative of any injury to any other entity or individual. No immediate victim is better situated than the Trustee to sue—and indeed the Defendants' misconduct has been brought to light by the Trustee's efforts, as well as those of the U.S. Department of Justice—nor is there any risk of duplicative recoveries by plaintiffs removed at different levels of injury from the violations." Complaint ¶ 481.

Trustee cannot recover the forfeited funds from the Government to distribute to Debtor's creditors. Rather, alleged victims will submit restitution claims to the Government who will evaluate and pay restitution when appropriate (without charging said alleged victims thousands of dollars an hour to do so).

"It is well settled that a bankruptcy trustee has no standing generally to sue third parties on behalf of the estate's creditors, but may only assert claims held by the bankrupt corporation itself." *Picard v. JPMorgan Chase & Co.*, 460 B.R. 84, 91 (S.D.N.Y. 2011). A bankruptcy trustee is authorize to bring claims that "fall into two broad categories: (1) actions brought by the trustee as successor to the debtor's interests included as property of the estate under 11 U.S.C. § 541, and (2) actions brought under one of the trustee's avoidance powers [such as 11 U.S.C. § 544]." *ASARCO LLC v. Americas Mining Corp*., 396 B.R. 278, 325 (S.D. Tex. 2008) (internal citations omitted). Here, the Trustee does not specify which Bankruptcy Code section he is bringing his claims under – the Trustee references 11 U.S.C. §§ 541, 542 and 544 of the Bankruptcy Code. But the Trustee's imprecise pleading makes no difference: he lacks standing to bring claims under both 11 U.S.C. §§ 541 and 544. Debtor, as the alleged perpetrator of the alleged RICO conspiracy cannot sue G Club. Thus, neither can the Trustee. "This is because the Trustee steps into the shoes of the debtor for the purpose of bringing property into the bankruptcy estate and, as such, possesses only the rights of the debtor." *Levin v. Nirav Deepak Modi (In re Firestar Diamond, Inc.)*, 634 B.R. 265, 296 (Bankr. S.D.N.Y. 2021). Nothing in the Complaint explains how creditors of Debtors were harmed by anything having to do with G Club. Even if the Trustee's deficient allegations are given weight, no money was taken from Debtor's creditors. The money was allegedly stolen from G Club members.

As in *Madoff*, the misconduct alleged here, harm to G Club's members "could have happened independently" to whatever schemes and crimes are otherwise alleged. *Picard v. Kohn*, 907 F. Supp. 2d 392, 397 (S.D.N.Y. 2012). Thus, at worst, G Club (despite being a victim of outside manipulation, as alleged) merely "facilitated" Debtor's illegal securities offerings and fraudulent operations meaning "the Trustee has failed to plead proximate cause, and thus lacks standing to bring claims under RICO." *Id.* at 397.

Therefore, the Complaint has not alleged that G Club, as opposed to individuals who misappropriated G Club's assets, harmed anyone. And, regardless, the Trustee has no standing to assert claims on behalf of G Club members. Lastly, there is no allegation in the Complaint that GCI harmed anyone or any explanation how. Thus, the Complaint must be dismissed.

### G. The Trustee Has Not Alleged Cognizable RICO Damages that are "Clear and Definite"

The Complaint does not specify what damages it actually seeks from G Club or GCI. But RICO specifically requires the Trustee to quantify how the *RICO conspiracy* harmed alleged victims. Generalized damages (unlike in common law claims for, say, breach of fiduciary duty) are insufficient. "[A] cause of action does not accrue under RICO until the amount of damages becomes clear and definite." *Motorola Credit Corp. v. Uzan*, 322 F.3d 130, 135 (2d Cir. 2003) (quoting *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 768 (2d Cir. 1994)); *see also Denney v. Deutsche Bank AG*, 443 F.3d 253, 266 (2d Cir. 2006) (a RICO plaintiff only has standing if, and can only recover "when his or her actual loss becomes clear and definite"). In the context of an allegedly defrauded creditor, the "clear and definite" requirement means that: "a creditor claiming that its ability to collect its debt has been impaired or frustrated by a RICO violation lacks

standing to sue under RICO for the amount of the debt as long as the extent of the loss remains uncertain, as for example where collection efforts continue." *First Capital Asset Mgmt. v. Brickellbush, Inc.*, 219 F. Supp. 2d 576, 578 (S.D.N.Y. 2002) (citing *Stochastic Decisions, Inc. v. DiDomenico*, 995 F.2d 1158, 1166 (2d Cir. 1993), *cert. denied*, 510 U.S. 945, 114 S. Ct. 385, 126 L. Ed. 2d 334 (1993), and *Bankers Tr. Co. v. Rhoades*, 859 F.2d 1096, 1105-06 (2d Cir. 1988)); *see also D'Addario v. D'Addario*, 901 F.3d 80, 93 (2d Cir. 2018) (in an heiress's RICO action against her siblings and others arising from the alleged looting of her father's probate estate, the Second Circuit affirmed the District Court's determination that claims for distribution of her inheritance were not ripe because the estate was not closed and the amount of the lost inheritance was too speculative).

The Trustee has not alleged, and cannot establish, clearly and definitely the extent to which the debts owed to Debtor's creditors will remain unpaid. There are nearly 300 adversary proceedings within the Chapter 11 Case as well as the forfeiture proceeding commenced by the Government and the SEC Complaint, all seeking effectively the same or similar relief: compensation of G Club's members. Given that the Government is holding approximately $200 million of G Club member money, it is clear that members applying for restitution will be a much more efficient and less expensive method of recovery for victims. Moreover, at this time, given all of the lawsuits and other actions, common sense dictates that there will be significant impact on the debts owed to creditors (assuming the Trustee even has standing to pursue those claims as set forth above).

As Judge Rackoff explained in *Picard v. Kohn*, 907 F. Supp. 2d at 397, calculating RICO damages must be precise and speculation cuts off causation and damages: "[a]ny attempt to

estimate that amount of damage would have to consider such imponderable counterfactuals as whether Madoff Securities might have obtained funds from other sources and how much earlier Madoff Securities would have been caught or entered bankruptcy without defendants' alleged contributions." Having failed to delineate any precise claim against Defendants or explain why the RICO case provides any benefit to any creditors, the case should be dismissed.

### H. The Doctrine of *In Pari Delicto* Precludes the Relief Sought

*In pari delicto* also precludes the Trustee from recovering under RICO § 1964(c). *In pari delicto* is a federal common law defense. *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 306-07 (1985). "The doctrine of *in pari delicto*, a term meaning 'of equal fault,' reflects the principle that a plaintiff who has participated in wrongdoing equally with another person may not recover from that other person damages ges [*sic*] resulting from the wrongdoing." *Republic of Iraq v. ABB AG*, 768 F.3d 145, 160 (2d Cir. 2014). The Second Circuit has held that *in pari delicto* is available as a defense to RICO causes of action where (1) "as a direct result of his own actions, the plaintiff bears at least substantially equal responsibility for the violations he seeks to redress," and (2) recognition of the *in pari delicto* defense "comport[s] with the purposes of the [RICO] statute." *Id.*, 768 F.3d at 162, 167 (internal citations and quotations omitted). In applying *in pari delicto*, the Trustee stands, once again, not independent of Debtor, but in his shoes. *See Picard v. JP Morgan Chase & Co. (In re Bernard L. Madoff Inv. Sec. LLC.)*, 721 F.3d 54, 58-59, 64 n.13 (2d Cir. 2013) ("the doctrine of *in pari delicto* bars the Trustee (who stands in Madoff's shoes) from asserting claims directly against the Defendants on behalf of the *estate* for wrongdoing in which Madoff (to say the least) participated" (emphasis in original)). The Trustee alleges in the RICO

Complaint that Debtor "is and has been the mastermind behind the Kwok Enterprise." Complaint ¶ 11.

As a representative of Debtor's bankruptcy estate, the Trustee cannot recover for the harm allegedly caused to the G Club members. The Trustee does not allege that the racketeering activity caused Debtor any direct injury to his business or property. To the contrary, the Trustee alleges that Debtor orchestrated and actually benefitted from the purported racketeering activity. Debtor's alleged masterminding of the RICO scheme means the Trustee – who steps into Debtor's infirmities as well as his rights – cannot pursue a claim Debtor himself couldn't. Obviously, Debtor could not sue G Club or GCI for defrauding its members. Thus, this presents another reason to dismiss this case.

**I. <u>The Trustee's RICO Claims are Barred by the PSLRA</u>**

The claims against G Club, GCI, and many others are premised on the improper raising of funds through G Club memberships. The Trustee's claims are borrowed from either the Government's Superseding Indictment or the SEC Complaint, or both. Section 107 of the PSLRA, known as the "RICO Amendment," provides that: "no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962." 18 U.S.C. § 1964(c). Therefore, the RICO Amendment bars precisely the claims brought by the Trustee.

The RICO Amendment "was intended not simply 'to eliminate securities fraud as a predicate offense in a civil RICO action,' but also to prevent a plaintiff from 'plead[ing] other specified offenses, such as mail or wire fraud, as predicate acts under civil RICO if such offenses are based on conduct that would have been actionable as securities fraud.'" *Monterey Bay Mil.*

*Hous., LLC v. AMBAC Assur. Corp.*, 531 F. Supp. 3d 673, 716 (S.D.N.Y. 2021) (citations omitted). This prohibition (the "PSLRA Bar") was designed to "eliminate the possibility that litigants might frame their securities claims under a mail or wire fraud claim," *Jordan (Bermuda) Inv. Co. v. Hunter Green Invs.*, 205 F. Supp. 2d 243, 248 (S.D.N.Y. 2002) (citations omitted), to "eliminat[e] the so-called 'treble damage blunderbuss of RICO[]' in securities fraud cases," *Mathews v. Kidder, Peabody & Co.*, 161 F.3d 156, 164 (3d Cir. 1998), and to prevent "litigants from using artful pleading to boot-strap securities fraud cases into RICO cases." *MLSMK Inv. Co. v. JP Morgan Chase & Co.*, 651 F.3d 268, 274 (2d Cir. 2011); *see also Thomas H. Lee Equity Fund V., L.P. v. Mayer Brown, Rowe & Maw LLP*, 612 F. Supp. 2d 267, 281 (S.D.N.Y. 2009).

In his RICO Complaint, the Trustee relies extensively upon, as defined in the RICO Complaint, the purported GTV Private Placement or the GTV fraud, the Farm Loan Program, the G-Clubs Scheme or G-Clubs fraud, and the Himalaya Exchange; these are precisely the same "securities offerings" the SEC sues on in the SEC Complaint. Thus, in *Picard v. Kohn*, 907 F. Supp. 2d 292, 396-401 (S.D.N.Y. 2012), the court dismissed the trustee's RICO claims due to the parallel SEC case: "Nonetheless, the Second Circuit has made it clear that the RICO Amendment does not apply only where a valid fraud claim exists as an alternative to a RICO claim." *Picard v. Kohn*, 907 F. Supp. 2d and 398-99. Like Judge Rakoff, this Court should so apply the Second Circuit's holding: "[w]e conclude that section 107 of the PSLRA bars civil RICO claims alleging predicate acts of securities fraud, even where a plaintiff cannot itself pursue a securities fraud action against the defendant." *MLSMK Inv. Co. v. JP Morgan Chase & Co.*, 651 F.3d 268, 277 (2d Cir. 2011).

### J. Joinder of Other Motions to Dismiss

Defendants hereby join in, to the extent applicable, the arguments made by other defendants in this matter who have filed motions to dismiss. Defendants reserve the right to advance further arguments at oral argument or as otherwise applicable in further briefing.

## IV. CONCLUSION

For the foregoing reasons, the Court should grant Defendants' Motion.

DEFENDANTS
G CLUB OPERATIONS LLC
G CLUB INTERNATIONAL LIMITED

By: /s/ Jeffrey M. Sklarz

Jeffrey M. Sklarz (ct20938)
Kellianne Baranowsky (ct26684)
Michelle A. Antao (ct31715)
GREEN & SKLARZ LLC
One Audubon St, 3rd Floor
New Haven, CT 06511
Tel: 203-285-8545
jsklarz@gs-lawfirm.com
kbaranowsky@gs-lawfirm.com
mantao@gs-lawfirm.com

## CERTIFICATE OF SERVICE

I hereby certify that on the date set forth below, a copy of the foregoing was served via CM/ECF. Parties may access this filing through the Court's CM/ECF system.

Date: September 18, 2024 /s/ Jeffrey M. Sklarz

**ANTONIA M. APPS**
**REGIONAL DIRECTOR**
**Thomas P. Smith, Jr.**
**Sandeep Satwalekar**
**Daniel Loss**
**William Conway**
**Amanda Rios**
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**100 Pearl Street, Suite 20-100**
**New York, New York 10004-2616**
**(212) 336-5571 (Loss)**
**LossD@sec.gov**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>**Plaintiff,**<br><br>**-against-**<br><br>**HO WAN KWOK (A/K/A MILES GUO, MILES KWOK, WENGUI GUO AND BROTHER SEVEN), KIN MING JE (A/K/A WILLIAM JE), MOUNTAINS OF SPICES LLC (D/B/A NEW YORK FARM), and G CLUB OPERATIONS LLC,**<br><br>**Defendants,**<br><br>**-and-**<br><br>**MEI GUO, QIANG GUO (A/K/A MILESON GUO), HING CHI NGOK, and SIN TING RONG,**<br><br>**Relief Defendants.** | **COMPLAINT**<br><br>**23 Civ. 2200 (      )**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against Defendants Ho Wan Kwok (a/k/a Miles Guo, Miles Kwok, Wengui Guo, and Brother Seven) ("Guo"), Kin Ming Je (a/k/a William Je) ("Je"), Mountains of Spices LLC (d/b/a New York

Farm) ("Mountains of Spices"), and G Club Operations LLC ("G Club Operations") (collectively, "Defendants") and Relief Defendants Mei Guo, Qiang Guo (a/k/a Mileson Guo), Hing Chi Ngok ("Ngok"), and Sin Ting Rong ("Rong") (collectively, "Relief Defendants"), alleges as follows:

**SUMMARY**

1. This action concerns multiple offering frauds orchestrated by Guo, an exiled Chinese businessman living in the United States who targeted retail investors through online and social media posts and videos. Since in or about April 2020, Guo has conducted fraudulent securities offerings (the "Subject Offerings") that have collectively raised at least hundreds of millions of dollars from investors in the United States and around the world. Unbeknownst to those investors, Guo and his financial adviser, Je, misappropriated a large portion of the funds raised from certain of the Subject Offerings in order to enrich themselves and their family members, including the Relief Defendants.

2. Guo pitched three unregistered securities offerings to investors as a means of obtaining shares in GTV Media Group, Inc. ("GTV"), a media company that Guo founded, and a fourth offering as a means to obtain a crypto asset security called "H-Coin" that he falsely claimed was backed by gold reserves.

3. First, from in or about April 2020 to June 2020, Guo and Je launched an unregistered offering of GTV common stock (the "GTV Private Placement"), which raised approximately $452 million. According to the private placement memorandum (the "GTV PPM"), GTV's mission was "to build the most popular and safest social media and transaction platform independent of the Chinese government's censorship and monitoring, allowing the people of China and the world to realize the freedom of speech and trade." Guo and Je claimed

that investor funds obtained pursuant to the GTV Private Placement would be used for GTV's operations and business development. In fact, however, just days after the conclusion of the GTV Private Placement, Guo and Je misappropriated $100 million of investor money for the benefit of a company solely owned by Guo's son, Qiang Guo.

4. Second, following the GTV Private Placement, from in or about July 2020 through March 2021, Guo solicited investments in an at least $150 million unregistered offering of convertible loans that could be exchanged for GTV common stock (the "Convertible Loan Offering"). Before and during the Convertible Loan Offering, Guo made material misrepresentations relating to GTV's valuation and the price at which GTV stock traded, falsely claiming, for example, that GTV was worth as much as $20 billion and that the stock was trading at $18 per share, mere months after the GTV Private Placement offered the stock at just $1 per share. These misrepresentations were important to investors' decisions to purchase GTV's convertible loans. Guo also misappropriated at least tens of millions of dollars raised from the Convertible Loan Offering.

5. Third, from in or about October 2020 through December 2021, Guo and G Club Operations sold memberships in a concierge service called G-Clubs (a/k/a G-Club and G|CLUBS) pursuant to an unregistered offering (the "G-Clubs Offering"). In connection with the G-Clubs Offering, Guo and G Club Operations falsely represented that purchasers of G-Clubs memberships would receive shares of GTV and/or G Fashion LLC ("G-Fashion"), a related company that held itself out as a fashion retailer. In fact, contrary to these representations, numerous G-Clubs members did not receive stock in either GTV or G-Fashion as promised. As with the Convertible Loan Offering, Guo's misrepresentations relating to GTV's valuation and the trading price of its stock were important to investors' decisions to

participate in the G-Clubs Offering. Out of at least $255 million raised pursuant to the G-Clubs Offering, Guo and members of his family, including Mei Guo, Qiang Guo, and Ngok, received approximately $51 million in misappropriated investor funds for their personal benefit.

6. Finally, beginning in at least approximately October 2021, Guo made material misrepresentations to prospective purchasers of a crypto asset security called H-Coin (a/k/a Himalaya Coin or HCN). For example, Guo falsely claimed that 20% of H-Coin's value was held in gold reserves. Additionally, Guo falsely stated that he would compensate investors for losses related to their H-Coin purchases. From approximately May 2021 through October 2022, thousands of investors contributed an aggregate of approximately at least $500 million for the purchase of H-Coin and a purported companion stablecoin, H-Dollar. Most of these investments occurred after Guo made the misrepresentations discussed herein.

**VIOLATIONS**

7. By virtue of the foregoing conduct and as alleged further herein, Defendants Guo and Je have committed securities fraud and Defendants Guo, G Club Operations, and Mountains of Spices offered and sold unregistered securities. Defendant Je also aided and abetted some of Guo's securities fraud violations.

8. Defendants Guo, Mountains of Spices, and G Club Operations violated Sections 5(a) and (c) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a) and 77e(c)].

9. Defendants Guo and Je violated Sections 17(a)(1) and 17(a)(3) of the Securities Act [15 U.S.C. §§77q(a)(1) and 77q(a)(3)] and Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)].

10. Defendant Guo further violated Section 17(a)(2) of the Securities Act [15 U.S.C.

§ 77q(a)(2)] and Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

11. Pursuant to Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)] and Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Je aided and abetted Guo's violations of Section 17(a)(2) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder.

12. Unless Defendants are restrained and enjoined, they will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

**NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT**

13. The Commission brings this action pursuant to the authority conferred upon it by Sections 20(b) and 20(d) of the Securities Act [15 U.S.C. §§ 77t(b) and 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

14. The Commission seeks a final judgment: (a) permanently enjoining Defendants from violating the federal securities laws and rules this Complaint alleges they have violated; (b) ordering Defendants to disgorge all ill-gotten gains they received as a result of the violations alleged here and to pay prejudgment interest thereon pursuant to Sections 21(d)(3), 21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), 78u(d)(5) and 78u(d)(7)]; (c) ordering Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; (d) permanently prohibiting Guo from participating in the offer or sale of securities, including crypto asset securities, except for transactions in his own personal account, pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)]; (e) permanently prohibiting Guo and Je

from serving as an officer or director of any company that has a class of securities registered under Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports under Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)], pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)]; (f) ordering Mei Guo, Qiang Guo, Ngok, and Rong to pay, with prejudgment interest, all ill-gotten gains by which they were unjustly enriched, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5) and 78u(d)(7)]; and (g) ordering any other and further relief the Court may deem just and proper.

**JURISDICTION AND VENUE**

15. This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

16. Defendants, directly and indirectly, have made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

17. Venue lies in this District under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Defendants may be found in, are inhabitants of, or transact business in the Southern District of New York, and certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within this District, including the solicitation of investors in the Subject Offerings and the receipt and diversion of investor funds. For example, GTV was headquartered in this District and Guo resided in this District during some of the relevant conduct.

**DEFENDANTS**

18. **Guo**, age 54, is a Hong Kong citizen living in New York, New York and

Case 1:23-cv-02200 Document 1 Filed 03/15/23 Page 7 of 36

Greenwich, Connecticut. At all relevant times, Guo controlled GTV, Saraca Media Group, Inc. ("Saraca"), G Club Operations, and G-Fashion. Guo is not registered with the Commission in any capacity. Guo asserted his Fifth Amendment right against self-incrimination in response to being subpoenaed for documents and testimony in the Commission staff's investigation preceding the filing of this action.

19. **Je**, age 55, is a dual Hong Kong and United Kingdom citizen currently living in London, United Kingdom. Je is a long-time investment banker and financial adviser to Guo and his family. Je served as GTV's adviser for the GTV Private Placement and also owns and controls various companies that received investor funds raised pursuant to the Convertible Loan Offering and G-Clubs Offering. Je is also the owner of an entity that purported to operate the so-called "Himalaya Exchange," through which H-Coin was offered and sold to the investing public.

20. **G Club Operations**, formed in 2020, is a Puerto Rico company with its principal places of business in Puerto Rico and New York, New York. G Club Operations operates the G-Clubs membership program and directly and indirectly received at least $255 million in investor proceeds during the G-Clubs Offering. G Club Operations is not registered with the Commission in any capacity.

21. **Mountains of Spices**, formed in 2019, is a New York company with its principal place of business in Great Neck, New York. Mountains of Spices directly and indirectly collected over $24.6 million in investor funds pursuant to the Convertible Loan Offering. Mountains of Spices is not registered with the Commission in any capacity.

**RELIEF DEFENDANTS**

22. **Mei Guo**, age 34, is a Hong Kong citizen living in New York, New York and Greenwich, Connecticut. Mei Guo is Guo's daughter. In February 2021, a corporate entity

solely owned by Mei Guo ("Company 1") received approximately $18 million in proceeds from the Convertible Loan Offering. In October 2021, Company 1 transferred $400,000 of such proceeds to Mei Guo's personal bank account. In addition, between March and May 2021, a company that is wholly-owned by Qiang Guo ("Company 2") transferred a total of $650,000 in Convertible Loan Offering proceeds to Mei Guo's personal bank account. Mei Guo and Company 1 had no legitimate claim to the funds they received that are traceable to the Convertible Loan Offering.

23. **Qiang Guo**, age 36, is a Hong Kong citizen residing in London, United Kingdom. Qiang Guo is Guo's son. Qiang Guo is the beneficial owner of Saraca, which used at least $100 million of GTV Private Placement investor funds for its own benefit, contrary to the disclosures to GTV Private Placement investors. Qiang Guo is the sole owner of Company 2, which received approximately $27 million in Convertible Loan Offering investor funds. In May and June 2021, Company 2 transferred $20 million of these investor funds to a bank account based in Switzerland belonging to Qiang Guo. In June 2021, Qiang Guo used approximately $3.5 million in G-Clubs Offering investor funds to purchase a Ferrari race car. Qiang Guo, Saraca, and Company 2 had no legitimate claim to these investor funds they received.

24. **Ngok**, age 54, is a Chinese citizen residing in Greenwich, Connecticut. Ngok is Guo's wife and is the sole owner of a corporate entity ("Company 3") that received approximately $5 million in Convertible Loan Offering investor funds in October 2020. Company 3 is also the 100% owner of a mansion in Greenwich, Connecticut, which was one of Guo's residences during the time period of the Subject Offerings. Ngok and Company 3 had no legitimate claim to the Convertible Loan Offering investor funds they received.

25. **Rong**, age 52, is a Hong Kong citizen residing in London, United Kingdom.

Rong is Je's wife. Between about January 2021 and February 2021, Je transferred approximately $3 million in Convertible Loan Offering proceeds from one of his companies to Rong's personal bank account. Rong had no legitimate claim to the investor funds she received.

## OTHER RELEVANT ENTITIES

26. **G Fashion LLC (a/k/a G|FASHION)** ("G-Fashion"), formed in 2020, is a Puerto Rico company with its principal place of business in New York, New York. According to the company's website, G-Fashion owns and operates "a global luxury brand, featuring bespoke collections by the world's top designers" and "serves as the fashion counterpart to G Clubs, and will provide exclusive benefits to G Clubs members."

27. **GNews Media Group, Inc.** ("GNews"), formed in 2019, is a Delaware corporation with its principal place of business in Puerto Rico. GNews is 100% owned by Saraca, a Delaware company owned by Guo's son, Qiang Guo. According to the GTV PPM, Guo and Saraca operate GNews. GNews' website describes GNews as "one of the world's leading social media platforms" and features Guo's videos and related content, including sections of the website entitled "Miles Guo" and "Miles' Text." The GNews website also contains links to the websites for G-Clubs, G-Fashion, and the so-called Himalaya Exchange, as well as articles that summarize H-Coin's purported recent trading activity.

28. **GTV**, formed in April 2020, is a Delaware corporation with its principal place of business in New York, New York. GTV owned and operated a news-focused social media website and mobile application. In September 2021, GTV agreed to settle Commission charges that it violated Sections 5(a) and 5(c) of the Securities Act by conducting the GTV Private Placement. GTV's website was taken down in March 2022 and the company has been inactive and insolvent since at least that time.

29. **Saraca** formed in May 2018, is a Delaware corporation with its principal place of business in New York, New York. Saraca is the parent company of GTV and is solely owned by Qiang Guo. In September 2021, Saraca agreed to settle Commission charges that it violated Sections 5(a) and 5(c) of the Securities Act in connection with the GTV Private Placement.

## FACTS

### I. Background on Guo

30. Guo is an exiled Chinese businessman who has been in the United States since in or around 2014. In 2017, Guo applied for political asylum in the United States and that application remains pending.

31. The GTV PPM, dated April 2020, describes Guo as a successful businessman and a billionaire.

32. On or about February 15, 2022, Guo filed for Chapter 11 bankruptcy protection, claiming assets valued between $50,000 and $100,000 and liabilities valued between $100 million and $500 million.

33. Following his departure from China, Guo became a vocal critic of the Chinese government and developed a large social media following among the Chinese diaspora on YouTube and Gettr.

### II. The GTV Private Placement

34. On or about April 17, 2020, Guo established GTV to own and operate a news-focused social media platform.

35. At the time of its formation, GTV was a wholly-owned subsidiary of Saraca, which has at all relevant times been beneficially owned by Guo's son, Qiang Guo.

36. Days after the creation of GTV, on April 21, 2020, Guo announced via a video

posted on his YouTube channel (the "Launch Video") the unregistered offering of between 20 million and 200 million newly-issued shares of GTV common stock at a price of $1 per share (*i.e.,* the GTV Private Placement).

37. The Launch Video, which has had over 4,000 views, described GTV as a social media platform like WeChat in China.

38. The Launch Video further claimed that GTV had the potential to "go beyond" WeChat and other successful platforms and "become a world comprehensive service platform which is decentralized serving investors and having the most advanced technologies including modern finance and modern block chain." [1]

39. The Launch Video provided Guo's mobile phone number for potential investors to use for inquiries about the offering.

40. In addition to participating in the Launch Video, Guo directed the preparation of the GTV PPM. Although others contributed to its preparation, Guo exercised authority over the GTV PPM's contents.

41. Je, who served as GTV's adviser for the GTV Private Placement, also edited the GTV PPM and other offering documents such as the "Investment Procedure Guidelines," an instructional step-by-step guide that was sent to potential investors along with the GTV PPM.

42. The GTV PPM stated that GTV's mission was to "build the most popular and safest social media and transaction platform independent of the Chinese government's censorship and monitoring, allowing the people of China and the world to realize the freedom of speech and trade."

43. According to the GTV PPM, GTV's social media platform would be "the first

[1] Certain statements attributed herein to Guo have been translated from Mandarin to English.

ever platform which will combine the power of citizen journalism and social news with state-of-the-art technology, big data, artificial intelligence, block-chain technology and real-time interactive communication" and planned to be "the only uncensored and independent bridge between China and the Western world."

44. The GTV PPM described Guo as a "billionaire" as well as GTV's "sponsor and adviser."

45. The GTV PPM stated that GTV Media planned to use the proceeds from the GTV Private Placement to "expand and strengthen the business."

46. The GTV PPM also contained the table depicted below representing the specific "contemplated" uses of investor proceeds set forth therein:

| **Description** | **Percentage of Proceeds** |
|---|---|
| Acquisition of companies to strengthen and grow GTV | Approximate 70% |
| Upgrade of GTV technology and security | Approximate 10% |
| Marketing | Approximate 8% |
| Working capital | Approximate 7% |
| Other | Approximate 5% |
| Total | 100% |

47. The GTV PPM noted that GTV's management would have "considerable discretion over the use of proceeds."

48. The GTV PPM did not disclose a plan to use any portion of the proceeds from the GTV Private Placement for the benefit of Saraca or the personal benefit of Guo or his family members.

49. The GTV PPM provided Guo's mobile phone number for potential investors to use for inquiries about the offering.

50. The GTV Private Placement was not made pursuant to an effective registration statement filed with the Commission.

51. Guo solicited the general public for the GTV Private Placement by posting videos on his publicly-accessible pages on social media platforms, such as YouTube, as well as GTV's and GNews's respective websites, www.gtv.org and www.gnews.org.

52. In addition, Guo personally disseminated information about the GTV Private Placement to hundreds of prospective investors via WhatsApp messages. These messages included links to both the Launch Video and a Google Drive folder that contained copies of the GTV PPM, Investment Procedure Guidelines, and other offering materials, none of which was password protected or contained any restriction on who could view them or any limitations on their ability to be shared.

53. Guo did not perform adequate due diligence to ensure that the persons solicited during the GTV Private Placement were accredited investors.

54. The GTV Private Placement closed on June 2, 2020 and, in total, raised approximately $452 million from more than 1,000 investors, including U.S. investors.

55. Pursuant to the GTV Private Placement's investment instructions that were set forth in the Investment Procedure Guidelines – the contents of which were known to Guo and Je – the vast majority of the offering proceeds were deposited directly into Saraca's bank accounts.

56. Three days after the close of the GTV Private Placement, on or about June 5, 2020, Saraca invested $100 million (approximately 22%) of the proceeds from the GTV Private Placement in a hedge fund ("Hedge Fund A"). Saraca made this investment on its own behalf

Case 1:23-cv-02508 Document 1 Filed 03/15/23 Page 14 of 36

and, by extension, for the benefit of Qiang Guo.

57. Hedge Fund A's investment strategy involved taking positions in various Asian currencies, particularly the Hong Kong dollar, versus certain developed market currencies through foreign currency forward and option contracts.

58. Guo and Je made the decision for Saraca to invest GTV Private Placement investor funds with Hedge Fund A and negotiated the terms of the investment.

59. Guo and Je had expressed investment interest to Hedge Fund A's portfolio manager on multiple occasions since 2018.

60. On or about May 26, 2020, Je instructed Hedge Fund A to have $100 million invested in Saraca's name and provided Hedge Fund A with the required documentation for the investment, including Saraca's "KYC" information and executed subscription agreements.

61. On June 4, 2020, Je sent an email to Hedge Fund A stating "we will wire the funds tomorrow."

62. At the time of this investment, Guo and Je knew or recklessly disregarded that Saraca's investment was made using investor funds from the GTV Private Placement and that the investment was contrary to the use of funds provisions in the GTV PPM.

63. Guo and Je also concealed Saraca's use of GTV Private Placement investor funds for its Hedge Fund A investment from GTV's board of directors and officers.

64. For example, Je attended GTV's first board meeting on July 1, 2020 and did not inform the GTV board that $100 million of the GTV Private Placement proceeds had been invested for Saraca's benefit in Hedge Fund A even though the GTV Private Placement was one of the main topics of discussion at the meeting.

65. As a result of investment losses sustained by Hedge Fund A, Saraca lost

approximately $30 million of its $100 million investment with Hedge Fund A by the time it liquidated its investment in October 2021.[2]

## III. Guo Misrepresents the Valuation of GTV and G-Fashion

66. From at least June through August 2020, Guo released additional videos on YouTube and the GTV website discussing GTV, as well as a new enterprise, G-Fashion.

67. On its website, G-Fashion purports to be "a global luxury brand, featuring bespoke collections by the world's top designers" and "serves as the fashion counterpart to G|CLUBS, and will provide exclusive benefits to G|CLUBS members."

68. On several occasions, in these videos, Guo made materially false and misleading statements concerning the valuation of GTV and G-Fashion.

69. For example, in a video publicly disseminated on June 2, 2020, Guo stated:

> Given the tremendous demand for GTV shares and the good capital position of GTV going forward, my lawyers and financial experts mutually agree that a $2 billion valuation is probably too low and that the company is probably closer to $10 billion given the tremendous demand for GTV shares.

70. As Guo knew or recklessly disregarded, he had not received advice from lawyers and financial experts supporting a valuation of close to $10 billion, and such a valuation was inaccurate.

71. Guo further asserted his Fifth Amendment right against self-incrimination in response to an investigative subpoena for testimony relating to his statements about GTV's valuation.

72. On or about June 17, 2020, Guo released another video to the general public. As

---

[2] Pursuant to a September 13, 2021 Order Instituting Cease-and-Desist Proceedings that was issued in connection with an SEC proceeding (*In the Matter of GTV Media Group, Inc. et al.* (File No. 3-02537)), Saraca transferred the remaining approximately $70 million from its Hedge Fund A investment to a Fair Fund where it will be distributed to GTV Private Placement investors.

Case 1:23-cr-00118 Document 1 Filed 03/15/23 Page 16 of 36

to the valuation of GTV, he stated:

> Just now, two or three hours ago, a comrade sold 10 thousand [GTV] shares, 10 thousand shares, and a deal has been concluded for $18 a share, $18 per share. But our investment committee was not happy and wanted to buy them all back for $20.

73. As Guo knew or recklessly disregarded, no such transaction had taken place, and GTV, which did not have an investment committee, had no plans to repurchase GTV shares from GTV Private Placement investors at $20 per share.

74. On or about August 2, 2020, Guo issued a public video claiming that "the market value of GTV stock [was] 20 billion dollars."

75. In the same video, Guo claimed that "[i]f G-Fashion goes public, it will be worth $100 billion for sure."

76. At the time he made these statements, Guo knew or recklessly disregarded that GTV was not worth close to $20 billion and that G-Fashion would not be worth $100 billion after going public.

## IV. The Convertible Loan Offering

77. On or about July 22, 2020, during the timeframe in which he was making misrepresentations about GTV's valuation, Guo announced a new securities offering by the Himalaya Farm Alliance through which investors could obtain GTV stock (*i.e.,* the Convertible Loan Offering). Guo made this announcement in a publicly available video.

78. The Himalaya Farm Alliance was a collective comprised of informal groups of Chinese expatriates, with each such group known as a "Farm." The Himalaya Farm Alliance was purportedly dedicated to advancing the Chinese pro-democracy movement.

79. Farms were located in various cities both within and outside the United States, including New York City.

80. In most cases, the Farms were associated with a corporate entity. The so-called "New York Farm" was associated with Mountains of Spices.

81. In the July 22, 2020 video announcing the Convertible Loan Offering, Guo explained that the Farms were offering convertible loans with a three-year term that, at maturity, would be convertible into one share of GTV stock for each dollar in principal and/or interest owed.

82. The Convertible Loan Offering was not made pursuant to an effective registration statement filed with the Commission.

83. From in or about August 2020 through March 2021, following Guo's false statements about GTV and its stock discussed above in Section III, the U.S.-based Farms raised at least $150 million from the general public in connection with the Convertible Loan Offering, including approximately $24.6 million raised by Mountains of Spices.

84. Neither Guo nor the Farms, including Mountains of Spices, performed any due diligence in order to determine whether the investors in the Convertible Loan Offering were accredited investors.

85. In connection with the Convertible Loan Offering, the Farms provided prospective investors with a "Loan Agreement" that represented that the investor's money would be used for a specific Farm's "general working capital purposes."

86. In fact, however, Guo misappropriated a substantial portion of Convertible Loan Offering funds raised by the U.S.-based Farms, including Mountains of Spices. Such funds were ultimately used for the benefit of Guo, Je, and members of their families.

87. Over the course of the Convertible Loan Offering, through on or about April 20, 2021, Guo directed the Farms to transfer approximately $81 million of the Convertible Loan

Offering proceeds to an Abu Dhabi bank account in the name of a Hong Kong company owned and controlled by Je ("Company 4"). The investor funds in Company 4's account were commingled with other funds.

88. Between in or about August 2020 and April 2021, Guo directed the transfer of approximately $35 million of Convertible Loan Offering investor funds, including Mountains of Spices investor funds, from Company 4's account to Company 1's, Company 2's and Company 3's bank accounts, which were under the control of Relief Defendants Mei Guo, Qiang Guo, and Ngok, respectively. Specifically, Company 1, which was controlled by Mei Guo, received approximately $18 million; Company 2, which was controlled by Qiang Guo, received approximately $11 million; and Company 3, which was controlled by Ngok, received approximately $5 million.

89. In turn, from Company 1's and Company 2's bank accounts, among other things:

a. $20 million was transferred to a bank account belonging to Qiang Guo based in Switzerland, of which approximately $330,000 was used for the purchase of a plane;

b. $1 million was transferred to bank accounts in the name of Mei Guo;

c. Approximately $2.3 million was paid towards yacht servicing costs;

d. Approximately $600,000 was paid to luxury automobile, motorcycle and power sport dealerships;

e. Approximately $281,000 was paid to an aircraft manufacturer; and

f. Approximately $950,000 was paid to a private flight crew company.

90. Ngok, Mei Guo, and Qiang Guo did not have legitimate claims to the Convertible Loan Offering investor funds they received.

91. Company 4 separately transferred an additional approximately $66.3 million, comprised largely of Convertible Loan Offering investor funds, to other accounts that were under the control of Je and Rong.

92. These transfers included, among others, $7 million to Je's personal bank accounts and $3 million to Rong's personal bank account.

93. Neither Je nor Rong had a legitimate claim to receive these Convertible Loan Offering investor funds.

**V. The G-Clubs Offering**

94. On or about June 20, 2020, after touting falsely inflated valuations for GTV and G-Fashion, Guo announced a new concierge service called G-Clubs and the sale of G-Clubs memberships (*i.e.*, the G-Clubs Offering). Guo made the announcement via a video posted on the GTV website.

95. Guo represented in the video that purchasing a G-Clubs membership would entitle the purchaser to shares of GTV or G-Fashion stock.

96. In at least four subsequent videos, which appeared on publicly accessible pages on GTV's website and on YouTube between approximately July 22, 2020 and August 12, 2021, Guo repeated his representation that purchasers of G-Clubs memberships would receive shares of GTV stock and/or G-Fashion stock.

97. G-Clubs launched in October 2020 and offered five tiers of memberships that ranged in cost from $10,000 to $50,000. The membership benefits purportedly included "exclusive early access to [sic] latest fashion collections, including special member pricing on purchases, extended video blogging time and early access to select music."

98. Between in or about October 2020 and December 2021, G Club Operations sold at least approximately $255 million in G-Clubs memberships to investors throughout the world,

including the United States.

99. Some investors purchased multiple G-Clubs memberships or wired funds in excess of the cost of the highest G-Clubs membership tier of $50,000 in order to acquire a greater number of GTV or G-Fashion shares.

100. The sale of GTV and G-Fashion stock through the G-Clubs Offering was not pursuant to an effective registration statement filed with the Commission.

101. Guo solicited investors for the G-Clubs Offering through his numerous publicly-accessible videos on GTV's website and YouTube.

102. Individuals who were interested in purchasing a G-Clubs membership were directed to fill out an application on G-Clubs' website. The application lacked financial questions that would make it possible to evaluate whether the individual qualified as an accredited investor.

103. G Club Operations reviewed and processed the membership applications, and G-Clubs Offering investors were directed to send their investment funds to G Club Operations' bank accounts.

104. Guo knowingly or recklessly misappropriated at least approximately $51 million of $255 million in investor funds that were raised from the G-Clubs Offering as follows:

a. In June 2021, $3.5 million of the G-Clubs investor funds were used to purchase a Ferrari race car from a Beverly Hills-based Ferrari dealership for Qiang Guo;

b. In December 2021, $26.5 million of the G-Clubs Offering investor funds were used towards the purchase of a 50,000 square foot mansion in Mahwah, New Jersey intended for the use and benefit of Guo, Ngok, Mei Guo, and Qiang

Guo;

c. Between December 2021 and March 2022, an additional $13 million of G-Clubs Offering investor funds was used to pay for renovations to Guo's Mahwah, New Jersey mansion, as well as various furniture and decorative expenditures, such as $978,000 for Chinese and Persian rugs, a $62,000 television, a $59,000 watch storage box, a $53,000 fireplace log cradle holder, and a $35,000 mattress; and

d. Between in or about August 2021 and November 2021, G-Clubs Offering investor funds were used to pay for various luxury items and services for Guo and his family, including $2.7 million for a yacht and yacht-related expenses, $2.9 million for a Bugatti automobile, $832,000 for a Lamborghini, and approximately $1.5 million for other vehicles and racing-related expenses.

105. Guo, Ngok, Mei Guo, and Qiang Guo did not have legitimate claims to receive these G-Clubs Offering investor funds.

106. To date, purchasers of G-Clubs memberships have not received GTV or G-Fashion stock.

## VI. The H-Coin Offering

107. In or around April 2021, the so-called Himalaya Exchange announced an upcoming initial offering of H-Coin, a new crypto asset security, and posted a "White Paper" for H-Coin on its website.[3]

108. The White Paper stated that the H-Coin Offering would involve the sale of 1

---

[3] The April 2021 announcement also referenced the sale of "HCN Credits," which the Himalaya Exchange website explained correspond to an investor's holding in H-Coin. For purposes of this Complaint, all references to "H-Coin" include HCN Credits.

billion H-Coins at a price of $.10 per coin and contained a graph depicting the potential for high investment returns.

109. On or about September 24, 2021, the CEO of the Himalaya Exchange described H-Coin as an "investment coin" in a videotaped interview posted on GTV's website.

110. On or around October 20, 2021, in a publicly-available online video, Guo discussed the upcoming launch of H-Coin and stated that he had "designed" H-Coins. In subsequent publicly-available videos, including a video posted on Guo's GNews website on or about June 2, 2022, Guo touted the liquidity of H-Coin, which was purportedly traded on the "Himalaya Exchange."

111. Additionally, in the October 20, 2021 video, Guo stated, in substance, that H-Coin "has 20% gold" and that "[n]o matter how much [H-Coin] raises, 20% will turn into gold."

112. Guo also stated in the October 20, 2021 video that H-Coin would make money and that he would compensate investors for "100%" of investment losses attributable to H-Coin.

113. On or around November 1, 2021, Guo announced via a publicly-available online video the official launch of H-Coin, along with a purported companion stablecoin, H-Dollar, through the so-called Himalaya Exchange. Guo explained that H-Coin could be purchased using H-Dollar and that H-Dollar would be linked to the U.S. Dollar on a 1-to-1 basis.

114. Guo told prospective investors in the November 1, 2021 announcement that the price of H-Coin "will be far beyond your imagination."

115. On or around the same date, Guo released a music video entitled "Hcoin to the Moon" on YouTube and Vevo. GNews' website also posted a link to the music video and referred to it as "Mr. Guo's new song."

116. The phrase "to the moon" is used in the crypto asset space to signal expectations

that a crypto asset will dramatically increase in value.

117. The "Hcoin to the Moon" video prominently featured Guo and provided the website address for the so-called Himalaya Exchange, through which investors could purchase H-Coin.

118. The "Hcoin to the Moon" video also contained a caption stating in English, "20% gold reserve attaches to the value."

119. Similarly, on or about November 1, 2021, the GNews website, which is operated by Guo and Saraca, reported that H-Coin would be "pegged to gold" through gold reserves "equal to 20% of the market value of the H-Coin."

120. Guo, who has been seeking asylum in the U.S. since 2017, made the statements regarding H-Coin discussed above while residing in the United States.

121. Guo also knew, or recklessly disregarded, the false and misleading nature of the his statements relating to (i) the supposed gold backing of 20% of H-Coin and (ii) his proffered intent to repay H-Coin investors for their losses.

122. Based on the H-Coin Offering's initial issuance (1 billion H-Coins) and subsequent fluctuations in its purported trading value (from $.10 to $46 per coin), as much as $9.2 billion in gold reserves would have been required to cover Guo's promise of securing 20% of H-Coin's value through gold reserves, which neither Guo nor the so-called Himalaya Exchange possessed at any point.

123. Guo also lacked the financial resources to cover investor losses from the sale of 1 billion H-Coin.

124. Guo filed for personal bankruptcy, where he declared assets of $100,000 or less, less than four months after making this promise to investors.

125. Within days of the H-Coin and H-Dollar launch, on or around November 12, 2021, various media articles reported that $100 million had already been raised from the initial sale of H-Coin and that its price has increased from its initial offering price of $.10 to $27.

126. On or around the same date, the CEO of the Himalaya Exchange was quoted in certain articles as saying that one billion H-Coin had already been sold, equating to a market value of $27 billion, and that the platform had opened more than 20,000 accounts for H-Coin trading purposes.

127. As of in or around October 2022, thousands of investors had purchased at least $500 million worth of H-Coins or H-Dollars, including at least approximately $373 million purchased on or after November 1, 2021. These funds were pooled in U.S. bank accounts belonging to the so-called Himalaya Exchange and purportedly used to pay for salaries and consulting firms.

128. Some H-Coin investors have attempted unsuccessfully to liquidate their purported H-Coin holdings.

**VII. The Subject Offerings Constituted the Offer and Sale of "Securities"**

129. As with the GTV Private Placement, which involved the offer and sale of GTV common stock, the other Subject Offerings constituted the offer and sale of "securities" under the federal securities laws.

130. The Convertible Loan Offering constituted offers and sales of "securities" under the federal securities laws because of the ability of investors to convert their loans into GTV common stock.

131. In addition, the convertible loans that were offered and sold through the Convertible Loan Offering are notes that are securities based on *Reves v. Ernst & Young*, 494 U.S. 56, 64-65 (1990). Specifically, investors purchased the notes expecting to earn profits in

Case 1:23-cv-02709 Document 1 Filed 03/15/23 Page 25 of 36

the form of interest based on the performance of the Farms and GTV and to invest in GTV, while the seller's stated purpose was to raise money for "general working capital purposes," *i.e.*, for general use of a business enterprise. The convertible loans were offered through a general solicitation to a broad segment of the public, and the public would reasonably expect that these loans convertible to GTV common stock were investments. There also is no other regulatory scheme that would render the application of the federal securities laws unnecessary. Thus, under *Reves*, the convertible loans were notes and offered and sold as securities.

132. Moreover, the convertible loans were also offered and sold as investment contracts and, therefore, are securities under Section 2(a)(1) of the Securities Act, pursuant to *SEC v. W.J. Howey Co.*, 328 U.S. 298-99 (1946). The Convertible Loan Offering involved an investment of money that was pooled as part of a common enterprise in the bank accounts controlled by Guo, and investors would share in the success of the enterprise through the returns on the loan that were promised and the ability to convert the loan to GTV stock. Convertible Loan Offering investors, who were entirely passive, also had a reasonable expectation of profits that would be derived from the entrepreneurial and managerial efforts of GTV based on the glowing statements made by Guo as to GTV's valuation and secondary market trading activity.

133. The G-Clubs memberships constituted offers and sales of GTV and G-Fashion common stock and, therefore, are securities under the federal securities laws.

134. The G-Clubs memberships are securities under Section 2(a)(1) of the Securities Act because, pursuant to *Howey*, they were offered and sold as investment contracts. Guo represented to prospective G-Clubs members that they would receive GTV and/or G-Fashion stock in exchange for their investments. The G-Clubs memberships involved an investment of money that was pooled as part of a common enterprise in the bank accounts controlled by

G-Clubs. G-Clubs Offering investors, who were entirely passive, also viewed the G-Clubs Offering as an opportunity to profit from the entrepreneurial and managerial efforts of GTV and G-Fashion based on the glowing statements made by Guo as to GTV's and G-Fashion's valuation and secondary market trading activity of GTV stock. Specifically, when touting the ability of G-Clubs Offering investors to obtain GTV and G-Fashion stock, Guo stated GTV was now worth up to 20 times as much per share and routinely touted the prospects of GTV's and G-Fashion's online platform.

135. Because G-Clubs Offering investors were told that G-Clubs memberships were a way to obtain GTV and G-Fashion stock, G-Clubs Offering investors' return on investment depended on the success or failure of (1) GTV's management's ability to develop its social media platform and/or (2) G-Fashion's management's development of a "Multi-lingual fashion e-commerce platform" and the desirability of its "high end collection by the world's top designers" and "featured furniture line (work in progress)" that were to be sold on the platform. Therefore, G-Clubs Offering investors, some of whom purchased multiple memberships and/or paid in excess of the $50,000 highest tier membership, had a reasonable expectation that they would obtain future profits if GTV and/or G-Fashion were successful in its entrepreneurial and managerial efforts to develop its businesses.

136. The H-Coins that were offered and sold are investment contracts, and therefore are securities, under Section 2(a)(1) of the Securities Act, based on the Supreme Court's framework in *Howey*. H-Coin investors paid U.S. dollars or H-Dollars to receive H-Coins through wire transfers and checks to U.S. bank accounts belonging to the so-called Himalaya Exchange or through transfers on its online platform. H-Coin investors shared equally in price increases or decreases of H-Coin. H-Coin investors, who were passive, also had a reasonable

Case 1:23-cv-02200 Document 1 Filed 03/15/23 Page 27 of 36

expectation of profits that would be derived from the entrepreneurial and managerial efforts of the Himalaya Exchange, including its ability to develop an online platform through which investors could transact using H-Coins.

**FIRST CLAIM FOR RELIEF**
**Violation of Section 17(a) of the Securities Act**
**(Guo)**

137. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 136.

138. By virtue of the foregoing, in connection with each of the GTV Private Placement, Convertible Loan Offering, G-Clubs Offering and H-Coin Offering, Defendant Guo, in the offer and sale of securities, by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, (i) employed devices, schemes and artifices to defraud; (ii) obtained money and property by means of untrue statements of material facts and omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaged in transactions, practices, and courses of business which operated or would operate as a fraud or deceit upon the purchasers of such securities.

139. By reason of the foregoing, Defendant Guo, directly or indirectly, violated and, unless enjoined, will again violate Securities Act Sections 17(a) [15 U.S.C. §§ 77q(a)].

**SECOND CLAIM FOR RELIEF**
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder**
**(Guo)**

140. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 136.

141. By virtue of the foregoing, in connection with each of the GTV Private Placement, Convertible Loan Offering, G-Clubs Offering and H-Coin Offering, Defendant Guo,

Case 1:23-cv-02200 Document 1 Filed 03/15/23 Page 28 of 36

directly and indirectly, in connection with the purchase and sale of securities and by the use of means and instrumentalities of interstate commerce, or the mails, knowingly or recklessly (i) employed devices, schemes or artifices to defraud; (ii) made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (iii) engaged in acts, practices and courses of business which operated or would have operated as a fraud and deceit upon purchasers of securities and upon other persons.

142. By reason of the foregoing, Defendant Guo, directly or indirectly, have violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rules 10b-5 thereunder [17 C.F.R. §§ 240.10b-5].

**THIRD CLAIM FOR RELIEF**
**Violations of Sections 17(a)(1) and 17(a)(3) of the Securities Act**
**(Je)**

143. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 76 and paragraphs 86 through 93.

144. As described above, in connection with the GTV Private Placement, Defendant Je, in the offer and sale of securities, by use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or directly, (i) employed devices, schemes and artifices to defraud; and (ii) engaged in transactions, practices, and courses of business which operated or would operate as a fraud or deceit upon the purchasers of such securities.

145. By reason of the foregoing, Defendant Je, directly or indirectly, violated and, unless enjoined, will again violate Securities Act Sections 17(a)(1) and (3) [15 U.S.C. §§ 77q(a)(1) and (3)].

**FOURTH CLAIM FOR RELIEF**
**Violations of Section 10(b) of the Exchange Act and**
**Rules 10b-5(a) and 10b-5(c) thereunder**
**(Je)**

146. The Commission re-alleges and incorporates by reference here the allegation in paragraphs 1 through 76 and paragraphs 86 through 93.

147. As described above, in connection with the GTV Private Placement, Defendant Je, directly and indirectly, in connection with the purchase and sale of securities and by the use of means and instrumentalities of interstate commerce, or the mails, knowingly or recklessly (i) employed devices, schemes or artifices to defraud; and (iii) engaged in acts, practices and courses of business which operated or would have operated as a fraud and deceit upon purchasers of securities and upon other persons.

148. By reason of the foregoing, Defendant Je, directly or indirectly, have violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)].

**FIFTH CLAIM FOR RELIEF**
**Aiding and Abetting Violations of Section 17(a)(2) of the Securities Act**
**(Je)**

149. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 76 and paragraphs 86 through 93.

150. As described above, in connection with the GTV Private Placement, Defendant Guo, directly or indirectly, in the offer or sale of securities by the use of the means or instruments of transportation or communication in interstate commerce or the mails, knowingly, recklessly, or negligently obtained money or property by means of one or more untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

151. By engaging in the conduct described, Defendant Guo violated Securities Act Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

152. Defendant Je intentionally, knowingly or recklessly provided substantial assistance to Defendant Guo.

153. By reason of the foregoing, Defendant Je aided and abetted the violations of Section 17(a)(2) of the Securities Act by Defendant Guo in connection with the GTV Private Placement and, pursuant to Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)], Defendant Je is liable to the same extent as Defendant Guo for his violations of Section 17(a)(2) of the Securities Act.

**SIXTH CLAIM FOR RELIEF**
**Aiding and Abetting Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder**
**(Je)**

154. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 76 and paragraphs 86 through 93.

155. As described above, Defendant Guo, directly or indirectly, in connection with the purchase and sale of securities for the GTV Private Placement, by the use of the means and instrumentalities of interstate commerce and by the use of the mails, intentionally, knowingly, or recklessly, made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

156. By engaging in the conduct described, Defendant Guo violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. 240.10b-5(b)].

157. Defendant Je intentionally, knowingly, or recklessly provided substantial assistance to Defendant Guo.

158. By reason of the foregoing, Defendant Je aided and abetted the violations of Section 10(b) [15 U.S.C. § 78j(b)] of the Exchange Act and Rule 10b-5(b) [17 C.F.R. 240.10b-5(b)] thereunder by Defendant Guo and, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Defendant Je is liable to the same extent as Defendant Guo for his violations of Sections 10(b) of the Exchange Act and Rule 10b-5(b) thereunder.

**SEVENTH CLAIM FOR RELIEF**
**Violations of Sections 5(a) and (c) of the Securities Act**
**(Guo)**

159. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 76 and paragraphs 129 through 136.

160. In connection with the GTV Private Placement, the Convertible Loan Offering, and the G-Clubs Offering, Defendant Guo, directly or indirectly, (i) made use of means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement was in effect; (ii) for the purpose of sale or for delivery after sale, carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, securities as to which no registration statement was in effect; or (iii) made use of means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy, through the use or medium of a prospectus or otherwise, securities as to which no registration statement had been filed.

161. By reason of the foregoing, Guo violated and, unless enjoined, will again violate, Securities Act Sections 5(a) and 5(c) [15 U.S.C. §§ 77e(a) and 77e(c)].

**EIGHTH CLAIM FOR RELIEF**
**Violations of Sections 5(a) and (c) of the Securities Act**
**(Mountains of Spices)**

162. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 33, paragraphs 66 through 93, and paragraphs 129 through 132.

163. In connection with the Convertible Loan Offering, Defendant Mountains of Spices directly or indirectly, singly or in concert, (i) made use of means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement was in effect; (ii) for the purpose of sale or for delivery after sale, carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, securities as to which no registration statement was in effect; or (iii) made use of means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy, through the use or medium of a prospectus or otherwise, securities as to which no registration statement had been filed.

164. By reason of the foregoing, Defendant Mountains of Spices violated and, unless enjoined, will again violate, Securities Act Sections 5(a) and 5(c) [15 U.S.C. §§ 77e(a) and 77e(c)].

**NINTH CLAIM FOR RELIEF**
**Violations of Sections 5(a) and (c) of the Securities Act**
**(G Club Operations)**

165. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 33, paragraphs 66-76, paragraphs 94 through 106, paragraph 129, and paragraphs 133 through 135.

166. In connection with the G-Clubs Offering, Defendant G Club Operations, directly

or indirectly, singly or in concert, (i) made use of means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement was in effect; (ii) for the purpose of sale or for delivery after sale, carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, securities as to which no registration statement was in effect; or (iii) made use of means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy, through the use or medium of a prospectus or otherwise, securities as to which no registration statement had been filed.

167. By reason of the foregoing, Defendant G Club Operations violated and, unless enjoined, will again violate, Securities Act Sections 5(a) and 5(c) [15 U.S.C. §§ 77e(a) and 77e(c)].

**TENTH CLAIM FOR RELIEF**
**Unjust Enrichment**
**(All Relief Defendants)**

168. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 106 and paragraphs 129 through 135.

169. Between February 2021 and October 2021, Relief Defendant Mei Guo received at least $19 million in Convertible Loan Offering investor funds. Mei Guo had no legitimate claim to the funds she received. Mei Guo obtained the funds under circumstances in which it is not just, equitable, or conscionable for her to retain the funds, and therefore was unjustly enriched.

170. From January 2021 through June 2021, Relief Defendant Qiang Guo received at least $31 million of proceeds from the Convertible Loan Offering and at least $3.5 million in proceeds from the G-Clubs Offering. Qiang Guo had no legitimate claim to the funds he

Case 1:23-cv-02508 Document 1 Filed 03/15/23 Page 34 of 36

received. Qiang Guo obtained the funds under circumstances in which it is not just, equitable, or conscionable for her to retain the funds, and therefore was unjustly enriched.

171. In October 2020, Relief Defendant Ngok received $5 million of proceeds from the Convertible Loan Offering. Ngok had no legitimate claim to the funds she received. Ngok obtained the funds under circumstances in which it is not just, equitable, or conscionable for her to retain the funds, and therefore was unjustly enriched.

172. Between January 2021 and February 2021, Relief Defendant Rong received $3 million in Convertible Loan Offering proceeds in her personal bank account. Rong had no legitimate claim to the money she received. Rong obtained the funds under circumstances in which it is not just, equitable, or conscionable for her to retain the funds, and therefore was unjustly enriched.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

### I.

Permanently enjoining Guo and his agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Sections 5(a) and (c) and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)] and Sections 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

### II.

Permanently enjoining Je and his agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly,

Sections 17(a) of the Securities Act [15 U.S.C. §§ 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5];

**III.**

Permanently enjoining Mountains of Spices and G Club Operations and their agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)];

**IV.**

Ordering Defendants to disgorge all ill-gotten gains they received directly or indirectly, with pre-judgment interest thereon, as a result of the conduct alleged in this Complaint pursuant to Sections 21(d)(3), 21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), (d)(5) and (d)(7)];

**V.**

Ordering Defendants to pay civil monetary penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

**VI.**

Imposing a conduct-based injunction pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)], prohibiting Guo from participating in the offer or sale of securities, including crypto asset securities, except for transactions in his own personal accounts;

**VII.**

Permanently prohibiting Guo and Je from serving as an officer or director of any company that has a class of securities registered under Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports under Section 15(d) of the Exchange Act [15

U.S.C. § 78o(d)], pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)];

**VIII.**

Ordering Relief Defendants Mei Guo, Qiang Guo, Ngok, and Rong, to pay, with prejudgment interest, all ill-gotten gains by which they were was unjustly enriched, under Sections 21(d)(3), 21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), 78u(d)(5) and 78u(d)(7)]; and

**IX.**

Granting any other and further relief this Court may deem just and proper.

**JURY DEMAND**

The Commission demands a trial by jury.

Dated: New York, New York
March 15, 2023

/s/ Antonia M. Apps

**ANTONIA M. APPS**
**REGIONAL DIRECTOR**
Thomas P. Smith, Jr.
Sandeep Satwalekar
Daniel Loss
William T. Conway III
Amanda Rios
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004
(212) 336-5571
lossd@sec.gov